IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ENTERPRISE RENT-A-CAR WAGE & HOUR EMPLOYMENT PRACTICES LITIGATION | ) ) ) | MDL No. 2056 Misc. No. 09-210 |
| | ) ) | Civil No. 07-1687 |
| NICKOLAS HICKTON, *et. al.*, | ) ) | Civil No. 09-0815 Civil No. 09-0816 |
| Plaintiffs, | ) ) | Civil No. 09-0824 Civil No. 09-0832 |
| v. | ) ) | Civil No. 09-0833 Civil No. 09-1188 |
| ENTERPRISE RENT-A-CAR COMPANY, *et. al.*, | ) ) | Civil No. 09-1321 Civil No. 10-1003 |
| | ) | Civil No. 10-1189 |
| Defendants. | ) ) | Civil No. 10-1456 Civil No. 11-0071 |
| | ) ) | Civil No. 11-0333 Civil No. 11-1024 |
| THIS DOCUMENT RELATES TO: | ) ) | Civil No. 12-0659 |
| | ) | |
| Graham v. Enterprise Leasing Company, Civil No. 09-0833 | ) ) | |
| | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

*I. Introduction*

This opinion concerns sample plaintiff Melinda McQuaig ("McQuaig"). Pending before

the court are eight motions for summary judgment filed by the relevant operating subsidiaries

(collectively "defendants") of defendant Enterprise Rent-a-Car Company ("ERAC") against

sample plaintiffs[1] selected from the cases consolidated in this multidistrict litigation ("MDL").

---
[1] The following individuals were selected as sample plaintiffs: Robert Bajkowski; Joseph Biski; Wayman F. Graham II; Kevin C. Hagler; Nils Hagstrom; Nickolas C. Hickton; Melinda McQuaig ("McQuaig") (formerly, Melinda Herrin); and Brandon Singleton.

The consolidated cases involve allegations that defendants violated the compensation requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay plaintiffs overtime compensation. Plaintiffs are or were assistant managers employed by one of the defendants.

This memorandum opinion addresses the motion for summary judgment filed by defendant Enterprise Leasing Company of Florida, LLC ("ERAC-Florida"), against McQuaig. (ECF No. 245.)[2] ERAC-Florida argues that McQuaig qualified for the executive, administrative and combination exemptions from the compensation requirements of the FLSA. McQuaig responds that summary judgment would be improper at this stage because there are genuine disputes of material facts concerning whether the "narrowly construed" FLSA exemptions are applicable. ERAC-Florida argues that no dispute is genuine because plaintiffs submitted declarations that violated the "sham affidavit" doctrine in an attempt to fabricate disputes of fact. In response, McQuaig argues that the sham affidavit doctrine is not applicable and that certain of the declarations filed in support of the motion for summary judgment were submitted in violation of Federal Rule of Civil Procedure 26. Each of those arguments will be addressed.

After an extensive review of the parties' submissions, the hearing transcript of the oral argument and the applicable legal principles, the court concludes that in light of the summary judgment standard of review and the narrowness of the FLSA exemptions, ERAC-Florida failed to satisfy its burden of proving as a matter of law that McQuaig was properly classified as exempt. The motion for summary judgment filed by ERAC-Florida against sample plaintiff McQuaig will be DENIED.

---

[2] Unless otherwise indicated, all references in this opinion to CM/ECF electronic document filing numbers are made with reference to the MDL master docket, filed under the miscellaneous case number 2:09-mc-210.

## II. Factual Background

ERAC-Florida hired McQuaig on June 20, 2005. (McQuaig Dep. (ECF No. 277- 1) at 5). McQuaig worked at ERAC-Florida's branch 4365 in Waycross, Georgia (the "Waycross branch"). (Id.) McQuaig's claims against ERAC-Florida concern the period from May 14, 2006 until November 27, 2006, during which time McQuaig was an assistant manager at the Waycross branch. (Id.)

The Waycross branch is a small, rural rental facility located fifty miles from the nearest ERAC-Florida branch in Kingsland, Georgia. (McQuaig Joint Concise Statement of Material Facts ("McQuaig JCS") (ECF No. 404) ¶¶ 3-4.) ERAC-Florida's corporate headquarters is in Jacksonville, Florida, which is more than seventy-five miles from the Waycross branch. (Decl James M. Brown ("Brown Decl.") (ECF No. 277- 3) ¶ 5.) The majority of the Waycross branch's business involved rentals to insured motorists under their insurance policies. (McQuaig JCS (ECF No. 404) ¶ 6.) These rentals were often made while vehicles were being repaired. (Id.)

When McQuaig accepted employment at ERAC-Florida on June 20, 2005, her initial job title was "management trainee." (McQuaig Dep. (ECF No. 277-1) at 5.) As a management trainee, McQuaig's "main role was to rent vehicles." (Id. at 9.) To that end, McQuaig "wrote tickets, washed cars, made reservations, picked up customers, [and] delivered cars" during her time as a management trainee. (Id.) She would occasionally transport cars to and from Jacksonville, Florida. (Id.) As a management trainee, she participated in "call-backs," which involved contacting rental customers to ensure the branch's vehicles were properly paid for and

returned.  (McQuaig JCS (ECF No. 404) ¶ 8.)  McQuaig testified that "[e]ven as a management

trainee, [she] assisted with the accounts receivables [*sic*] . . . [and] we all helped in the duties of

the office."  (McQuaig Dep. (ECF No. 277-1) at 9.)  She received training as a management

trainee in customer service and in ERAC-Florida's sales procedures and techniques.  (<u>Id.</u>)

McQuaig was promoted to "management assistant" on April 23, 2006.  (<u>Id.</u> ¶ 12.)  Prior

to being promoted, McQuaig was required to pass the management qualification interview (the

"MQI"). (McQuaig Dep. (ECF No. 277-1) at 13.)   The MQI was a four-hour interview intended

to assess the interviewee's knowledge of the car rental business.  (<u>Id.</u>)  To be eligible for the

management assistant promotion, McQuaig was also required to participate in sales training, and

her performance ratings as a management trainee had to meet minimum benchmarks.  (<u>Id.</u>)

McQuaig was promoted to "assistant manager" on May 14, 2006.  (<u>Id.</u> at 5.)  According

to McQuaig, her promotion to assistant manager produced only two changes in her actual

responsibilities at the Waycross branch.  (<u>Id.</u> at 15, 60.)  The first change is that McQuaig was

required to review the Waycross branch's employees' time worked each week in order to verify

they had actually worked the hours submitted to the payroll system.  (<u>Id.</u>)  According to

McQuaig, it was "just a matter of clicking a button."  (<u>Id.</u>)  She testified that after her promotion,

"that's the only [new task] that I did on my own without having to call and ask somebody."  (<u>Id.</u>

at 60.)  The second change was that she was required to attend "assistant branch manager

meetings," which provided continuing training in sales and management.  (<u>Id.</u> at 15-17.)  One of

the training courses McQuaig attended was about "leadership and performance reviews."

(McQuaig Dep. (ECF No. 277-1) at 17.)

During McQuaig's tenure as assistant manager, the Waycross branch was also staffed by

some combination of an area manager, a branch manager, one management trainee or

management assistant, and at least two part-time "car preps." The area manager was not based at the Waycross branch and did not have an office there, but was involved in overseeing operations there. (Id. at 21, 41, 63.) Car preps were limited to working thirty hours per week. (Id. at 15.) Management trainees, who were classified as nonexempt (and paid overtime) often worked more than forty hours per week. (Id.) ERAC-Florida endeavored, however, to send them home before paying overtime, whenever possible. (Id.) McQuaig testified that the hours she worked as an assistant manager were similar to the hours she worked as a management trainee or management assistant (which is also classified as a nonexempt position). (Id. at 58.) In all three positions, she regularly worked more than fifty hours per week: "it was 55, 60, 70, sometimes 80 hours a week." (Id.; McQuaig Decl. (ECF No. 325, Ex. C) ¶ 3.) Upon her promotion to assistant manager she stopped earning overtime. (McQuaig Dep. (ECF No. 277-1) at 14-15.) Instead, she was paid a salary plus a commission based upon the Waycross branch's profits. (Id.)

