IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ENTERPRISE RENT-A-CAR | ) | MDL No. 2056 |
| WAGE & HOUR EMPLOYMENT | ) | |
| PRACTICES LITIGATION | ) | Misc. No. 09-210 |
| | ) | |
| | ) | Civil No. 07-1687 |
| NICKOLAS HICKTON, *et. al.*, | ) | Civil No. 09-0815 |
| | ) | Civil No. 09-0816 |
| Plaintiffs, | ) | Civil No. 09-0824 |
| | ) | Civil No. 09-0832 |
| v. | ) | Civil No. 09-0833 |
| | ) | Civil No. 09-1188 |
| ENTERPRISE RENT-A-CAR | ) | Civil No. 09-1321 |
| COMPANY, *et. al.*, | ) | Civil No. 10-1003 |
| | ) | Civil No. 10-1189 |
| Defendants. | ) | Civil No. 10-1456 |
| | ) | Civil No. 11-0071 |
| | ) | Civil No. 11-0333 |
| | ) | Civil No. 11-1024 |
| | ) | Civil No. 12-0659 |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| Graham v. Enterprise Rent-A-Car | ) | |
| Company, Civil No. 09-0833 | ) | |
| | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

*I. Introduction*

This opinion concerns sample plaintiff Wayman F. Graham II ("Graham").  Pending

before the court are eight motions for summary judgment filed by the relevant operating

subsidiaries (collectively "defendants") of defendant Enterprise Rent-a-Car Company ("ERAC")

against sample plaintiffs[1] selected from the cases consolidated in this multidistrict litigation

---

[1] The following individuals were selected as sample plaintiffs: Robert Bajkowski ; Joseph Biski; Wayman F. Graham II ("Graham"); Kevin C. Hagler; Nils Hagstrom; Nickolas C. Hickton; Melinda McQuaig (formerly, Melinda Herrin); and Brandon Singleton.

("MDL").  The consolidated cases involve allegations that defendants violated the compensation requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay plaintiffs overtime compensation.   Plaintiffs are or were assistant managers employed by one of the defendants.

This memorandum opinion addresses the motion for summary judgment filed by defendant Enterprise Leasing Company of Florida, LLC ("ERAC-Florida"), against Graham. (ECF No. 247.)[2]  ERAC-Florida argues that Graham qualified for the executive and combination exemptions from the compensation requirements of the FLSA.  Graham responds that summary judgment would be improper at this stage because there are genuine disputes of material facts concerning whether the "narrowly construed" FLSA exemptions are applicable.  ERAC-Florida argues that no dispute is genuine because plaintiffs submitted declarations that violated the "sham affidavit" doctrine in an attempt to fabricate disputes of fact.  In response, Graham argues that the sham affidavit doctrine is not applicable and that certain of the declarations filed in support of the motion for summary judgment were submitted in violation of Federal Rule of Civil Procedure 26.  Each of those arguments will be addressed.

After an extensive review of the parties' submissions, the hearing transcript of the oral argument and the applicable legal principles, the court concludes that in light of the summary judgment standard of review and the narrowness of the FLSA exemptions, ERAC-Florida failed to satisfy its burden of proving as a matter of law that Graham was properly classified as exempt. The motion for summary judgment filed by ERAC-Florida against sample plaintiff Graham will be DENIED.

---

[2] Unless otherwise indicated, all references in this opinion to CM/ECF electronic document filing numbers are made with reference to the MDL master docket, filed under the miscellaneous case number 2:09-mc-210.

## *II. Factual Background*

ERAC-Florida hired Graham on November 25, 2003.  (Graham Joint Concise Statement
of Material Facts ("Graham JCS") (ECF No. 434) ¶ 1.) Graham was employed in a variety of
functions at several ERAC-Florida branches in the Miami area.  The claims at issue in this
opinion concern the period from May 16, 2005 until February 27, 2006, during which time he
was an assistant manager, first at an ERAC-Florida branch in South Beach (a neighborhood of
Miami Beach, Florida) (the "South Beach branch") and later at defendant's branch at the Miami
International Airport (the "airport branch").  (Id. ¶¶ 3-5, 10; Declaration of Lucila M. Pelay
("Pelay Decl.") (ECF No. 280-2) ¶ 4.)

Graham began working at ERAC-Florida in November 2003 as a "management trainee."
(Pelay Decl. (ECF No. 280-2) ¶ 4.)  He was promoted to a "management assistant," then to an
"assistant manager" and ultimately to a "branch manager" before being terminated by ERAC-
Florida.[3]  (Id.)  As stated above, this opinion involves Graham's tenure as an assistant manager.
His first assignment as an assistant manager at ERAC-Florida was at the South Beach branch
beginning on May 16, 2005. (Graham JCS (ECF No. 434) ¶ 5.)  The South Beach branch's
business primarily consisted of insurance replacement rentals for customers whose cars were
being serviced.  (Id. ¶ 6.)  The branch also rented to individuals vacationing in the area.  (Id.)
During Graham's tenure as an assistant manager at the South Beach branch, the branch was also

---

[3] The record reflects the following hierarchy of employees within ERAC-Florida, from greatest authority to least: (1)
area manager; (2) branch manager; (3) assistant manager; (4) management assistant; (5) management trainee.  The
branches were also staffed by a variety of other employees, many of whom worked part-time.  Those employees had
job titles such as "shuttle driver," "car prep," or "receptionist."  (Graham Dep. (ECF No. 280-1) at 23, 27;
Declaration of Roxanne Lalla-Maharajh ("Lalla-Maharajh Decl.") (ECF No. 280-3) ¶ 11.)

staffed by between five and six full-time hourly employees and four part-time hourly employees. (Pelay Decl. (ECF No. 280-2) ¶ 10.)

When Graham began working at the South Beach branch, he was supervised by a branch manager. From June 20, 2005 until August 1, 2005, no branch manager was assigned to that location. (Id.) Lucila Pelay ("Pelay"), a human resources manager for ERAC-Florida, stated in her declaration that Graham "ran the South Beach branch [when it was] without a Branch Manager between June 20, 2005 and August 1, 2005." (Id.) Contradicting Pelay's statement, Graham testified in his deposition that the South Beach branch remained "under the authority of the area manager" during that time period. (Graham Dep. (ECF No. 280-1) at 50.) Graham recalled that other local branch managers assisted with the branch's operations during that time period as well:

> Q:     And, did you have occasion to perform tasks that might usually belong to the branch manager, because there was no branch manager?
>
> A:     Under the authority of the area manager, he'd have to actually come in and do those types of tasks
>        . . . [T]here were other . . . local branch managers that could assist.

(Id.) Although the area manager delegated some branch manager tasks to Graham during that time period, Graham was required to coordinate by telephone with his area manager in the performance of those tasks. (Id.) In essence, Graham testified that he had no authority to make the kinds of discretionary decisions a branch manager would make. (Id.) Instead, the area manager made those decisions; Graham performed the operative or clerical tasks associated with those responsibilities, after consulting with the area manager by telephone. (Id.)

While he worked at the South Beach branch, Graham filled out a self-assessment in which he estimated that he spent:

- forty percent of his time on "management of customer service";

- ten percent of his time on "human resource management";

- ten percent of his time on "sales and marketing";

- ten percent of his time on "branch accounting";

- ten percent of his time on "fleet management";

- ten percent of his time on "management of branch safety, security, maintenance, and appearance"; and

- ten percent of his time on "other tasks," such as training the branch's management trainees and management assistants.