McQuaig testified that she made more money as a management assistant and management trainee than she did as an assistant manager. (Id. at 55.) Her compensation as an assistant manager included a salary of $1,077 per bi-weekly pay period and commissions of 5.25% of the profits of her branch. (McQuaig JCS (ECF No. 404) ¶ 46.) These payments were equivalent to a base annual salary of $28,000. (Brown Decl. (ECF No. 277-3) at ¶ 14.) According to James Brown ("Brown"), who is ERAC-Florida's Group Human Resources Manager for Northeast Florida, ERAC-Florida estimated that McQuaig's total annual compensation would be $37,000, but that the Waycross branch performed poorly during McQuaig's tenure, so her total compensation missed that target. (Id.) Brown did not quantify the deficit. The base salary for management trainees in the Waycross branch during McQuaig's time as an assistant manager was $850 per bi-weekly pay period, plus overtime. (Id. ¶ 15.) The

base salary for management assistants during the relevant time period at the Waycross branch was $925 per bi-weekly pay period, plus overtime. (Id.) Assuming a management trainee and management assistant worked fifty hours per week during the relevant time period, a management trainee earned $30,387 annually and a management assistant earned $33,068 annually, according to Brown.[3] (Id.)

As an assistant manager, McQuaig did delegate work at times to subordinate employees,[4] but she testified that most employees knew their responsibilities without her input—for example, when a car returned from a rental, the car preps knew to clean it without her directing them to do so. (McQuaig Dep. (ECF No. 277-1) at 19.) McQuaig testified that it was a "team effort" and that all employees were encouraged to take accountability for the Waycross branch's success. (Id.) All employees, including nonexempt management trainees and management assistants, corrected each other's mistakes and made recommendations to each other. (Id. at 20.) Based upon her testimony, it appears McQuaig did have some greater degree of authority actually to *direct* the actions of other employees at her branch, as opposed to making suggestions or recommendations. (Id.) She consistently testified, however, that very little direction was needed because the branch's employees were trained in their responsibilities outside the branch, and knew their roles. (Id. at 19-20.) When direction was necessary, the branch manager was responsible for making most decisions. (Id. at 36.) McQuaig testified that "as far as who does what, the branch manager decides that." (Id.) If the branch manager was out of the office, McQuaig had greater responsibility to supervise and to delegate minor tasks to the branch's

---

[3] The court notes that by its calculations, these amounts should be $30,388 and $33,069 (bi-weekly salary multiplied by 26 and then multiplied by 11/8 to account for overtime payment), but that Brown apparently rounded down.
[4] McQuaig testified at her deposition that although the branch's employees (other than the branch manager) were "coworkers, . . . they're people that work under" her. (McQuaig Dep. (ECF No. 277-1) at 42.)

employees.  (Id. at 42, 63.)  McQuaig testified that she generally worked the same hours as her branch manager.  (Id. at 64.)

With respect to directing the work of the Waycross branch's employees, McQuaig had limited responsibilities.  The branch manager set the work schedule for all employees.  (Id. at 29-30, 38.)  McQuaig did not make recommendations regarding the schedule, but might remind the branch manager if a particular employee had a meeting at a certain time.  (Id.)  If the branch manager was out of the office, it was McQuaig's responsibility to make sure the employees took their lunch breaks and left on time.  (Id. at 38.)

Most employee training at ERAC-Florida was conducted outside the Waycross branch, according to McQuaig.  (Id. at 20.)  She attempted to motivate employees by praising their good work.  (Id. at 36.)  All employees were encouraged to assist each other in improving their performance and sales techniques, and they would occasionally role-play sales situations and talk about how to handle them.  (Id. at 36, 39.)  McQuaig's participation in the role-playing did not change when she was promoted to assistant manager.  (Id. at 39.)   McQuaig would suggest other employees ask particular questions on the phone that might help them become better at gaining corporate rental accounts.  (Id. at 21.)

According to McQuaig's testimony, she was not involved in disciplining employees.  She never handed out any "write-ups."  (Id. at 41.)  She received a write-up for repeated tardiness and her area manager came to the branch to present the write-up.  (Id.)  McQuaig wanted to discipline an employee on one occasion because he would regularly argue with her in front of customers.  (Id. at 61.)  She asked her branch manager "to write him up," and the branch manager responded that he would talk to the employee.  (Id.)  The employee did not receive a write-up.  (Id. at 61-62.)

Brown testified assistant managers at ERAC-Florida are expected to play a role in hiring, disciplining, training, and evaluating branch employees. (Brown Decl. (ECF No. 277-3) ¶ 16.) Brown explained that the ERAC-Florida human resources department places substantial weight on the opinions of assistant managers, who they believe are often more actively involved in and aware of the performance of subordinate employees than branch managers. (Id. ¶¶ 17-18.) McQuaig testified that she played no role in the hiring or firing of employees at the Waycross branch, and gave no input on hiring or firing of personnel. (McQuaig Dep. (ECF No. 277-1) at 33, 60-61.) She testified that she did not recommend candidates for jobs. (Id. at 35.) She testified that she had no role in decisions regarding promotions or transfers, and at least one person was eligible for promotion during McQuaig's tenure. (Id. at 37.) If the Waycross branch was understaffed, either the branch manager or the area manager was responsible for coordinating with another branch to obtain additional staffing. (Id. at 29.)

Although McQuaig never wrote any performance reviews during her six months as an assistant manager, she did attend a training session for assistant managers on performance reviews, as mentioned above. (Id. at 17-18.) She testified that "[her] branch manager wrote the employee reviews." (Id. at 18.) She believed one performance review was conducted while she was assistant manager, and she was not involved in conducting the review or asked for input with respect to the review. (Id. at 37-38.) She remembered her branch manager and area manager asking her informally about the performance of other employees in the Waycross branch. (Id. at 30.) Brown's declaration explains that McQuaig's lack of participation in employee reviews was odd, and was explained by the shortness of her tenure at ERAC-Florida. (Brown Decl. (ECF No. 277-3) ¶ 19.) In his declaration, Brown claims that no employees were reviewed at the Waycross branch during the time when McQuaig was an assistant manager. (Id.)

According to McQuaig's testimony, her responsibilities in managing other employees increased when the branch manager was not present. For example, when a customer asked to speak to a manager, that customer would be referred to the branch manager, unless he was out of the branch; in which case, she would speak to the customer. (McQuaig Dep. (ECF No. 277-1) at 23.) If the branch manager was not in the office, McQuaig might ask a car prep to pick up a car at a dealership, which is an instruction she would not give if the branch manager were present. (Id. at 28.) When the branch manager was not present, it was McQuaig's responsibility to ensure that employees took their lunch breaks and clocked out at their scheduled times. (Id. at 38.)

According to McQuaig, her day-to-day activities did not change significantly when she was promoted to assistant manager. If the branch was going to have a busy day, the branch manager might coordinate a meeting of employees in the morning, but McQuaig testified she never led those meetings. (Id. at 29.) She estimated that sixty percent of her time as assistant manager was spent "renting vehicles and . . . washing cars and making reservations." (Id. at 48.) She testified that she washed three to five cars daily as an assistant manager. (Id. at 30.) To wash a single car required between twenty and thirty minutes. (Id. at 31.) McQuaig estimated that she "ran the counter" at the Waycross branch sixty percent to seventy percent of the time. (Id. at 26.) "To run the counter" means to "sit up there and answer the phone and write tickets. . . . [T]hey're sitting at our computers, you know, answering, making reservations, you know, and writing tickets." (Id.) When she was not running the counter, that task was performed by either the branch manager or the management trainee. (Id.) McQuaig, her branch manager, and the Waycross branch's management trainee or assistant (if there was one), took turns working Saturday mornings. (Id. at 22.) She worked three hours every second or third Saturday, and no other employees were present at the branch on Saturdays. (Id.) McQuaig acknowledged that her

work sometimes involved multitasking, such that she might write a rental ticket at the same time she trained or instructed an employee. (<u>Id.</u> at 47.)