(Graham Assistant Manager Review (ECF No. 280-5) at E-010528.)  ERAC-Florida preselected the above-listed categories of tasks when it created the self-assessment form; when he filled out the form, Graham estimated what percentage of his time he spent on each category of task.  (Id.) When Graham estimated the portion of his time spent on "management of customer service," his estimate included the time spent coaching, training and managing employees, as well as delegating tasks to and sharing tasks with employees.  (Graham Dep. (ECF No. 280-1) at 42.)  It also included customer service functions which Graham carried out.  (Id. ("'Delegates and shares functions' . . . generally, that was the case. . . . [S]ome of the times a lot of the functions I actually did, you know, myself.").)  As explained more fully below, Graham equated "customer service" with the non-sales tasks carried out by branch employees.

Graham transferred to the airport branch on August 22, 2005, where he continued his employment as an assistant manager until February 28, 2006.[4]  (Graham JCS (ECF No. 434) ¶ 10.)  At the height of the rental season the airport branch maintained a fleet of over 1,000 vehicles.  (Id. ¶ 11.)  At the time of Graham's transfer, ERAC-Florida employed more than eighty workers at its airport branch.  (Pelay Decl. (ECF No. 280-2) ¶ 11.)  The airport branch was typically staffed by two assistant managers, one of whom supervised the inside rental counter, and one of whom oversaw the outside "drive" location where rental vehicles were received, cleaned, stored and presented to customers.[5]  (Declaration of Roxanne Lalla-Maharajh ("Lalla-Maharajh Decl.") (ECF No. 280-3) ¶ 11; Graham Dep. (ECF No. 280-1) at 35, 57.)  Both the inside and the outside location were typically staffed by four or five hourly employees.  (Lalla-Maharajh Decl. (ECF No. 280-3) ¶ 11.)  The inside rental counter was also staffed by at least two receptionists.  (Id.)

The airport branch had an area manager who was at the branch Monday through Friday, as well as two branch managers.  (Graham Dep. (ECF No. 280-1) at 103, 105.)   Graham testified that the area manager and two branch managers "ran the operation" and that assistant managers, management trainees and management assistants performed the "legwork" associated with managing the branch.  (Id. at 105.)  Graham consistently testified during his deposition that there were very few distinctions between the role he played within ERAC-Florida as a

_____

[4] Pelay characterized Graham's transfer to the airport branch as a "promotion," although it was not accompanied by a change in title.  (Pelay Decl. (ECF No. 280-2) ¶ 11.)  The record contains no evidence tending to show whether assistant managers at the airport branch earn more than other assistant managers within ERAC-Florida.  Graham admitted, however, that ERAC-Florida placed its "best" employees at the airport branch, because of the branch's visibility and the volume of its business.  (Graham Dep. (ECF No. 280-1) at 15.)

[5] Graham admitted that it had been "standard" procedure for one assistant manager to "run" the drive and another assistant manager to "run" the inside counter, but also recalled that standard had often not been met at the airport branch because those roles were often filled by nonexempt employees; he testified that he had earned his promotion because he was skilled at "running the drive" as a management trainee and management assitant.  (Graham Dep. (ECF No. 280-1) at 57.)

management trainee or management assistant and the role he played as an assistant manager—although he did admit assistant managers were more likely to be placed in supervisory roles such as running the "drive"—and that the main institutional difference between those three categories of employees is that assistant managers were relied on to perform the "legwork" when management assistants and management trainees could not be required to work longer without incurring overtime costs to the branch.  (<u>Id.</u> at 4, 9, 51, 105.)  "[O]ne of the biggest expenses [to ERAC-Florida] was the overtime for the MTs."  (<u>Id.</u> at 9.)   "What the MTs and MAs couldn't do for time reasons . . . the assistant manager had to kick in and take care of . . . ." (<u>Id.</u> at 105.) Graham indicated that he worked between sixty and seventy-five hours per week (<u>id.</u> at 9), averaging around sixty-five or seventy hours (<u>id.</u> at 94), and that he often worked "12 -- 14 -- 16 hours" per day at the airport branch "because the MTs had to leave [on account of] their overtime" (<u>id.</u> at 51).   Graham usually worked six days per week.  (<u>Id.</u> at 94.)

As an assistant manager, Graham testified that his main jobs involved making sales, providing customer service and performing other office functions.  (<u>Id.</u> at 4.)  Graham testified that he performed these same tasks while employed as a management trainee.  (<u>Id.</u> ("Essentially everything I did as an MT was the same as I did as assistant manager.").)

Graham was often responsible for opening the airport branch while he worked there, which involved arriving early to ensure that the branch was prepared for the day.  (<u>Id.</u> at 36, 58-59.)  This preparation work often took Graham two-to-three hours, and it was common for him to arrive at work as early as 4:30 a.m., hours earlier than most other branch employees.  (<u>Id.</u> at 58-59.)  Graham testified that the duties involved with opening the store included unlocking the store, setting out the reservation slips for the day, checking that the appropriate cars had been dropped off overnight, making sure the airport shuttles had begun cycling, and deciding whether

to add cars that had been dropped off overnight to the airport branch's fleet or to send them back to the branch from which they came.  (Graham Dep. (ECF No. 280-1) at 58-60.)  Although a few shuttle drivers came in early in the morning, other employees generally did not start arriving until around 7:00 a.m., along with a branch manager.  (Id. at 58.)  Graham's counterpart assistant manager was usually tasked with closing the branch.  (Id.)

At the airport branch Graham was given the title of "team captain," and was assigned a team of employees, whose sales metrics were assessed collectively and compared to other subgroups of ERAC-Florida employees.  (Id. at 39.)  While employed at the airport branch, Graham estimated that he spent:

- seventy percent of his time on "management of customer service";

- five percent of his time on "human resource management";

- five percent of his time on "sales and marketing";

- five percent of his time on "branch accounting";

- five percent of his time on "fleet management";

- five percent of his time on "management of branch safety, security, maintenance, and appearance"; and

- five percent of his time on "other tasks."[6]

 (Id. at 68.)  Graham indicated that "customer service" meant the outside, "drive" functions of the branch, as opposed to the sales functions which were performed at the inside counter.  (Id. at

---

[6] These time-allocation estimates differ from those reached in a contemporaneous estimation made by Graham during his employment in an ERAC-Florida employee self-assessment; Graham explained at his deposition that the performance review only encapsulated a portion of his time at ERAC-Florida, whereas his deposition estimate was "looking back at the whole time there . . . as a whole at the airport."  (Graham Dep. (ECF No. 280-1) at 67.)

47 ("[We tried to] hav[e] the -- the better people that sold, you know, at the counter and the

people probably outside with me that were, you know, better with customer service.").)

There are disputes about the extent to which Graham was responsible for training and

developing other ERAC-Florida employees in his role as an assistant manager.  Although

Graham testified that he was not responsible for training and development of employees on his

team, he wrote in his assistant manager performance review and affirmed during his deposition

that he felt "a strong sense of accomplishment" when he was able to "train others and help them

develop."  (Graham Dep. (ECF No. 280-1) at 66.)  Likewise, Carlos Jiminez, an employee of

ERAC-Florida who worked under Graham at the airport branch, also averred that part of

Graham's duties as assistant manager included training branch employees in the performance of

their job duties.  (Jiminez Decl. (ECF No. 280-4) ¶ 4.)  Graham, attempting to clarify the role he

played in training and developing employees, testified that "everyone in the office was . . .

influential in helping to train and assist others."  (Graham Dep. (ECF No. 280-1) at 39.)

Graham, however, affirmed in his deposition that he performed "'[c]ustomer service training,

sales and marketing [training], local office training (branch management), MQI training, [and]

airport branch training.'" (Id. at 45.)