McQuaig had limited discretion at the Waycross branch. For example, fleet management—"making sure you have the right number of cars for the amount of rentals you might have"—was the responsibility of the branch manager and area manager. (<u>Id.</u> at 28.) McQuaig did not coordinate with other offices when there was a need to shuffle cars among or between them, which was a common occurrence. (<u>Id.</u>) She did not have authority to release one the Waycross branch's vehicles to a different branch. (<u>Id.</u>) McQuaig's participation in fleet management was, according to her testimony, limited to driving employees to other branches to pick up additional cars when needed, or informing the branch manager if the branch needed to acquire a specialized or luxury vehicle to meet a particular customer's requirements. (<u>Id.</u> at 28, 45.) If the branch manager was not in the branch, McQuaig called the area manager with respect to all fleet management issues to obtain approval. (<u>Id.</u> at 45-46.) To her recollection, the branch manager was not required to obtain approval from the area manager in similar situations. (<u>Id.</u>)

McQuaig's discretion in dealing with customers was limited by company policy. She was permitted to give preapproved discounts and upgrades to assuage dissatisfied customers, but for certain types of upgrades she was required to obtain approval from the branch manager; her discretion in this area was the same as the discretion of a management trainee or a management assistant. (<u>Id.</u> at 24-25, 35.) When asked whether she had any role in "develop[ing] strategies and strategic alternatives to solve problems," McQuaig responded that she had no recollection of developing strategies or solving problems beyond giving discounts or upgrades to customers. (<u>Id.</u> at 40.) She testified that any decision that affected branch profits was made by the branch manager. (<u>Id.</u> at 50.) In determining whether to rent to customers who were not using a debit

10

card, credit card or money order, McQuaig was not permitted to deviate from pre-established company policies. (Id. at 25.) To make a cash rental, the customer was required to have two out of three forms of identity verification, such as current pay stubs or utilities bills. (Id.) All employees were taught to apply that policy. (Id.)

McQuaig did some branch marketing. (Id.) She visited companies near the Waycross branch to try to develop new business. (Id.) Occasionally, she would give out Enterprise marketing materials such as pens or writing pads. (Id.) She did not have to ask permission to give out the marketing materials, but she was required to obtain approval for other marketing purchases, such as buying biscuits or doughnuts for customers. (Id. at 26.) Everyone at the Waycross branch took an active role in marketing. (Id. at 39.) McQuaig made one or two sales calls per month as an assistant manager. (Id. at 49.) A sales call typically took her away from the branch for a half day. (Id.)

The number of employees at Waycross branch was somewhat fluid. (See id. at 21-22, 27-28, 62-63.) Normally a branch manager, an assistant manager (McQuaig), a management trainee (who was promoted to management assistant before McQuaig left the Waycross branch), and two part-time car preps were present in the branch. (Id. at 21-22, 27-28, 37, 62-63; Brown Decl. (ECF No. 277-3) ¶¶ 20-22.) According to McQuaig, there was never a time during her tenure when the branch was staffed by more than one full-time employee (excluding herself and the branch manager). (McQuaig Dep. (ECF No. 277-1) at 63.) One of the two part-time employees was out occasionally because of health problems. (Id.) The two part-time car preps respectively worked, on average, twenty-nine hours per week and thirty-four hours per week. (Brown Decl. (ECF No. 277-3) ¶22.)

On October 23, 2006, McQuaig's branch manager transferred to another ERAC-Florida branch.  (McQuaig JCS (ECF No. 404) ¶ 37.)  From then until November 13, 2006, when McQuaig took a leave of absence, she was the most senior employee working at the Waycross branch.  (Id. ¶ 38.)  McQuaig testified that during this time she referred to her area manager for most decisions.  (McQuaig Dep. (ECF No. 277-1) at 6 ("I always had to refer to the area manager, you know.  I was not the branch manager.").)   She never returned to work after taking her leave of absence on November 13, 2006, and she was removed from ERAC-Florida's payroll on November 27, 2006.  (McQuaig JCS (ECF No. 404) ¶ 39.)  She explained that her reason for leaving ERAC-Florida was that she believed her pay was not commensurate with the amount of time required by her job as an assistant manager.  (Id. at 52.)

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing Celotex Corp., 477 U.S. at 322-23; Anderson, 477 U.S. at 248)).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  The court must rely on the substantive law to identify which facts are material.  Abington Friends Sch., 480 F.3d at 256 (citing Anderson, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV. Discussion

The FLSA is a federal statute, originally enacted in 1938, and designed to combat substandard labor conditions relating to unfair wages, overlong working hours and a variety of other perceived evils. At issue in this motion for summary judgment are some of the myriad exemptions to the FLSA's overtime requirements. Specifically, ERAC-Florida claims that McQuaig was exempt from the FLSA's compensation requirements under one of the following exemptions: 1) executive, 2) administrative or 3) combination.

As a preliminary matter, before addressing the substantive arguments relating to FLSA exemptions, the court will address the two secondary arguments presented by the parties. First, ERAC-Florida argues that McQuaig submitted a sham affidavit after her deposition, which this court should disregard in assessing the existence of genuinely disputed material facts. Second, McQuaig argues that ERAC-Florida failed to disclose the identity of witnesses whose statements were attached to its motion for summary judgment, in violation of Rule 26 of the Federal Rules of Civil Procedure.

## A. Sham Affidavit Doctrine

ERAC-Florida asserts that McQuaig submitted a "sham affidavit." Under the "sham affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'" Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 679 (3d Cir. 2006) (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see, e.g., Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007) (holding that to permit the plaintiffs to engineer factual disputes by means of self-serving affidavits "'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'" (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969))); Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231, 2008 U.S. Dist. LEXIS 70026, at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment based on employee's "performance evaluations . . . , her contemporaneous reporting of her job responsibilities, [her] resume, and her deposition testimony"), adopted by Memorandum Opinion, Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231 (W.D. Pa. Apr. 7, 2008).

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez, 503 F.3d at 253. Because the trial court is vested with the inherent power to grant summary judgment on disputed records, Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary weight to an affidavit that is clearly offered solely for the purpose of defeating summary judgment. Jiminez, 503 F.3d at 253. The practical underpinning of the sham affidavit doctrine "is that prior depositions are more reliable than affidavits." Id.

In <u>Jiminez</u>, the Court of Appeals for the Third Circuit recognized that other courts of appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent affidavit contradicts prior deposition testimony, it should be disregarded." <u>Id.</u> at 254. The Court of Appeals for the Third Circuit has "adopted a more flexible approach." <u>Id.</u> The court recognized in <u>Jiminez</u> that "not all contradictory affidavits are necessarily shams." <u>Id.</u> Notably, "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." <u>Id.</u> (quoting <u>Baer v. Chase</u>, 392 F.3d 609, 625 (3d Cir. 2004)). "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the affiant should have the opportunity to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit. <u>Id.</u>; <u>see</u> <u>Martin v. Merrell Dow Pharmaceuticals, Inc.</u>, 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents. <u>See</u> <u>Lytle v. Capital Area Intermediate Unit</u>, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting <u>Baer</u>, 392 F.3d at 625)). To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ."

16

Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting

Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).  When

allegations in a subsequent affidavit could support statements made in prior deposition

testimony, the dueling statements "are more appropriately dealt with on cross-examination than

on summary judgment."  Ragan v. Fuentes, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J.

Sept. 28, 2007).