With respect to Graham's supervisory responsibilities at ERAC-Florida, Roxanne Lalla-

Maharajh ("Lalla-Maharajh"), a current area manager for ERAC-Florida and Graham's former

branch manager at the airport branch, averred that assistant managers are part of the "branch

management team."  (Lalla-Maharajh Decl. (ECF No. 280-3) ¶¶ 2, 3, 10.)  According to Lalla-

Maharajh, "[a]lthough Assistant Branch Managers would write rental contracts if needed,

Management Trainees and Management Assistants would write far more contracts because the

Assistant Branch Managers were busy overseeing branch operations." (Id. ¶ 8.) Graham, on the

other hand, disputed that he oversaw operations, testifying that he "couldn't give any employee instruction without [first] having the approval of the branch manager." (Graham Dep. (ECF No. 280-1) at 21.)  He testified that his responsibilities as an assistant manager did not differ much from the responsibilities of management trainees and management assistants, especially since all three positions had the same basic duties and employees in these positions received instructions from the branch manager.  (Id. at 51.)  According to Graham, the final "say-so" belonged to the area manager, and that authority "trickled down to the branch managers."  (Id. at 104.)  As an assistant manager, he did what his branch manager told him to do, just like he had done while he was a management trainee and a management assistant.  (Id.)  Graham did, however, testify during his deposition that he could give "major instruction[s]" to management trainees and that he delegated tasks to subordinates as part of his job.  (Graham Dep. (ECF No. 280-1) at 21.)  For example, although he lacked the authority either to tell an employee to take time off from work or to take a couple of days' rentals off a customer's bill, he could instruct employees to go out to the parking lot to assist arriving customers.  (Id.)  Graham testified that management trainees and management assistants were not free to disregard his instructions.  (Id. at 104.)

Graham's delegation of tasks to subordinate employees related to the operational aspects of the car rental business.  Specifically, Graham testified that he instructed employees to wash and prepare cars for each incoming reservation, which included ensuring that each car received the appropriate maintenance, and he instructed branch employees to assist customers, when the need arose.[7]  (Graham Dep. (ECF No. 280-1) at 28, 39, 53.)  Although he believed the branch manager and the area manager were in charge of running the branch's operations, he was aware

---

[7] He testified that in addition to delegating the responsibility, he washed between twenty and forty cars per day himself.  (Id. at 62.)

that management trainees and management assistants were required to follow his instructions.
(Id. at 104.)  He testified that he participated in developing, planning, and implementing the
branch's overall sales strategy, which included assisting employees with promoting and selling
"protection products" (i.e., insurance-related upsells) and upgrades.  (Id. at 47-48.)  Those
functions were secondary, however, according to Graham, because "[w]e were running the drive
[and] [t]here really wasn't much time for" training or coaching employees to sell protection
products and upgrades.  (Id. at 48.)   Graham's input into the branch's sales strategy was to make
sure better salespeople worked the inside counter while employees who had better customer
service skills worked outside with him.  (Id. at 47.)   He did not "[m]ak[e] difficult decisions in
matters of importance" because "that's put . . . on the branch manager."  (Graham Dep. (ECF
No. 280-1) at 54.)

     With the exception of the delegation of tasks and training mentioned above, Graham's
responsibilities were limited in other human resources management tasks including disciplining
employees and scheduling.  Graham testified that he was not responsible for disciplining
employees or scheduling employee shifts.  (Id. at 42, 56.)  Instead, the lead reservationist "made
the schedules for everyone."  (Id. at 28, 43.)   Though Graham did not schedule employees, if
additional employees were needed on the "drive," he would pull extra workers from inside;
likewise, if he had too many employees, he might send some inside.  (Id. at 56.)  Lalla-Maharajh
testified that Graham could send employees home if business was slow or call more employees
to work if the airport branch was busy.  (Lalla-Maharajh Decl. (ECF No. 280-3) ¶ 13.)

     Similarly, although major disciplinary decisions were the responsibility of the branch
manager, Graham could make recommendations to the branch manager relating to disciplinary
issues.  (Graham Dep. (ECF No. 280-1) at 42.)  Lalla-Maharajh testified that assistant branch

managers were expected to play a role in discipline during Graham's tenure, but did not testify

that Graham participated in disciplinary matters.  (Lalla-Maharajh Decl. (ECF No. 280-3) ¶ 15.)

Pelay testified that "Assistant Branch Managers [were] expected to play a role in hiring,

disciplining, training, and evaluating branch employees . . . for the period that Mr. Graham was

an Assistant Branch Manager," but did not indicate that Graham himself had participated in any

disciplining of employees.  (Pelay Decl. (ECF No. 280-2) ¶ 12.)

       The record indicates no material participation by Graham in the decision-making process

relating to the promotion or the hiring and firing of employees.  Pelay testified that assistant

branch managers "*typically* participate" during employee interviews, on which they "*regularly*

provide comments on . . . candidates" which are given "considerable weight in the hiring

process."  (Id. at ¶ 13 (emphasis added).)  No testimony was introduced that Graham participated

in the hiring process.  Graham did not recall participating in the hiring process as an assistant

manager, and stated he had no input in hiring decisions.  (Graham Dep. (ECF No. 280-1) at 41,

98.)  He remembered the branch manager having responsibility for the hiring and interviewing

process at the South Beach branch.  (Id.)  He testified that the airport branch had only employed

individuals who had already worked at ERAC-Florida's other branches, so there was no hiring or

interview process.  (Id.)  Graham testified he did not have any input regarding who was to be

fired.  (Id. at 41.)  Pelay and Lalla-Maharajh both testified that assistant managers generally are

expected to participate in termination decisions, but neither testified that Graham participated in

any meaningful way in any decisions to fire employees.  (Pelay Decl. (ECF No. 280-2) ¶¶ 15-16;

Lalla-Maharajh Decl. (ECF No. 280-3) ¶¶ 15-18.)  With respect to promotions, Graham testified

that he volunteered his opinions about the value of branch employees, but did not know whether

his opinions were considered as part of the decision-making process with respect to advancement

and promotion of employees.  (Graham Dep. (ECF No. 280-1) at 46-47 ("[W]hen I gave it, I would hope that it was, but to the best of my knowledge no weight was given to my recommendations.").)  Although he did not know whether any weight was given to his recommendations, he suspected that his opinion was not relevant because he noticed no correlation between people he had suggested were deserving and people who were receiving promotions.  (Id.)   Neither Pelay nor Lalla-Maharajh testified that they gave Graham's recommendations weight in decisions relating to the advancement of employees.  (Pelay Decl. (ECF No. 280-2) ¶¶ 15-16; Lalla-Maharajh Decl. (ECF No. 280-3) ¶¶ 15-18.)  Again, their testimony was purely generic.[8]  (Id.)

Beyond offering his opinions about the value of particular employees, as described above, Graham inserted perfunctory comments on employee evaluations after the branch manager had filled out the review and made his own comments.  (Graham Dep. (ECF No. 280-1) at 42.)   For example, on an eight-page employee review of Faith Wells, Graham's hand-written comments were limited to the following:

> ASST. MANAGER'S COMMENTS:
>
> Faith is an excellent MT.   She is very dedicated and always shines at the office.
>
> ASST. MANAGER'S SUGGESTIONS FOR IMPROVEMENTS:
>
> Assume more a leadership role [*sic*].  This will prepare for the next level.

---

[8] The court notes that this deficit in the testimony of Pelay and Lalla-Maharjh is particularly striking because many similar declarations by human resources personnel were submitted by ERAC in support of motions for summary judgment relating to the other sample plaintiffs in this case—the human resources employees submitting those declarations often specifically testified that they had given weight to the recommendations of the sample plaintiff at issue, or specifically testified that the sample plaintiff participated in the hiring of an employee.  (See, e.g. Declaration of Teshena Hartline ("Hartline Decl.") (ECF No. 288-2) ¶ 18 ("While an Assistant Manager at 1553, Mr. Bajkowski contributed to the decisions to hire two MT's, [names redacted] for MT positions.").)