McQuaig's original declaration is dated October 19, 2009.  (ECF No. 325 at 128.) She

was deposed on December 18, 2009 (McQuaig Dep. (ECF No. 277-1) at 1), and submitted a

supplemental declaration dated January 30, 2011 (ECF No. 325 at 122).  McQuaig argues the

two declarations are consistent with each other and her deposition testimony.   ERAC-Florida

points to two alleged inconsistencies between the declarations and the deposition testimony,

which will be discussed below in order.  As an initial matter, however, the court notes that

McQuaig's initial declaration was made prior to the deposition, and the transcript of the

deposition clearly establishes that counsel for ERAC-Florida had access to the declaration before

and during the deposition.  In such circumstances, the sham affidavit doctrine still applies

because there is "no principle that cabins sham affidavits to a particular sequence."  In re CitX

Corp., 448 F.3d at 679-80.  Nonetheless, "cross-examining the affiant in [the] later deposition

seems the better way to find the flaws in a bogus affidavit."  Id.

First, ERAC-Florida argues that paragraph 6 of McQuaig's supplemental declaration is

inconsistent with her prior deposition testimony.  Paragraph 6 provides:

> I also recall that as an Assistant Manager my schedule
> largely overlapped with that of my Branch Manager, Whit Stewart,
> and that he was present at the branch the majority of the time that I
> was there.  As my Branch Manager, Mr. Stewart directed and
> supervised my work.

17

(McQuaig Suppl. Decl. (ECF No. 325, Ex. B) ¶ 6.)  ERAC-Florida argues that paragraph 6

contradicts McQuaig's deposition testimony, but fails to cite any testimony that the declaration

contradicts.  (See ERAC-Florida's Resp. (ECF No. 793) at 2-3.)  Instead, ERAC-Florida argues

that McQuaig, in paragraph 6, "entirely ignores key undisputed facts that show that she was

often free from direct supervision." (Id. at 5.)  The fact that McQuaig's statement contradicts

other evidence in the record does not make it a sham.  Instead, it underscores that there are

genuine factual disputes between the parties—i.e., one person says one thing, and another says

something different.  In any event, paragraph 6 is not flatly contradictory of McQuaig's

deposition testimony.  In her deposition she confirmed that the hours she worked were similar to

the hours her branch manager worked:

> Q:    Did you and the branch manager for the most part --
> essentially did y'all work the same days and hours?
>
> A:    Pretty much, yes.

(McQuaig Dep. (ECF No. 277-1) at 64.)  She repeatedly emphasized during her deposition that

her branch manager supervised her work, and was often required to be consulted when she made

important decisions.  Paragraph 6 does not flatly contradict McQuaig's deposition testimony.

ERAC-Florida argues that paragraph 6 contradicts McQuaig's deposition testimony that

(a) she often worked alone on Saturdays, (b) her branch manager was often away from the

branch while McQuaig was working, (c) her branch manager took a vacation and was away from

Waycross branch, (d) the Waycross branch did not have a branch manager during the end of her

tenure as assistant manager and (e) McQuaig's branch manager, when he was in the branch, was

often in his office doing his own work, instead of supervising McQuaig.  McQuaig, however,

never stated either in her deposition or subsequent declaration that her job was always closely

scrutinized and evaluated by her branch manager. (ERAC-Florida's Resp. (ECF No. 793) at 3.)

Instead, throughout her deposition testimony McQuaig repeatedly stated that she, as an assistant

manager, was under the direction and supervision of a branch manager since the branch manager

was in charge of the daily operations of the branch. (McQuaig Dep. (ECF No. 277-1) at 10, 15,

26, 29, 35, 45, 51, 61.) Paragraph 6 does not contradict McQuaig's previous testimony. (See

generally McQuaig Suppl. Decl. (ECF No. 325, Ex. B) ¶ 6.)

Paragraph 6 of her supplemental declaration is consistent with and not flatly

contradictory to McQuaig's deposition testimony; the sham affidavit doctrine is inapplicable.

See Jiminez, 503 F.3d at 253; (McQuaig Suppl. Decl. (ECF No. 325, Ex. B) ¶ 6.). To the extent

the parties disagree about any perceived inconsistencies in the characterization or meaning of

particular words, that disagreement is best resolved by cross-examination and argument to the

jury.

Second, ERAC-Florida argues that paragraph 7 of McQuaig's original declaration is

inconsistent with her deposition testimony. Paragraph 7 provides:

> As an Assistant Manager my primary job responsibility was
> renting cars to customers. To do this, I routinely cleaned and
> washed cars, picked up and dropped off customer's cars, and
> completed rental paperwork, which took most of my time each
> day.

(McQuaig Decl. (ECF No. 325, Ex. C) ¶ 7.) ERAC-Florida argues that paragraph 7 contradicts

McQuaig's deposition testimony, which ERAC-Florida characterizes as confirming that she

spent the majority of her time on management tasks. (ERAC-Florida's Resp. (ECF No. 793) at

4.)

McQuaig testified at her deposition that as an assistant manager: (a) she cleaned and

washed cars every day (McQuaig Dep. (ECF No. 277-1) at 30); (b) left the branch to obtain

19

additional cars when the branch needed them (id. at 28); and (c) sixty to seventy percent of her time was spent answering the phone and *writing tickets*—that is, rental paperwork—while she was "running the counter" (id. at 26).  Paragraph 7 is not flatly contradictory to the deposition and it is explicitly supported by McQuaig's deposition testimony.  The thrust of ERAC-Florida's argument takes issue with McQuaig's use of the term "primary job responsibility," because they believe her prior deposition testimony establishes as a matter of law that her primary job responsibility is other than she declares.  This perceived inconsistency in the testimony is nonfactual, but deals with the characterization given the facts by the witnesses and parties involved, as well as the legal conclusions of the parties.  The court notes that McQuaig's declaration relates to her opinion about what her primary responsibility was, and that she expressed the same opinion during the deposition. (Id. at 35.)  For the purposes of the sham affidavit analysis, it is immaterial whether ERAC-Florida disputes McQuaig's legal opinions, and it is entirely expected that they would.  In any event, to the extent paragraph 7 expresses McQuaig's legal opinion—inadmissible opinion evidence— it would not be sufficient to create a genuine dispute of material fact and preclude summary judgment.

For the reasons set forth above, because the statements contained in paragraph 6 of McQuaig's supplemental declaration and paragraph 7 of her original declaration are not flatly contradictory of her deposition testimony, the court does not find McQuaig's original and supplemental declarations to be shams.  The court does, however, note that ERAC-Florida could not meet its substantial burden of proof on summary judgment even if the declarations were disregarded.  Notably, the vast majority (and perhaps all) of the factual information contained in the first section of this memorandum opinion is derived from sources other than the declarations.  Even if the declarations were stricken from the record, there would still be sufficient genuine

disputes of material fact to preclude the court from entering summary judgment in ERAC-Florida's favor.

### B. Rule 26 Disclosures

Plaintiffs assert that statements submitted by defendants in support of the various motions for summary judgment were made in violation of Federal Rule of Civil Procedure 26. Defendants argue that they satisfied their Rule 26 obligations because the identities of the declarants were disclosed in the course of depositions. Attached to ERAC-Florida's motion for summary judgment were the declarations of Brown and Philip Funk ("Funk" and together with Brown, "declarants"), both of whom are or were employees of ERAC-Florida. (ECF No. 277.) ERAC-Florida argues that the identity of declarants was disclosed to McQuaig through the course of discovery. (Defs.' Suppl. Br. on the Sufficiency of Disclosures (ECF No. 769) at 8-12.) Specifically, ERAC-Florida notes that Brown was present at McQuaig's deposition and that Funk was known to McQuaig during her employment and was discussed during her deposition. (Id. at 10-11.)

A party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i). "A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E).

Under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

Rule 37(c) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless*." FED. R. CIV. P. 37(c) (emphasis added); see Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000).

Because the court is denying this motion for summary judgment, it need not rule on the propriety of the disclosures under Rule 26. Instead, the discretionary application of Rule 37 sufficiently disposes of the issue, because, presuming defendants did violate Rule 26, the presumed violations would have been harmless. The imposition of Rule 37 sanctions is within the discretion of this court. Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir. 1995). There are several factors which courts of appeals will consider in evaluating how this court exercises its discretion regarding Rule 37 sanctions. In re TMI Litig., 193 F.3d 613, 721 (3d Cir. 1999). This court will use those factors as a guide in applying its discretion. The factors are:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and
>
> (4) bad faith or willfulness in failing to comply with the district court's order.