(Faith Wells Performance Review (ECF No. 280-7) at 6.)  On a similar review, Graham's "comments" were: "[y]ou are a very important part of the team.  Please continue to help customers."  (Pio Delgado Performance Review (ECF No. 280-8) at 2.)  Graham's "suggestion[]" was: "[f]ocus on the customers."  (Id.)

As an assistant manager, Graham earned a base salary of $25,000 per year, which amounted to bi-weekly payments of $981.  (Graham JCS (ECF No. 434) ¶ 24.)  In addition to his salary, Graham also earned commissions based on the profitability of the branch.  (Id. ¶ 23.)  As a management trainee and management assistant, Graham earned between $9.28 and $10.75 per hour.  (Id. ¶ 25.)  Graham earned $31,980 as an hourly management trainee in 2004.  (Id. ¶ 26.)  In 2005, after being promoted to assistant manager, Graham earned $41,149, which included commission from branch profits.  (Id.)  The record does not contain information relating to the salaries earned by management trainees and management assistants in 2005.  Assuming a sixty-eight-hour work week[9] and fifty work weeks per year, Graham earned $12.10 per hour as an assistant manager, or a twelve percent increase over the high end of his hourly wage as a management trainee.  Had Graham, however, been classified as nonexempt (and given the previously stated assumptions about the amount of time he spent working each week[10]), his annual income would have correlated with a straight-time hourly rate of $10.03 per hour.[11]

---

[9] Graham testified that he worked between sixty and seventy-five hours per week as an assistant manager—viewing this fact in the light most favorable to Graham, the court will use an average of sixty-eight hours per week in its calculations.  (See Graham Dep. (ECF No. 280-1) at 30.)

[10] A few courts have discouraged the use of mathematics to compare wages with salaries, as this court has done.  See, e.g., Taylor v. Autozone Inc., No. CV 10–08125–PCT–FJM, 2012 WL 254238, at *11 (D. Ariz. Jan. 27, 2012); Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (holding that the court should not perform "mathematical gymnastics," such as dividing an employee's weekly salary by the number of hours he worked to determine his hourly wage, but should instead "simply compare[] the manager's weekly salary with the highest possible non-exempt weekly wage" (assuming forty hours of work)).  To compare a weekly salary with an hourly wage is to compare apples with oranges.  Ultimately, in order to make a comparison, the court must engage in some amount of mathematical extrapolation.  For example, in Moore, although the court dismissed the use of mathematics, in order to make a meaningful comparison, the court was required to assume forty hours worked by

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.   The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

nonexempt employees to determine a "weekly wage." 352 F. Supp. 2d at 1279.  The court finds the approach utilized in this opinion to be the most useful and appropriate way to provide a meaningful comparison.  Instead of making unsupported assumptions about the number of hours worked, the court is resolving factual disputes in light of the summary judgment standard.  Support for this court's approach is found in a decision of the Court of Appeals for the Third Circuit:

> [T]he regulation requires an analysis of the relationship between the foremen's salary and the wages paid to the crew members.  The foremen's salary here breaks down to $129 per nine-hour day.  The crew members receive $106.50 per eight-hour day.  If the crew members worked nine hours, their daily wage would come to $126.47 (with overtime).  There are, however, some benefits that the foremen receive that the hourly workers do not. . . . In sum, this evidence, while inclined in favor of exempt status, is not compelling.

Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1146 (3d Cir. 1983).

[11] The following equation was used to determine this hourly rate ($z$ = hourly rate):

$$50 \times (40z + 28(1.5 \times z)) = 41,149$$
$$50 \times (40z + 42z) = 41,149$$
$$50 \times (82z) = 41,149$$
$$4100 \times z = 41,149$$
$$z = 41,149 \div 4100$$
$$z = 10.03$$

> **(B)** showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the
> entry of summary judgment, after adequate time for discovery and
> upon motion, against a party who fails to make a showing
> sufficient to establish the existence of an element essential to that
> party's case, and on which that party will bear the burden of proof
> at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A

genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could

rationally find in favor of the non-moving party in light of his burden of proof." (citing Celotex

Corp., 477 U.S. at 322-23; Anderson, 477 U.S. at 248)).

> "[W]hen the moving party has carried its burden under Rule 56(c),
> its opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts . . . .  Where the record
> taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586-87 (1986)).  The court must rely on the substantive law to identify

which facts are material.  Abington Friends Sch., 480 F.3d at 256 (citing Anderson, 477 U.S. at

248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV. Discussion

The FLSA is a federal statute, originally enacted in 1938, and designed to combat substandard labor conditions relating to unfair wages, overlong working hours and a variety of other perceived evils.  At issue in this motion for summary judgment are some of the myriad exemptions to the FLSA's overtime requirements.  Specifically, ERAC-Florida claims that Graham was exempt from the FLSA's compensation requirements under either the executive exemption or combination exemption.

As a preliminary matter, before addressing the substantive arguments relating to FLSA exemptions, the court will address the two secondary arguments presented by the parties.  First, ERAC-Florida argues that Graham submitted a sham affidavit after his deposition, which this court should disregard in assessing the existence of genuinely disputed material facts.  Second, Graham argues that ERAC-Florida failed to disclose the identity of witnesses whose statements were attached to its motion for summary judgment, in violation of Rule 26 of the Federal Rules of Civil Procedure.

A. *Sham Affidavit Doctrine*

ERAC-Florida asserts that Graham submitted a "sham affidavit."  Under the "sham affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'"  Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 679 (3d Cir. 2006) (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see, e.g., Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007) (holding that to permit the plaintiffs to engineer factual disputes by means of self-serving affidavits "'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'" (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969))); Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231, 2008 U.S. Dist. LEXIS 70026, at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment based on employee's "performance evaluations . . . , her contemporaneous reporting of her job responsibilities, [her] resume, and her deposition testimony"), adopted by Memorandum Opinion, Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231 (W.D. Pa. Apr. 7, 2008).

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."  Jiminez, 503 F.3d at 253.  Because the trial court is vested with the inherent power to grant summary judgment on disputed records, Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary weight to an affidavit that is clearly offered solely for the purpose of defeating summary judgment.  Jiminez, 503 F.3d at 253.  The practical underpinning of the sham affidavit doctrine "is that prior depositions are more reliable than affidavits."  Id.

18

In <u>Jiminez,</u> the Court of Appeals for the Third Circuit recognized that other courts of appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent affidavit contradicts prior deposition testimony, it should be disregarded." <u>Id.</u> at 254.  The Court of Appeals for the Third Circuit has "adopted a more flexible approach."  <u>Id.</u>  The court recognized in <u>Jiminez</u> that "not all contradictory affidavits are necessarily shams."  <u>Id.</u>  Notably, "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit."  <u>Id.</u> (quoting <u>Baer v. Chase</u>, 392 F.3d 609, 625 (3d Cir. 2004)).  "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the affiant should have the opportunity to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit.  <u>Id.</u>; <u>see</u> <u>Martin v. Merrell Dow Pharmaceuticals, Inc.</u>, 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents.  <u>See</u> <u>Lytle v. Capital Area Intermediate Unit</u>, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting <u>Baer</u>, 392 F.3d at 625)).  To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ."

Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting

Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).  When

allegations in a subsequent affidavit could support statements made in prior deposition

testimony, the dueling statements "are more appropriately dealt with on cross-examination than

on summary judgment."  Ragan v. Fuentes, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J.

Sept. 28, 2007).