Id. (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)).

McQuaig was given the opportunity to pursue additional discovery of declarants before the court ruled on the motion for summary judgment and chose not to do so. (Tr. of Continued Arg. (ECF No. 807) at 117, July 25, 2011.) The only relief requested by plaintiffs in the briefing on this issue is a "request that the Court disregard the declarations of Defendants' witnesses provided after the close of the summary judgment discovery period." (Pl.'s Resp. to Defs.' Suppl. Br. on the Sufficiency of Disclosures (ECF No. 791) at 2.) There is no pending motion for sanctions. As the court explains *infra* in Section IV.C, genuinely disputed material facts compel a resolution of this motion in favor of McQuaig. Thus, to the extent the court relied on declarants' testimony, the reliance was harmless, as the only relief requested by McQuaig relates to the court's determination of this motion, on which McQuaig ultimately prevailed.

Applying the TMI/Meyers factors, the court finds: first, there is no prejudice to McQuaig, as explained above; second, McQuaig had the opportunity to conduct further discovery with respect to declarants, but chose not to do so, and could have cured any perceived prejudice; third,

efficient administration of this multidistrict litigation compels the court to resolve this summary

judgment motion without further procedural delay or complicated wrangling of the record

without purpose; and fourth, the court finds no bad faith on the part of ERAC-Florida.  For these

reasons, and all the reasons listed above, but primarily because the court is resolving the

summary judgment in favor of McQuaig, there is no need to disregard the statements of the

declarants, as requested by McQuaig.


### C. The FLSA Exemptions

#### 1.  General Framework

The FLSA exempts from its overtime provisions "any 'employee in a bona fide

executive, administrative, or professional capacity.'"  Soehnle v. Hess Corp., 399 F. App'x 749,

750 n.1 (3d Cir. 2010) (quoting 29 U.S.C. § 213(a)(1)).  Additionally, the FLSA exempts from

its overtime provisions "[e]mployees who perform a combination of exempt duties."  29 C.F.R. §

541.708.

In light of the broad remedial purpose of the FLSA,[5] exemptions are narrowly construed

against the employer.  Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir.

2000).  An FLSA exemption is properly characterized as an affirmative defense.  Id. at 180-81,

183.  Thus, "[t]he burden of proof to establish that its employees come within the scope of an

overtime exemption is on the employer."  Friedrich v. U.S. Computer Serv., 974 F.2d 409, 412

(3d Cir. 1992).  "[I]f the record is unclear as to some exemption requirement, the employer will

---

[5] "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted."  Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987); see De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 373 (3d Cir. 2007); Sperling v. Hoffman-La Roche Inc., 862 F.2d 439, 446-47 (3d Cir. 1988) (relying on the FLSA's "broad remedial purpose" as a basis for a liberal construction of the statute in favor of potential plaintiffs).

be held not to have satisfied its burden." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991).

ERAC-Florida bears the burden of proving that McQuaig was exempt from the overtime provisions of the FLSA. Id. In order for summary judgment to be granted, ERAC-Florida must establish all the essential elements of the exemption to the extent required by the summary judgment standard discussed above. If a reasonable jury could find that ERAC-Florida did not meet its burden with respect to just one element of the exemptions, it would be compelled to return a verdict in favor of McQuaig. As such, summary judgment is inappropriate here unless there are no genuine issues as to material facts with respect to *any* of the elements of the exemption. Each exemption, however, is independently sufficient to provide the basis for judgment in favor of ERAC-Florida. See 29 U.S.C. § 213(a)(1) ( providing that "any employee employed in a bona fide executive, administrative, *or* professional capacity" is exempt (emphasis added)). To prevail, ERAC-Florida must establish a lack of genuinely disputed material facts with respect to *all* the elements of at least one of the asserted exemptions.

The Secretary of Labor has statutory authority to publish FLSA regulations to aid courts in determining the scope of exemptions and has exercised that authority. 69 Fed. Reg. 22,121 (Apr. 23, 2004). Section 13(a)(1) of the FLSA provides that "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman *as such terms are defined and delimited from time to time by regulations of the Secretary*" is exempt. 29 U.S.C. § 213(a)(1) (emphasis added). Unlike prior regulations, the currently applicable 2004 regulations were adopted after notice and comment and fall within the ambit of the Secretary's legislative rule-making authority. 69 Fed. Reg. 22,121, 22,124 (Apr. 23, 2004). These regulations are, therefore, entitled to Chevron deference. See Chevron USA v. Natural

Res. Def. Council, 467 U.S. 837 (1984); <u>Cash v. Cycle Craft Co., Inc.</u>, 508 F.3d 680, 683. (1st Cir. 2007).

Under the regulations, exempt work includes any work which is "directly and closely related to the performance of exempt work." 29 C.F.R. § 541.703. The regulations provide the following guidance:

> The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, "directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. Work "directly and closely related" to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine. Work is not "directly and closely related" if the work is remotely related or completely unrelated to exempt duties.

<u>Id.</u> In a similar vein, "[o]ccasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees" are exempt when they are done as a means of performing an exempt task. 29 C.F.R. § 541.707. The court should consider the following factors in determining whether occasional tasks are exempt: (1) "[w]hether the same work is performed by any of the exempt employee's subordinates"; (2) the "practicability of delegating the work to a nonexempt employee"; (3) "whether the exempt employee performs the task frequently or occasionally"; and (4) "existence of an industry practice for the exempt employee to perform the task." <u>Id.</u>

The executive, administrative and combination exemptions will be addressed in order.

### 2. *The Executive Exemption*

An exempt "executive" is any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;[6]

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

> (3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

### (a) Management as Primary Duty

The regulations provide a nonexhaustive list of "management" duties. 29 C.F.R. § 541.102.[7] An employee may concurrently perform nonexempt duties and still qualify for the

---

[6] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

[7] Section 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

executive exemption as long as the requirements of § 541.100 (including the primary duty requirement) are otherwise satisfied.  Id. § 541.106.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a); see Reich v. Wyoming, 993 F.2d 739 742 (10th Cir. 1993) (providing that the employee's primary duty is that which is of principal importance to his or her employer); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982) (finding assistant manager's primary duty to be that which is most critical or important to success of the business).  Thus, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  The regulations identify four nonexhaustive factors to consider when determining an employee's primary duty, including:

> (1) "the relative importance of the exempt duties as compared with other types of duties;"
>
> (2) "the amount of time spent performing exempt work;"
>
> (3) "the employee's relative freedom from direct supervision; and"
>
> (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

Id.  The amount of time spent in the performance of exempt work may be a useful guide in determining whether exempt work is an employee's primary duty.  Id.  Employees who spend more than half of their time on exempt work generally satisfy the primary duty requirement.  Id. The regulations caution, however, against blind adherence to a time-based analysis, as time spent on exempt work is only one of the four nonexhaustive factors to consider.  Id.[8]

---

[8] The regulations provide the following example of the application of the primary duty analysis:

Each of the four factors will be considered in order.