Graham was deposed on October 16, 2009; in response to the motions for summary

judgment he submitted a declaration dated October 22, 2009, and a supplemental declaration

dated February 3, 2011.  (ECF No. 321.)  Graham argues the two declarations are consistent with

each other and his deposition testimony.   ERAC-Florida alleges four inconsistencies between

Graham's supplemental declaration and his deposition testimony.  Although the original

declaration post-dates Graham's deposition, in its briefing, ERAC-Florida's complaints were

limited to the supplemental declaration.  The court need only determine, therefore, whether the

contents of the supplemental declaration constitute sham testimony.   Each of ERAC-Florida's

four specific objections will be considered in order.

First, ERAC-Florida argues that paragraph 4 of Graham's supplemental declaration is

inconsistent with his prior deposition testimony.  Paragraph 4 provides:

> As an Assistant Manager, I did not have the ability to
> recommend that an employee be hired or fired.  In fact, based on
> my experiences at Enterprise, this was the responsibility of my
> direct supervisors, the Branch Manager.  Over time, these included
> Nicole Hodge and Rick Miller as Branch Managers at the South
> Beach Location, and Iris Campos, David Vickers, and Jardine
> Lewis as Branch Managers at the Airport location.  Enterprise's
> human resources department was also involved in the decision-
> making process.  This was a collaborative process involving my
> supervisors.  At no time did I recommend or suggest to my

supervisors that an employee be hired or fired, and I was not asked
to give any input on these decisions by my Branch managers.

(Graham Suppl. Decl. (ECF No. 321, Ex. B) ¶ 4.)  The court—having reviewed the entire

transcript of Graham's deposition—cannot discern anything remotely contradictory in paragraph

4, let alone rising to the levels necessary under the more restrictive standard applicable in this

circuit.

Graham testified during his deposition that he was not involved in decisions to hire and

fire employees, but that those decisions were reserved for his superiors within the branches

where he worked and within ERAC-Florida's human resources department.  ERAC-Florida

argues that paragraph 4 is a sham because Graham: (a) admitted to participating in employee

reviews, which could play a role in the decision to hire or fire an employee, (b) testified that he

could make recommendations to the branch manager about "major disciplinary action," and (c)

did not recall during his deposition whether he had participated in evaluations of prospective

hires.    (ERAC-Florida's Resp. (ECF No. 794) at 6.)  None of this testimony is contradicted by

the testimony in paragraph 4.  Instead, paragraph 4 clarifies, expands upon, and completes

Graham's deposition testimony.  Graham's superficial involvement in performance reviews does

not establish any involvement in the hiring and firing process, and his testimony about "major

disciplinary action" is ambiguous with respect to whether such a phrase captures the decision to

fire an employee.  Graham's lack of memory on a subject is not contradicted by his later

recollection.    To the extent the first sentence of paragraph 4, if read literally, implies that

Graham either lacked the linguistic or mental capacity to make recommendations, or in another

interpretation would be subject to extreme punishment for making recommendations, the court

assumes a reasonable jury would interpret that testimony to mean only that his recommendations

21

were neither solicited nor, to his knowledge, important.  A reasonable jury could not only credit

this testimony, but might interpret it as a close reiteration of Graham's earlier testimony.

Paragraph 4 does not flatly contradict his deposition testimony, and is not, therefore, a sham.

Second, ERAC-Florida argues that paragraph 5 of Graham's supplemental declaration is

inconsistent with his prior deposition testimony.  Paragraph 5 provides:

> As an Assistant Manager, I rarely directed the work of
> other branch employees.  On those rare occasions when I did,
> however, it was in accordance with the explicit directives given to
> me by the Branch Manager or the Area Manager.  The majority of
> my time was spent working alongside Management Trainees and
> Management Assistants in order to fulfill our primary job duty:
> renting cars to customers.  The positions of Assistant Manager,
> Management Assistant and Management Trainee are largely
> interchangeable (and the work is delegated and supervised by the
> Branch Manager), and on occasions when I was not in the branch,
> either a Management Trainee or Management Assistant would
> perform similar work, including the work I would normally do
> such as completing car rentals.  Assistant Managers were "glorified
> Management Trainees."

(Graham Decl. (ECF No. 321, Ex. B) ¶ 5.)  ERAC-Florida argues this testimony contradicts

Graham's testimony during his deposition that he delegated work and remembered giving

instructions to each of the numerous employees about whom he was specifically asked.  (ERAC-

Florida's Resp. (ECF No. 794) at 6.)   The court concludes that the testimony contained in

paragraph five must be considered a sham, because it flatly contradicts Graham's specific and

unequivocal deposition testimony.  Graham testified at his deposition that he spent a majority of

his time overseeing the "drive."  As part of this responsibility, he supervised a small team of

employees, delegated tasks without asking permission, provided feedback and training to the

employees, and had the authority to send extra employees inside if they were not needed or to

call more employees to the outside team if necessary.  Although Graham's conclusion that he

22

"rarely directed the work of other branch employees" is both ambiguous and slightly vague, the

range of reasonable interpretations of that conclusion does not include one in which Graham

delegated and managed subordinate employees to the extent he testified during his deposition.

As such, it is flatly contradictory, and could not reasonably be interpreted to support or

supplement his prior testimony.  The court must conclude that no reasonable jury could credit

such testimony.  The court will not consider the testimony contained in paragraph 5 of Graham's

supplemental declaration in its determination of this motion for summary judgment, for the

above-stated reasons.  Because no reasonable jury could credit the testimony, the court will not

consider it sufficient to create a *genuine* issue of material fact.

Third, ERAC-Florida argues that paragraph 6 of Graham's supplemental declaration is

inconsistent with his prior deposition testimony.  Paragraph 6 provides:

> Any so-called "management" responsibilities I had were
> insignificant and secondary to my primary duty of renting cars.
> For example, as an Assistant Manager I was required to complete a
> small section of the performance evaluations of other branch
> employees.   However, I completed the section only after the
> Branch Manager had completed the majority of the evaluation,
> including the Branch Manager's rating of the employee's
> performance.   Any comments I made were after-the-fact and not
> even considered in my Branch Manager's already completed
> evaluations.   My understanding was that I was involved in the
> evaluation process for the limited purpose of simply documenting,
> not evaluating, matters I had observed about the employee being
> evaluated by the Branch Manager, without any further contribution
> by me to the process.

(Graham Decl. (ECF No. 321, Ex. B) ¶ 6.)  ERAC-Florida argues that this paragraph contradicts

Graham's deposition testimony where he (a) admitted to evaluating employees and providing

feedback, and (b) stated that he hoped his recommendations about which employees deserved

promotions were given weight, but that he had no personal knowledge about the matter.  (ERAC-

Florida's Resp. (ECF No. 794) at 11-13.)  ERAC-Florida also argues that paragraph 6 contradicts

Graham's testimony that he could make recommendations about disciplining employees.

Paragraph 6 does not flatly contradict the deposition testimony in any of the three ways argued

by ERAC-Florida.  Graham's providing a legal opinion followed by a nonexclusive example of

something he did while employed at ERAC-Florida does not contradict his earlier testimony

about similar, but unrelated matters.  Because paragraph 6 is not flatly contradictory, it is not

sham testimony.

 The thrust of ERAC-Florida's argument takes issue with Graham's use of the term

"primary job responsibility," because they believe his prior deposition testimony establishes as a

matter of law that his primary job responsibility is other than he declares.  This perceived

inconsistency in the testimony is nonfactual, but deals with the characterization given the facts

by the witnesses and parties involved, as well as the legal conclusions of the parties.  The court

notes that Graham's declaration relates to his opinion about what his primary responsibility was,

and that he expressed the same opinion during the deposition.  For the purposes of the sham

affidavit analysis, it is immaterial whether ERAC-Florida disputes Graham's legal opinions, and

it is entirely expected that they would.  In any event, to the extent paragraph 6 expresses

Graham's legal opinion—which is inadmissible opinion evidence—it would not be sufficient to

create a genuine dispute of material fact and preclude summary judgment.