First, with respect to the relative importance of exempt duties, a jury could reasonably determine that McQuaig's limited exempt duties were much less important than her nonexempt duties. Among McQuaig's exempt executive duties were her approval of employee work hours, her limited role training employees, and any time she spent directing other employees in their work.[9] A jury could reasonably conclude, based upon McQuaig's testimony, that these obligations were not nearly as important to ERAC-Florida as McQuaig's responsibilities in performing menial functions at the branch or in staffing the retail counter at the branch. Those labor-intensive or inside-sales tasks (which are nonexempt) were vital to the success of her branch. The sales function was the primary function of the rental facility. McQuaig was there to rent vehicles and ensure customer satisfaction. Because the staff at the Waycross branch was so small, it is reasonable to conclude that McQuaig's most important purpose was to complete the menial and sales tasks necessary to insure the success of the branch, without incurring overtime expenses to the branch. This conclusion is bolstered by the substantial evidence in the record that McQuaig's managerial roles were very limited. Specifically, McQuaig testified her review

---

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).
[9] ERAC-Florida's argument that McQuaig participated in the management of the Waycross branch's inventory is unpersuasive. McQuaig testified she had almost no role in management of the rental fleet, and that what role she did have was entirely nondiscretionary. For example, she might inform her branch manager if a particular customer placed a special order. The branch manager would then make all the arrangements to have the car available. If the branch manager was out, McQuaig was required to rely on her area manager to make inventory shuffling arrangements with other branches. McQuaig had no more role in inventory management than a warehouse stocker, who informs decision makers about which stocks or materials are running low.

of employee hours was perfunctory and took very little time. She testified her training role was minor because employees received training from ERAC-Florida's corporate office and the other employees had been working at ERAC-Florida for enough time to know their responsibilities. For similar reasons, and because her branch manager was usually present to make managerial decisions, McQuaig testified that her role delegating work to her three other co-workers was trivial. The first factor weighs against McQuaig's primary duty being management.

Second, regarding the amount of time spent on exempt work, McQuaig testified that she spent the majority of her time, at least sixty percent, performing manual or sales tasks. ERAC-Florida argues that she was simultaneously training or managing employees while she was washing cars or working at the sales counter. In order to entertain that argument, the court would be required, however, to disregard McQuaig's testimony that she spent little time training or delegating work. Her testimony is supported by the small number of employees who worked at the Waycross branch and generally knew what their roles were. The second factor weighs against McQuaig's primary duty being management.

Third, with respect to freedom from supervision, McQuaig testified that she generally worked the same hours as her branch manager. She testified consistently that she was required to check with her branch manager before making most decisions, and that she generally had the same degree of discretion as nonexempt employees to act without her branch manager's involvement. She testified that important decisions affecting the branch's profits were always made by higher-level employees, and that even when the branch manager was out of the office, she was required to call either the area manager or him in many situations. The third factor weighs against her primary duty being management.

Fourth, the court must consider McQuaig's wage in relation to nonexempt employees. Accepting her testimony as true, she earned less money as an assistant manager than she did as management trainee or management assistant (both of which are classified by ERAC-Florida as nonexempt positions). Her salary amounted to only $28,000, while nonexempt management trainees and management assistants who worked ten hours of overtime per week—not abnormal at the Waycross branch—earned $30,387 and $33,068 per year, respectively. [10] Brown confirmed that McQuaig's commission based upon the Waycross branch's profits was lower than expected. The court accepts as true for the purpose of summary judgment McQuaig's testimony that she earned less money after her promotion to a purportedly exempt position. The fourth factor weighs against McQuaig's primary duty being management.

Because the court concludes that, when viewing the facts in the light most favorable to McQuaig, the four primary duty factors collectively could be found in McQuaig's favor, it is for

---

[10] A few courts have discouraged the use of mathematics to compare wages with salaries, as this court has done. See, e.g., Taylor v. Autozone Inc., No. CV 10–08125–PCT–FJM, 2012 WL 254238, at *11 (D. Ariz. Jan. 27, 2012); Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (holding that the court should not perform "mathematical gymnastics," such as dividing an employee's weekly salary by the number of hours he worked to determine his hourly wage, but should instead "simply compare[] the manager's weekly salary with the highest possible non-exempt weekly wage" (assuming forty hours of work)). To compare a weekly salary with an hourly wage is to compare apples with oranges. Ultimately, in order to make a comparison, the court must engage in some amount of mathematical extrapolation. For example, in Moore, although the court dismissed the use of mathematics, in order to make a meaningful comparison, the court was required to assume forty hours worked by nonexempt employees to determine a "weekly wage." 352 F. Supp. 2d at 1279. The court finds the approach utilized in this opinion to be the most useful and appropriate way to provide a meaningful comparison. Instead of making unsupported assumptions about the number of hours worked, the court is resolving factual disputes in light of the summary judgment standard. Support for this court's approach is found in a decision of the Court of Appeals for the Third Circuit:

> [T]he regulation requires an analysis of the relationship between the foremen's salary and the wages paid to the crew members. The foremen's salary here breaks down to $129 per nine-hour day. The crew members receive $106.50 per eight-hour day. If the crew members worked nine hours, their daily wage would come to $126.47 (with overtime). There are, however, some benefits that the foremen receive that the hourly workers do not. . . . In sum, this evidence, while inclined in favor of exempt status, is not compelling.

Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1146 (3d Cir. 1983).

a jury to determine whether her primary duty was management. A reasonable jury could conclude that McQuaig's nonexempt tasks—like writing sales tickets, cleaning cars, and interacting with customers—were her duties of principal importance to ERAC-Florida, see Reich v. Wyoming 993 F.2d 739, 742 (10th Cir. 1993), and were most critical or important to the success of ERAC-Florida, see Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982). A jury could reasonably conclude that her most critical or important purpose to ERAC-Florida was to perform the necessary menial functions remaining after the nonexempt management assistant and car preps had gone home for the day. This conclusion is supported by McQuaig's testimony that her job functions were essentially unchanged by her promotion to assistant manager and that she was closely supervised, had little discretion, did not make important strategic decisions on behalf of the Waycross branch, rarely was needed to delegate work or direct coworkers and earned less than nonexempt employees at the branch.

### (b) Customarily and Regularly Directs Work of Two or More Employees

To qualify under the executive exemption, an employee must customarily and regularly direct the work of two or more other employees, or their equivalent. 29 C.F.R. §§ 541.100(a)(3), 541.104(a). According to the regulations:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement." Id. § 541.104(c).

ERAC-Florida did not meet its burden to demonstrate that, as a matter of law, McQuaig customarily and regularly directed the work of two or more full time employees. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement." Id. Accepting as true McQuaig's deposition testimony, the branch manager was responsible for directing and supervising the Waycross branch's employees, motivating and managing them, and setting the work schedule. In determining this element, although supervisory responsibility may be distributed among multiple executives, hours worked by a subordinate employee cannot be credited to more than one executive. 29 C.F.R. § 541.104(d) ("Hours worked by an employee cannot be credited more than once for different executives. Thus, a shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement."). The Waycross branch was staffed by five individuals, two of whom were part time. There is insufficient evidence in the record to conclude that there were sufficient collective hours worked by the four subordinate employees at the Waycross branch to satisfy this element of the executive exemption with respect to a branch manager *and* to McQuaig. That is, if McQuaig worked fifty hours per week, each car prep worked thirty hours per week, and the management trainee worked forty hours per week (which a jury could reasonably conclude, based upon the record), there would be insufficient collective hours worked at the Waycross branch to exempt more than one supervisor under the executive exemption. In that hypothetical, only 150 total, potential supervisee hours would have taken place per week, less than the necessary 160 hours required to satisfy two managers.

The court concludes that ERAC-Florida failed to meet its burden to satisfy this factor of the executive exemption because a reasonable jury could conclude that (1) McQuaig did not

supervise two or more full-time employees on a customary and regular basis, and (2) McQuaig

"merely assist[ed] the manager … and supervise[d] . . . only in the actual manager's absence. . . .

" 29 C.F.R. § 541.104(c).


*(c)  Authority to Hire, Fire, or Effect Some "Other Change of Status"*

In order to qualify as an exempt executive, an employee must have authority to hire or

fire other employees, or have particular weight given to his or her suggestions and

recommendations regarding hiring, firing, promotion, advancement or other changes of status.

29 C.F.R. § 541.100(a)(4).  "[O]ther change of status" means any "tangible employment action"

as that term is commonly used under Title VII, such as "reassignment with significantly different

responsibilities."  69 Fed. Reg. 22,122, 22,131 (Apr. 23, 2004).    In the Title VII context, the

Supreme Court has defined "tangible employment action [to] constitute[] a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits."  Burlington

Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Pa. State Police v. Suders, 542 U.S. 129,

144 (2004).  "A tangible employment action in most cases inflicts direct economic harm."