 Fourth, ERAC-Florida argues that paragraph 7 of Graham's supplemental declaration is

inconsistent with his prior deposition testimony.  Paragraph 7 provides:

> I also recall that as an Assistant Manager my schedule
> largely overlapped with that of my branch managers, and that a
> manager was present at the branch the majority of the time that I
> was there.  My branch managers directed and supervised my work,
> or else the area manager.  The limited discretion I was able to

24

> exercise as an Assistant Manager concerned routine matters unrelated to the management of the branch or its employees, such as calling another rental location to request that a car be sent to the branch. I also did this as a Management Trainee and Management Assistant, and was something that Management Trainees and Management Assistants did when I was an Assistant Manager. Managing the branch was not my role and certainly not my primary duty.

(Graham Decl. (ECF No. 321, Ex. B) ¶ 7.) ERAC-Florida takes issue with the legal conclusions made by Graham in paragraph 7 and with his testimony that his schedule overlapped with his branch manager. (ERAC-Florida's Resp. (ECF No. 794) at 13-16.) For the reasons provided in the paragraph above, relating to paragraph 6 of Graham's supplemental declaration, ERAC-Florida's disputing Graham's legal conclusions is immaterial to the sham affidavit analysis. Further, the testimony regarding overlapping schedules does not flatly contradict Graham's earlier testimony. He testified that he spent several hours without supervision in the morning at the airport branch, but he also testified that he often spent more than twelve hours per day at the branch. Paragraph 7 is not a sham.

Upon extensive review of Graham's deposition testimony, his supplemental declaration, and the briefing submitted by the parties, for the reasons set forth above, the court concludes that only paragraph 5 constitutes sham testimony. The court will not consider that testimony in its disposing of the present motion. All other objections raised by ERAC-Florida do not rise to the level of sham testimony.

### B. Rule 26 Disclosures

Plaintiffs assert that statements submitted by defendants in support of the various motions for summary judgment were made in violation of Federal Rule of Civil Procedure 26.

Defendants argue that they satisfied their Rule 26 obligations because the identities of the declarants were disclosed in the course of discovery.  Attached to ERAC-Florida's motion for summary judgment were the declarations of a number of current and former employees of ERAC-Florida, including Pelay and Lalla-Maharjh (collectively, "declarants").  (ECF No. 280.)

A party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  FED. R. CIV. P. 26(a)(1)(A)(i).  "A party must make its initial disclosures based on the information then reasonably available to it.  A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E).

Under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

Rule 37(c) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

26

justified *or is harmless*." FED. R. CIV. P. 37(c) (emphasis added); see Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000).

     Because the court is denying this motion for summary judgment, it need not rule on the propriety of the disclosures under Rule 26.   Instead, the discretionary application of Rule 37 sufficiently disposes of the issue, because, presuming defendants did violate Rule 26, such presumed violations would have been harmless.   The imposition of Rule 37 sanctions is within the discretion of this court.   Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir. 1995).   There are several factors which courts of appeals will consider in evaluating how this court exercises its discretion regarding Rule 37 sanctions.   In re TMI Litig., 193 F.3d 613, 721 (3d Cir. 1999).   This court will use those factors as a guide in applying its discretion. The factors are:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and
>
> (4) bad faith or willfulness in failing to comply with the district court's order.

Id. (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)).

     Graham was given the opportunity to pursue additional discovery of declarants before the court ruled on the motion for summary judgment and chose not to do so.  (Tr. of Continued Arg.

(ECF No. 807) at 117, July 25, 2011.)  The only relief requested by plaintiffs in the briefing on

this issue is a "request that the Court disregard the declarations of Defendants' witnesses

provided after the close of the summary judgment discovery period."  (Pl.'s Resp. to Defs.'

Suppl. Br. on the Sufficiency of Disclosures (ECF No. 791) at 2.)  There is no pending motion

for sanctions.  As the court explains *infra* in Section IV.C, genuinely disputed material facts

compel a resolution of this motion in favor of Graham.  Thus, to the extent the court relied on the

declarants' testimony, the reliance was harmless, as the only relief requested by Graham relates

to the court's determination of this motion, on which Graham ultimately prevailed.

Applying the TMI/Meyers factors, the court finds: first, there is no prejudice to Graham,

as explained above; second, Graham had the opportunity to conduct further discovery with

respect to declarants, but chose not to do so, and could have cured any perceived prejudice; third,

efficient administration of this multidistrict litigation compels the court to resolve this summary

judgment motion without further procedural delay or complicated wrangling of the record

without purpose; and fourth, the court finds no bad faith on the part of ERAC-Florida.  For these

reasons, and all the reasons listed above, but primarily because the court is resolving the

summary judgment in favor of Graham, there is no need to disregard the statements of the

declarants, as requested by Graham.

### *C. The FLSA Exemptions*

#### *1.  General Framework*

The FLSA exempts from its overtime provisions "any 'employee in a bona fide

executive, administrative, or professional capacity.'"  Soehnle v. Hess Corp., 399 F. App'x 749,

750 n.1 (3d Cir. 2010) (quoting 29 U.S.C. § 213(a)(1)).  Additionally, the FLSA exempts from

its overtime provisions "[e]mployees who perform a combination of exempt duties."  29 C.F.R. §

541.708.

In light of the broad remedial purpose of the FLSA,[12] exemptions are narrowly construed

against the employer.  Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir.

2000).  An FLSA exemption is properly characterized as an affirmative defense.  Id. at 180-81,

183.  Thus, "[t]he burden of proof to establish that its employees come within the scope of an

overtime exemption is on the employer."  Friedrich v. U.S. Computer Serv., 974 F.2d 409, 412

(3d Cir. 1992).  "[I]f the record is unclear as to some exemption requirement, the employer will

be held not to have satisfied its burden."  Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900

(3d Cir. 1991).

ERAC-Florida bears the burden of proving that Graham was exempt from the overtime

provisions of the FLSA.  Id.  In order for summary judgment to be granted, ERAC-Florida must

establish all the essential elements of the exemption to the extent required by the summary

judgment standard discussed above.  If a reasonable jury could find that ERAC-Florida did not

meet its burden with respect to just one element of the exemptions, it would be compelled to

return a verdict in favor of Graham.  As such, summary judgment is inappropriate here unless

there are no genuine issues as to material facts with respect to *any* of the elements of the

exemption.  Each exemption, however, is independently sufficient to provide the basis for

judgment in favor of ERAC-Florida.  See 29 U.S.C. § 213(a)(1) ( providing that "any employee

employed in a bona fide executive, administrative, *or* professional capacity" is exempt (emphasis

---

[12] "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted."  Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987); see De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 373 (3d Cir. 2007); Sperling v. Hoffman-La Roche Inc., 862 F.2d 439, 446-47 (3d Cir. 1988) (relying on the FLSA's "broad remedial purpose" as a basis for a liberal construction of the statute in favor of potential plaintiffs).

added)).  To prevail, ERAC-Florida must establish a lack of genuinely disputed material facts with respect to *all* the elements of at least one of the asserted exemptions.

The Secretary of Labor has statutory authority to publish FLSA regulations to aid courts in determining the scope of exemptions and has exercised that authority.  69 Fed. Reg. 22,121 (Apr. 23, 2004).  Section 13(a)(1)  of the FLSA provides that "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman *as such terms are defined and delimited from time to time by regulations of the Secretary*" is exempt.  29 U.S.C. § 213(a)(1) (emphasis added).  Unlike prior regulations, the currently applicable 2004 regulations were adopted after notice and comment and fall within the ambit of the Secretary's legislative rule-making authority.  69 Fed. Reg. 22,121, 22,124 (Apr. 23, 2004). These regulations are, therefore, entitled to <u>Chevron</u> deference.  <u>See</u>  <u>Chevron USA v. Natural Res. Def. Council</u>, 467 U.S. 837 (1984); <u>Cash v. Cycle Craft Co., Inc.</u>, 508 F.3d 680, 683. (1st Cir. 2007).