Burlington Indus., 524 U.S. at 762.

To determine whether an employee's suggestions and recommendations are given

"particular weight," it is not required that the employee have final authority regarding any of the

above-listed changes of employment status.  29 C.F.R. § 541.105.  Instead, courts should

consider whether making suggestions is part of the employee's job description or duties, whether

suggestions are made or requested frequently, and whether they are frequently relied upon.  Id.;

see Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (finding crew leaders of

chicken catchers to be nonexempt when they could not hire or fire employees, but had limited

authority to borrow workers from other crews, and made referrals to their employer regarding

prospective employees).

There are genuine issues of fact with respect to this element of ERAC-Florida's

affirmative defense which preclude summary judgment. McQuaig testified she was not

responsible for the hiring, firing, advancement, promotion or other changes of the status of

branch employees. At least one employee was promoted, and McQuaig testified she was not

involved at all in that decision. The record shows that she neither participated in nor made

suggestions with respect to hiring, firing, advancement, promotion or other material changes of

status. She testified she was not permitted to discipline employees. Brown testified that

McQuaig would have been required to participate in those decisions, but she was not at the

branch for a long enough period of time, and no opportunities arose at the time she worked.

With respect to particular weight, the court must consider whether suggesting

employment actions is part of the employee's job description or duties, whether suggestions are

frequently made or requested, and whether they are frequently relied upon. 29 C.F.R. § 541.105;

Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006). There are genuine disputes

with respect to this component as well. McQuaig suggested an employee be disciplined on one

occasion, and she acknowledged that she had informal conversations with her branch and area

managers about employees' performance, but she also testified that she never participated in any

performance reviews. She testified that she was not permitted to discipline employees by

herself, and would have done so if she was permitted to discipline employees. Brown testified

that McQuaig did have the authority to discipline subordinates, and that ERAC-Florida expects

assistant managers to discipline employees. Brown testified that assistant managers at ERAC-

Florida normally are expected as part of their job performance to participate in performance reviews and that it was odd that McQuaig had not done so. Brown explained McQuaig's lack of participation by pointing out that she only worked at the Waycross branch for six months as an assistant manager, and that no employees were reviewed during that time. McQuaig remembers that at least one employee was reviewed during that time, and that she had no input or involvement in the review process. Because there are material facts in dispute, a jury should be permitted to determine whether McQuaig's suggestions were given "particular weight."

Because there are material facts in dispute with respect to three of the four elements of the executive exemption, ERAC-Florida failed to meet its burden and summary judgment cannot be granted on the basis of the executive exemption.

### 3. The Administrative Exemption

An exempt "administrative" employee is any employee:

> (1) Compensated on a salary or fee basis at a rate not less than $455 per week[11] . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

### (a) Primary Duty of Management or Business Related Office Work

---

[11] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

Under the administrative exemption, an employee's "primary duty"[12] must consist of performing office or nonmanual work directly related to the management and general business operations of the employer. 29 C.F.R. § 541.200(a)(2). Section 541.201(b) provides examples of "[w]ork directly related to management or general business operations":

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b).

In order for work to be "directly related to the management or general business operations," it must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. § 541.201(a). The concept of a "production worker" is not limited to individuals involved in the manufacture of tangibles. Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-04 (3d Cir. 1991). For example, in Martin v. Cooper, the Court of Appeals for the Third Circuit held inside[13] salespersons of electrical products to be production, rather than administrative, employees. Id. at 903.

The administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they

---

[12] See supra, Section IV.C.2.a, for a discussion of the term "primary duty."
[13] An "inside" salesperson is an employee who makes sales inside his or her place of business, which contrasts with the outside salesperson, exempt under the FLSA, who must be "customarily and regularly engaged away from the employer's place of business." 29 C.F.R. § 541.500.

contribute to the running of the business itself.  <u>Bothell v. Phase Metrics, Inc.</u>, 299 F.3d 1120, 1127 (9th Cir. 2002).  Thus, context matters: an underwriter at a department store who decides whether to issue credit to consumers "performs a support function auxiliary to the department store's primary function of selling clothes"; whereas, an underwriter for a large bank "is directly engaged in creating the 'goods'—loans and other financial services—produced and sold by [the bank]."  <u>Davis v. J.P. Morgan Chase & Co.</u>, 587 F.3d 529, 535 (2d Cir. 2009).  Courts distinguish exempt administrative employees from nonexempt production employees who perform administrative tasks by determining whether the employees are engaged in the "running of the business and not merely . . . the day-to-day carrying out of its affairs."  <u>Bratt v. Cnty. of Los Angeles</u>, 912 F.2d 1066, 1070 (9th Cir. 1990).

ERAC-Florida argues that McQuaig was involved in many of the activities expressly identified in § 541.201(b), including marketing, accounting, safety and health, personnel management and human resources.  (Mem. Supp. Def. Enterprise Leasing Co. Florida, LLC's Mot. Summ. J. as to Pl. Melinda McQuaig ("ERAC-Florida Br.") (ECF No. 246) at 24-26.)  ERAC-Florida further argues that McQuaig's responsibilities for inventory management qualify as exempt administrative duties.  McQuaig argues that a reasonable jury could find that ERAC-Florida failed to meet its burden of proof with regard to McQuaig's primary duty.  (Pl.'s Resp. to Def. Enterprise Leasing Co. of Florida, LLC's Mot. for Summ. J. as to Pl. Melinda McQuaig ("McQuaig Br.") (ECF No. 322) at 23-26.)  McQuaig argues that her office responsibilities were not sufficiently important to ERAC-Florida and were merely the carrying on of its daily affairs.  (<u>Id.</u> at 27-28.)  She argues that her most important job responsibility was the production of sales, as opposed to the administration of the Waycross branch.

To the extent ERAC-Florida points to specific administrative job duties performed by McQuaig, many such duties were nonexempt. For example, ERAC-Florida argues that McQuaig made marketing calls to customers and prospective customers of the Waycross branch, which it argues is an administrative task relating to marketing. For a variety of reasons, the court is not persuaded that such actions, even if they were McQuaig's primary duty, would qualify as administrative under the regulations. First, making sales calls is not an office task, and driving a vehicle to a prospective customer is more akin to manual work, such as operating machinery. Second, making sales calls and salesmanship (which are distinct from marketing) are not listed as examples of exempt areas of work in § 541.201(b). Third, the regulations provide a separate exemption for outside sales employees, which ERAC-Florida did not raise as an issue in this motion for summary judgment. With respect to ERAC-Florida's argument that McQuaig spent a significant amount of time performing work related to "safety and health," that argument is premised on McQuaig's testimony that she was constantly alert to avoid any safety issues at the branch—being safety-conscious is not an administrative task which constitutes the running of the business. ERAC-Florida also attempts to rely on testimony that McQuaig occasionally counted the Waycross branch's office supplies (McQuaig Dep. (ECF No. 277-1) at 26) to argue that she participated in managing the branch's supplies. This is a nonexempt job duty, involving physical labor, which does not amount to the running of the business; it is merely the carrying out of its day-to-day affairs.

With respect to other of McQuaig's tasks which ERAC-Florida argues were administrative, there are genuine disputes about whether McQuaig performed those duties and what the performance actually entailed. These disputes include McQuaig's responsibilities in fleet management, human resources and personnel management. As discussed above with

39

respect to the executive exemption, the court must accept McQuaig's testimony that her role in those tasks was incredibly limited, and that she generally did not participate in a meaningful way in running the Waycross branch with respect to those aspects of the business.