Under the regulations, exempt work includes any work which is "directly and closely related to the performance of exempt work."  29 C.F.R. § 541.703.  The regulations provide the following guidance:

> The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, "directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. Work "directly and closely related" to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine. Work is not "directly and closely related" if the work is remotely related or completely unrelated to exempt duties.

Id.   In a similar vein, "[o]ccasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees" are exempt when they are done as a means of performing an exempt task.  29 C.F.R. § 541.707.  The court should consider the following factors in determining whether occasional tasks are exempt: (1) "[w]hether the same work is performed by any of the exempt employee's subordinates"; (2) the "practicability of delegating the work to a nonexempt employee"; (3) "whether the exempt employee performs the task frequently or occasionally"; and (4) "existence of an industry practice for the exempt employee to perform the task." Id.

The executive and combination exemptions will be addressed in order.


### 2.  The Executive Exemption

An exempt "executive" is any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;[13]
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

---

[13] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive exemption. This memorandum opinion, therefore, will not discuss that element of the exemption.

### (a)  Management as Primary Duty

The regulations provide a nonexhaustive list of "management" duties.  29 C.F.R. § 541.102.[14]  An employee may concurrently perform nonexempt duties and still qualify for the executive exemption as long as the requirements of § 541.100 (including the primary duty requirement) are otherwise satisfied.  Id. § 541.106.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a); see Reich v. Wyoming, 993 F.2d 739 742 (10th Cir. 1993) (providing that the employee's primary duty is that which is of principal importance to his or her employer); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982) (finding assistant manager's primary duty to be that which is most critical or important to success of the business).   Thus, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a). The regulations identify four nonexhaustive factors to consider when determining an employee's primary duty, including:

_____

[14] Section 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

(1) "the relative importance of the exempt duties as compared with other types of duties;"

(2) "the amount of time spent performing exempt work;"

(3) "the employee's relative freedom from direct supervision; and"

(4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

Id.  The amount of time spent in the performance of exempt work may be a useful guide in determining whether exempt work is an employee's primary duty.  Id.  Employees who spend more than half of their time on exempt work generally satisfy the primary duty requirement.  Id. The regulations caution, however, against blind adherence to a time-based analysis, as time spent on exempt work is only one of the four nonexhaustive factors to consider.  Id. [15]

Each of the four factors will be considered in order.

First, with respect to the relative importance of exempt duties, Graham's principal exempt duty was managing the "drive," which involved overseeing and directing other employees who were charged with receiving, preparing and shuffling rental cars, among other tasks.  Graham's other exempt duties involved (a) training subordinate employees, (b) providing informal feedback on their performance, (c) allocating employees where they were needed at any given time within the branch, and (d) participating (even in a superficial sense) in performance

---

[15] The regulations provide the following example of the application of the primary duty analysis:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

reviews.  Graham's nonexempt duties included (a) all non-supervisory tasks relating to sales, (b) menial support tasks such as washing or driving a car, and (c) nondiscretionary administrative or clerical tasks such as setting out reservation sheets, checking cars that had been dropped off in the morning, or the opening of the store.

In determining the relative importance of Graham's exempt duties as compared with his nonexempt duties, the court notes that to the extent Graham was entrusted with executive responsibility, it was in areas of relatively low importance and low responsibility.  Accepting as true Graham's testimony, he did not play a meaningful role in hiring and firing employees, scheduling of time, setting of salaries, setting of budgets, keeping of records, or other matters of higher significance included in 29 C.F.R. § 541.102.[16]  Those decisions were reserved for branch managers, area managers and nonaffiliated, corporate employees of ERAC-Florida.  Graham merely supervised other employees in the carrying out of tasks, which, according to him, they were essentially capable of performing without substantial oversight.  The court finds significant that many of Graham's exempt tasks were not exclusively within the purview of assistant managers.  Management assistants and management trainees (both of which positions are classified as nonexempt by ERAC-Florida) performed the same duties, including running the "drive."  Graham consistently testified during his deposition that there were very few distinctions between the role he played within ERAC-Florida as a management trainee or management assistant and the role he played as an assistant manager.  He testified the main institutional difference between assistant managers as compared with management trainees and management assistants is that assistant managers were relied on to perform the "legwork" associated with

---

[16] For example, during his deposition, Graham testified that he participated in problem solving while he was an employee of ERAC-Florida, but that he did not "[m]ak[e] difficult decisions in matters of importance when appropriate" because "that's put . . . on the branch manager."  (Graham Dep. (ECF No. 280-1) at 54.)

making sales when management assistants and management trainees needed to be sent home to

reduce overtime costs to the branch.  The first factor weighs against Graham's primary duty

being management.

Second, regarding the amount of time spent on exempt work, even resolving disputed

facts in favor of the nonmoving party, the court must conclude that Graham spent the majority of

his time at the airport branch running the "drive."  During his deposition, he often reiterated that

was his most frequent task.  He testified that he spent seventy percent of his time on customer

service, which he equated with his outdoor responsibilities.   He testified he did not have time to

train or coach coworkers on sales techniques because "[w]e were running the drive."  (Graham

Dep. (ECF No. 280-1) at 48.)  The court having already concluded above that running the

"drive," was an exempt, executive task because it involved significant delegation of

responsibilities and direction of employees, the court concludes that the second factor weighs in

favor of Graham's primary duty being management.

Third, with respect to freedom from supervision, Graham testified that many of his

superiors were almost constantly at the airport branch at the same time he was there.  During his

time at the South Beach branch, although he was not supervised as closely in the sense that his

area manager was not always present (and he was for a time, the highest-ranking employee at the

branch), he was still required to defer all important decisions to the discretion of his supervisors.

The several hours that Graham spent on his own during the mornings at the airport branch did

not substantially involve management, as very few other employees were present, and Graham

was mostly performing clerical and menial tasks to prepare the branch for the day ahead.

Moreover, freedom from supervision includes the concept of independent discretion.  Morgan v.

Family Dollar Stores, Inc., 551 F.3d 1233, 1270 n.57 (11th Cir. 2008) ("Having discretionary

35

power is one aspect of freedom from supervision. . . . Thus, the . . . regulations . . . are consistent with[] our consideration of the frequency with  which an employee exercises discretionary powers in our primary duty analysis.").  Not only was Graham subject to the near-constant presence of his bosses, there is little, if any, evidence in the record showing that Graham exercised discretion in matters beyond temporarily reassigning employees within the branch, or delegating minor tasks.  Graham's testimony, which the court must credit, is replete with instances in which he denies any independent discretion relating to one or another aspect of management of the branch.   The court concludes, in consideration of the summary judgment standard and the record before it, that the third factor weights against Graham's primary duty being management, especially considering Graham's lack of discretionary power and the direct presence of multiple overseers where he worked.

Fourth, the court must consider "the relationship between [Graham's] salary and the wages paid to other employees for the kind of nonexempt work performed by the [Graham]." Because the court was not presented with any evidence about the "wages paid to *other* employees" during the time period when Graham was an assistant manager, the court will consider this factor neutral.  To the extent the court has limited information about the wages of nonexempt employees based upon Graham's wage before his promotion, the factor would still be neutral.  The record reflects that Graham likely earned more money than similar, nonexempt employees, but it also reflects that he was working substantially more hours than those employees.  In light of the lack of record evidence, and because the limited evidence available leads to no meaningful comparison, the court cannot discern that this factor would weigh either for or against management being Graham's primary duty.  The court will, therefore, consider it a neutral factor.