More importantly, there is insufficient evidence to determine as a matter of law that the arguably administrative tasks performed by McQuaig constituted her "primary duty." It is not the province of this court on a motion for summary judgment to determine which witness's testimony to credit and which to discredit, and the court cannot disregard the testimony of McQuaig that her primary responsibility in terms of time spent and importance to the Waycross branch was making sales and performing physical labor. She testified that she spent more than sixty percent of her time performing sales-related tasks (such as writing tickets and interacting with customers) or labor-intensive tasks (such as washing cars). Inside sales tasks and physical tasks are not within the ambit of the administrative exemption. Martin v. Cooper, 940 F.2d at 903-06. Inside salespeople may be production employees. Id. ERAC-Florida did not meet its burden of proving that McQuaig's primary duty was management– or business-related office or nonmanual work.


*(b)  Discretion and Independent Judgment and Matters of Significance*

To fall within the administrative exemption, an employee must "exercise . . . discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). The regulations consider the exercise of discretion and independent judgment to involve evaluation of options and subsequent decisionmaking. Id. § 541.202(a). Courts should determine whether an employee exercises discretion and independent judgment "in . . . light of

40

all the facts involved in the particular employment situation in which the question arises."  <u>Id.</u> §

541.202(b).  When determining whether an employee exercises discretion and independent

judgment with respect to matters of significance, courts should consider the following

nonexhaustive list of factors:

> whether the employee has authority to formulate, affect, interpret,
> or implement management policies or operating practices; whether
> the employee carries out major assignments in conducting the
> operations of the business; whether the employee performs work
> that affects business operations to a substantial degree, even if the
> employee's assignments are related to operation of a particular
> segment of the business; whether the employee has authority to
> commit the employer in matters that have significant financial
> impact; whether the employee has authority to waive or deviate
> from established policies and procedures without prior approval;
> whether the employee has authority to negotiate and bind the
> company on significant matters; whether the employee provides
> consultation or expert advice to management; whether the
> employee is involved in planning long- or short-term business
> objectives; whether the employee investigates and resolves matters
> of significance on behalf of management; and whether the
> employee represents the company in handling complaints,
> arbitrating disputes or resolving grievances.

<u>Id.</u>

The FLSA "discretion and independent judgment" requirement can be satisfied even if

the employee's decisions are reviewed or changed by a superior.  "[T]he term 'discretion and

independent judgment' does not require that the decisions made by an employee have a finality

that goes with unlimited authority and a complete absence of review," but the employee's

decisions "may consist of recommendations for action rather than the actual taking of action."

29 C.F.R. § 541.202(c).  For that reason, "[t]he fact that an employee's decision may be subject

to review and that upon occasion the decisions are revised or reversed after review does not

mean that the employee is not exercising discretion and independent judgment."  <u>Id.</u>  Employees

can exercise discretion and independent judgment even when their recommendations are subject to review. Id.; accord Paul v. UPMC Health Sys., No. 09-1565, 2009 WL 699943, at *12 (W.D. Pa. Mar. 10, 2009). Carrying out clerical duties, on the other hand, is not sufficient for administrative exemption, even if the duties involve a small amount of discretion. See Goldstein v. Dabanian, 291 F.2d 208, 210-11 (3d Cir. 1961) (holding that employees, whose duties included cashing checks, accepting payments and issuing money orders, were not within the administrative exemption).

Here, ERAC-Florida did not specifically address the factors enumerated in 29 C.F.R. § 541.202(b). ERAC-Florida instead argued generally that when McQuaig gave upgrades and discounts to unsatisfied customers, participated in employee evaluations, determined which customers could rent cars at the Waycross branch, made cash deposits on behalf of the Waycross branch, and gave away marketing-related materials on behalf of the branch, she was required to exercise independent judgment and discretion. (ERAC-Florida Br. (ECF No. 246) at 26-28.) McQuaig argues that the discretion she exercised was no greater than the discretion exercised by nonexempt employees at ERAC-Florida and was limited by company policy and supervisory oversight. In other words, she argues she was not permitted to exercise discretion with respect to "matters of significance" for the Waycross branch. (McQuaig Br. (ECF No. 326) at 26-27.) To accept ERAC-Florida's arguments, the court would be required to disregard the testimony of McQuaig that: (a) her discretion in giving discounts and upgrades was limited by company policy, (b) she was required to obtain approval from a supervisor before deviating from company policy in discounts and upgrades, (c) she did not participate in performance reviews, (d) she was not permitted to deviate from ERAC-Florida guidelines establishing cash-based rental criteria, (e) she did not participate in important decisions or in making branch business strategy, and (f)

she was not permitted to spend money on her marketing activities beyond giving out the pens and paper which her supervisor had given her prior approval to hand out.

Resolving factual disputes in favor of McQuaig's testimony, the court finds that a reasonable jury could conclude that none of the enumerated factors listed in 29 C.F.R. § 541.200(a)(3) are satisfied in this case. At the summary judgment stage, the court cannot discredit McQuaig's testimony with respect to the matters noted above. In light of that testimony, there are material facts in genuine dispute regarding both McQuaig's independence and her discretion.

For the reasons stated above, the court finds that there are genuine disputes with respect to material facts in two of the three § 541.200(a) elements of the administrative exemption. Because ERAC-Florida has the burden of proving each element of the exemption, these genuine disputes preclude summary judgment on the basis of the administrative exemption.

### 4. The Combination Exemption

Under the FLSA regulations, an employee who performs a combination of exempt duties—but who does not satisfy the primary duty requirement under any of the stand-alone exemptions—may nonetheless qualify for exempt status. 29 C.F.R. § 541.708. "[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption" so long as the other requirements, such as the salary basis test, are met. Id.; accord IntraComm, Inc. v. Baja, 492 F.3d 285, 292-95 (4th Cir. 2007) (deferring to the Secretary of Labor's interpretation that "the combination exemption provides a mechanism for cobbling together different exempt duties for the purposes of meeting the primary-duty test" but "does not . . . relieve employers of their burden to independently establish the other

requirements of each exemption whose duties are combined"). The primary thrust of the combination exemption, therefore, is merely that the performance of exempt executive work cannot be the basis for preventing an otherwise exempt administrative employee from being exempted because his primary duty is blended between executive and administrative work and vice versa. Id.

McQuaig's testimony that she spent the majority of her time on sales-related and physical tasks within the Waycross branch, and the court's conclusion that a reasonable jury could conclude such nonexempt tasks constituted her primary duty preclude summary judgment on the basis of the combination exemption.

Conclusively, because ERAC-Florida did not meet its burden with respect to other necessary elements of both the administrative and the executive exemptions—beyond merely failing to establish the primary duty element—the combination exemption is inapplicable to McQuaig. See IntraComm, Inc. 492 F.3d at 292-95. Thus, the court cannot grant ERAC-Florida's motion for summary judgment on the basis of the combination exemption, even if her primary duty were found to be some combination of exempt administrative and executive tasks.

### V. Alternative Argument – three-week period

ERAC-Florida did not meet its burden of proof with respect to its alternative argument that it is entitled to summary judgment for the last three weeks of McQuaig's employment at ERAC-Florida, when the branch manager at the Waycross branch transferred away. There is insufficient evidence in the record establishing how McQuaig's responsibilities and work duties differed during that period. She testified she did not have the responsibilities of the branch manager during that time frame, but was required to rely on the area manager to make important

decisions.  Because the record insufficiently distinguishes the relevant three-week time period from the other time periods and it is unclear how the necessary elements of the exemptions would be proved by ERAC-Florida, the court will deny the motion for summary judgment on that alternative ground as well.

## VI. Conclusion

For the reasons set forth in this memorandum opinion, because ERAC-Florida did not prove as a matter of law *all* the elements of at least one of the exemptions, and in consideration of the relevant summary judgment standard and the narrowly construed FLSA exemptions, ERAC-Florida's motion for summary judgment against sample plaintiff Melinda McQuaig (ECF No. 245) will be denied.  Summary judgment is precluded by the abundance of disputed material facts regarding McQuaig's job responsibilities, on which the court must defer to future resolution by a jury.  An order will follow.

By the court,


 /s/ Joy Flowers Conti
Hon. Joy Flowers Conti
United States District Judge


Date:  July 20, 2012