36

Because the court concludes that, when viewing the facts in the light most favorable to Graham, two of the four primary duty factors could be found in Graham's favor and only one weighed against Graham, it is for a jury to determine whether his primary duty was management. Although this is a closer case than with respect to some other sample plaintiffs in this MDL, a reasonable jury could conclude that Graham's nonexempt tasks—like selling rentals, washing cars and performing nondiscretionary clerical or administrative tasks—were his duties of principal importance to ERAC-Florida, see Reich v. Wyoming 993 F.2d 739, 742 (10th Cir. 1993), and were most critical or important to the success of ERAC-Florida, see Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982).   A jury could reasonably conclude that his most critical or important purpose to ERAC-Florida was to perform the necessary menial and clerical functions remaining after the nonexempt management assistants and trainees had used their forty hours (without incurring any overtime expenses to ERAC-Florida).   Because ERAC-Florida did not establish the first element of the exemption to the extent required at the summary judgment stage and because ERAC-Florida must prove all elements of the exemption, the court will deny its motion for summary judgment on the basis of the executive exemption.  The court will, nonetheless, consider the other elements for the sake of completeness.

*(b) Customarily and Regularly Directs Work of Two or More Employees*

To qualify under the executive exemption, an employee must customarily and regularly direct the work of two or more other employees.  29 C.F.R. § 541.100(a)(3).  According to the regulations:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

37

29 C.F.R. § 541.701.   "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement."  Id. § 541.104(c).

Graham testified that his most frequent task was running the "drive," which involved directing a group of approximately five employees in receiving, cleaning, storing and presenting vehicles to customers.  In light of this testimony, there is no genuine dispute whether Graham customarily and regularly directed the work of two or more employees.  The court need not resolve any disputed testimony in coming to this conclusion.  Because the court already concluded, however, that ERAC-Florida did not meet its burden of proving the first element of the executive exemption, and because the court concludes below that ERAC-Florida did not meet its burden of proving the third element of the exemption (authority to hire, fire, etc.), the motion for summary judgment must be denied regardless of the satisfaction of the summary judgment burden with respect to this second element.

*(c) Authority to Hire, Fire, or Effect Some "Other Change of Status"*

In order to qualify as an exempt executive, an employee must have authority to hire or fire other employees, or have particular weight given to his or her suggestions and recommendations regarding hiring, firing, promotion, advancement or other changes of status. 29 C.F.R. § 541.100(a)(4).  "[O]ther change of status" means any "tangible employment action" as that term is commonly used under Title VII, such as "reassignment with significantly different responsibilities."  69 Fed. Reg. 22,122, 22,131 (Apr. 23, 2004).    In the Title VII context, the Supreme Court has defined "tangible employment action [to] constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." Burlington

Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Pa. State Police v. Suders, 542 U.S. 129,

144 (2004). "A tangible employment action in most cases inflicts direct economic harm."

Burlington Indus., 524 U.S. at 762.

To determine whether an employee's suggestions and recommendations are given

"particular weight," it is not required that the employee have final authority regarding any of the

above-listed changes of employment status. 29 C.F.R. § 541.105. Instead, courts should

consider whether making suggestions is part of the employee's job description or duties, whether

suggestions are made or requested frequently, and whether they are frequently relied upon. Id.;

see Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (finding crew leaders of

chicken catchers to be nonexempt when they could not hire or fire employees, but had limited

authority to borrow workers from other crews, and made referrals to their employer regarding

prospective employees).

Graham denied participating in any decisions to hire or fire any employees.   He denied

having input in hiring or termination decisions.  To the extent ERAC-Florida attempted to

introduce evidence to rebut that testimony, that evidence was generic, and related only to ERAC-

Florida's expectations for assistant managers' participation in hiring and firing.   For the

purposes of deciding this motion for summary judgment, the court will resolve this dispute, to

the extent one exists, in favor of Graham, the nonmoving party.   There are genuine disputes

which prevent the court from concluding that Graham had authority to hire or fire or effect some

other change of status in ERAC-Florida employees.

As for "particular weight," ERAC-Florida argues that Graham's suggestions and

recommendations were given particular weight by ERAC-Florida because providing feedback on

39

performance evaluations and providing informal feedback and training to employees may ultimately affect future employment opportunities.  With respect to particular weight, the court must consider whether suggesting employment actions is part of the employee's job description or duties, whether suggestions are frequently made or requested, and whether they are frequently relied upon.  29 C.F.R. § 541.105; Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006).  There are genuine disputes with respect to this component as well.  Specifically, it is unclear to what extent Graham's comments on performance reviews and suggestions for promotions were relied upon by the relevant decision makers at ERAC-Florida.  Graham testified that he suspected his comments and suggestions were unimportant because he often made suggestions about promotions which were not carried into effect.  ERAC-Florida relies again on generic testimony that the suggestions and recommendations of assistant managers are important, but failed to provide any evidence that the suggestions of Graham were important.  A reasonable jury could conclude, in light of (a) the perfunctory and limited nature of Graham's comments on performance reviews, (b) the absence of any evidence showing Graham's opinions were solicited for hiring and firing decisions, (c) Graham's testimony that he suspected his unsolicited suggestions for promotions were not important based on the aftereffect of those suggestions, and (d) the lack of direct testimony from ERAC-Florida employees regarding whether *Graham*'s suggestions were given particular weight, that Graham's suggestions were not given particular weight, or that ERAC-Florida did not meet its burden on this element.   Thus, ERAC-Florida did not establish the third element of the executive exemption to the extent required by the summary judgment standard.

Because there are material facts in dispute with respect to two of the four elements of the executive exemption, ERAC-Florida failed to meet its burden and summary judgment cannot be granted on the basis of the executive exemption.

### 3.  The Combination Exemption

Under the FLSA regulations, an employee who performs a combination of exempt duties—but who does not satisfy the primary duty requirement under any of the stand-alone exemptions—may nonetheless qualify for exempt status.  29 C.F.R. § 541.708.   "[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption" so long as the other requirements, such as the salary basis test, are met.  Id.; accord IntraComm, Inc. v. Baja, 492 F.3d 285, 292-95 (4th Cir. 2007) (deferring to the Secretary of Labor's interpretation that "the combination exemption provides a mechanism for cobbling together different exempt duties for the purposes of meeting the primary-duty test" but "does not . . . relieve employers of their burden to independently establish the other requirements of each exemption whose duties are combined").  The primary thrust of the combination exemption, therefore, is merely that the performance of exempt executive work cannot be the basis for preventing an otherwise exempt administrative employee from being exempted because his primary duty is blended between executive and administrative work and vice versa.  Id.

Because ERAC-Florida did not meet its burden with regard to all other necessary elements of the executive exemption—beyond merely failing to establish the primary duty element—the combination exemption is inapplicable to Graham.   See IntraComm, Inc. 492 F.3d

41

at 292-95.    Thus, the court cannot grant ERAC-Florida's motion for summary judgment on the basis of the combination exemption.

## *V. Conclusion*

For the reasons set forth in this memorandum opinion, because ERAC-Florida did not prove as a matter of law *all* the elements of at least one of the exemptions, and in consideration of the relevant summary judgment standard and the narrowly construed FLSA exemptions, ERAC-Florida's motion for summary judgment against sample plaintiff Wayman Graham (ECF No. 247) will be denied.  Summary judgment is precluded by the abundance of disputed material facts regarding Graham's job responsibilities, on which the court must defer to future resolution by a jury.  An order will follow.


By the court,


 /s/ Joy Flowers Conti
Hon. Joy Flowers Conti
United States District Judge


Date:  July 20, 2012