IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ENTERPRISE RENT-A-CAR WAGE & HOUR EMPLOYMENT PRACTICES LITIGATION | ) ) ) | MDL No. 2056 Misc. No. 09-210 |
| | ) ) | Civil No. 07-1687 |
| NICKOLAS HICKTON, *et. al.*, | ) ) | Civil No. 09-0815 Civil No. 09-0816 |
| Plaintiffs, | ) ) | Civil No. 09-0824 Civil No. 09-0832 |
| v. | ) ) | Civil No. 09-0833 Civil No. 09-1188 |
| ENTERPRISE RENT-A-CAR | ) | Civil No. 09-1321 |
| COMPANY, *et. al.*, | ) ) | Civil No. 10-1003 Civil No. 10-1189 |
| Defendants. | ) ) | Civil No. 10-1456 Civil No. 11-0071 |
| | ) ) | Civil No. 11-0333 Civil No. 11-1024 |
| THIS DOCUMENT RELATES TO: | ) ) | Civil No. 12-0659 |
| | ) | |
| Galia v. Enterprise Rent-A-Car Company, Civil No. 09-0816 | ) ) ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

*I. Introduction*

This opinion concerns sample plaintiff Brandon Singleton ("Singleton"). Pending before

the court are eight motions for summary judgment filed by the relevant operating subsidiaries

(collectively "defendants") of defendant Enterprise Rent-a-Car Company ("ERAC") against

sample plaintiffs[1] selected from the cases consolidated in this multidistrict litigation ("MDL").

The consolidated cases involve allegations that defendants violated the compensation

requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.*

("FLSA"), by failing to pay plaintiffs overtime compensation. Plaintiffs are or were assistant

managers employed by one of the defendants.

This memorandum opinion addresses the motion for summary judgment filed by

defendant Enterprise Leasing Company of Chicago, LLC ("ERAC-Chicago"), against Singleton.

(ECF No. 241.)[2] ERAC-Chicago argues that Singleton qualified for the executive and

combination exemptions from the compensation requirements of the FLSA. Singleton responds

that summary judgment would be improper at this stage because there are genuine disputes of

material facts concerning whether the "narrowly construed" FLSA exemptions are applicable.

ERAC-Chicago argues that no dispute is genuine because plaintiffs submitted declarations that

violated the "sham affidavit" doctrine in an attempt to fabricate disputes of fact. In response,

Singleton argues that the sham affidavit doctrine is not applicable and that certain of the

declarations filed in support of the motion for summary judgment were submitted in violation of

Federal Rule of Civil Procedure 26. Each of those arguments will be addressed.

After an extensive review of the parties' submissions, the hearing transcript of the oral

argument and the applicable legal principles, the court concludes that in light of the summary

judgment standard of review and the narrowness of the FLSA exemptions, ERAC-Chicago failed

to satisfy its burden of proving as a matter of law that Singleton was properly classified as

---

[1] The following individuals were selected as sample plaintiffs: Robert Bajkowski; Joseph Biski; Wayman F. Graham II; Kevin C. Hagler; Nils Hagstrom; Nickolas C. Hickton; Melinda McQuaig (formerly, Melinda Herrin); and Brandon Singleton ("Singleton").

[2] Unless otherwise indicated, all references in this opinion to CM/ECF electronic document filing numbers are made with reference to the MDL master docket, filed under the miscellaneous case number 2:09-mc-210.

exempt.  The motion for summary judgment filed by ERAC-Chicago against sample plaintiff Singleton will be DENIED.


## *II. Factual Background*

Brandon Singleton ("Singleton") was hired as a management trainee on or about March 28, 2005, to work at ERAC-Chicago's 1530 branch located at 74th Street and Stony Island Avenue in Chicago, Illinois.  (Singleton Joint Concise Statement of Material Facts ("Singleton JCS") (ECF No. 407) ¶¶ 1-2.)  On March 6, 2006, Singleton was transferred to the Midway Airport branch.  (Id. ¶ 3.)  On July 7, 2006, Singleton passed the management qualification interview ("MQI"), a qualifying exam known as the "grill" and was promoted to a management assistant.  (Id. ¶ 4.)  Singleton was promoted to an assistant manager on August 2, 2006, and was transferred to an ERAC-Chicago branch in Matteson, Illinois (the "Matteson branch").  (Id. ¶ 6.)  On May 23, 2007, Singleton was transferred to another ERAC-Chicago branch on Stony Island Avenue between 92nd and East 93rd Streets (the "Stony Island" branch).  (Id. ¶ 7.)  Singleton voluntarily resigned from his position as an assistant manager after failing to return to ERAC-Chicago following a military leave of absence.  (Id. ¶ 9.)  His employment was terminated on June 1, 2009.  (Id.)

Singleton's primary duties as an assistant manager included running the front counter where customers rented vehicles and managing the vehicle fleet at both branch locations.[3]  (Id. ¶¶ 15, 20.)  Singleton testified that as an assistant manager, he could not make decisions "without conferring with the higher [ups]."  (Singleton Dep. (ECF No. 260) at 48.)  As an assistant

---

[3] Singleton notes that all branch employees shared the responsibility of managing the fleet.  (Singleton Suppl. Decl. (ECF No. 260) at 2 ¶ 5.)

manager, Singleton was below the branch manager and the area manager in ERAC's employee hierarchy. (Singleton JCS Additional Facts (ECF No. 407) ¶ 25.) In his first performance review evaluation as an assistant manager, Singleton prepared a written breakdown of his responsibilities which included rough estimations of what he spent his time doing at work. (Singleton Dep. (ECF No. 260) at 43.) In that performance review, Singleton estimated that he spent:

- thirty-five percent of his time on "management of customer service," which Singleton testified at his deposition he understood to mean "making sure that the customer is happy . . . [and] satisfied with the service they [*sic*] were provided";

- twenty percent of his time on "sales and marketing," which involved "selling up"[4] customers at the register and finding corporate accounts (Singleton testified at his deposition that he spent "at least" that percentage of his time on sales and marketing tasks);

- fifteen percent of his time on "fleet management," which Singleton believed to mean "adding [and] deleting cars";

- ten percent of his time on "management of branch safety, security, maintenance and appearance," which included ensuring the security of cash boxes, deposits and other branch assets, such as the vehicles[5];

---

[4] "Selling up" is the practice of convincing customers to opt into more expensive and profitable rental agreements. (Singleton Dep. (ECF No. 260) at 12.)

[5] At his deposition, Singleton testified that he estimated ten percent of his time was spent on branch security to indicate low involvement because while the branch manager oversaw and delegated security issues, Singleton was still involved. (Singleton Dep. (ECF No. 260) at 44 ("I put 10 percent meaning I wasn't really the primary manager of those duties.").)

- ten percent of his time on "branch accounting," meaning following up with accounts receivable[6]; and

- ten percent on other activities, such as employee development and motivation, and serving as the branch's corporate accounts manager ("BCAM")[7]. (Id. at 43-44.)

Singleton indicated that he spent none of his time on "human resources management" and testified at his deposition that he did not believe he was involved in human resources management. (Id.) Singleton testified by a predeposition affidavit that he spent the largest amount of his time completing rentals, selling related services and ensuring customer satisfaction. (Singleton Decl. (ECF No. 333, Ex. B) ¶ 8.)

While working at the Matteson and Stony Island branches, Singleton was the only assistant manager. (Singleton JCS Additional Facts (ECF No. 407) ¶ 8.) During this time Singleton was given the keys to the branch by the branch manager. Singleton, however, testified that he only had the authority to open and close the branch when the branch manager was not present. (Id. ¶ 15.) Likewise, during the transition period when there was no branch manager the management assistant was also given a key to the branch. The parties dispute the level of authority that Singleton had as an assistant manager. (Id.)

---

[6] Singleton similarly testified that the ten percent estimate for "branch accounting" was merely an indication of low involvement: "I was putting a lower number there in regards to the accounts receivable lists and things of that nature. I didn't really work those things." (Id. at 43.)

[7] The BCAM role involved growing the branch's accounts with recurrent corporate customers and growing the number of rentals for each corporate account to increase income. (ERAC-Chicago Resp. (ECF No 189 at 2:09-cv-00816) at 6-7.) As a BCAM, Singleton delegated responsibilities to other employees and occasionally made outside sales calls. (Id.) Singleton testified that as the BCAM, he "did not have the authority to enter into arrangements with corporate accounts to rent cars without first speaking with the Branch Manager and, at times, even the Regional Corporate Accounts Manager would have to get involved." (Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 13.) Singleton testified he "could not close any deals without first speaking with a supervisor" and that "the most that [he] could do was to send a referral back to the office." (Id.)

ERAC-Chicago argues that Singleton had authority to use discretion to rent cars when the minimum rental criteria was not satisfied, which management assistants and management trainees could not do.  (Singleton Dep. (ECF No. 260) at 18, 26.)  Singleton averred that his authority to rent cars was limited by the branch manager's oversight.  (Id. at 26.)   He testified that the branch manager controlled his car rentals by telling him "how he wanted a rental to look, meaning what things he would approve."  (Id. at 19, 35.)  The parties agree that Singleton was responsible for ensuring that correct deposits were taken on vehicles and that customers had the proper insurance coverage in place prior to renting a car.  (Singleton JCS (ECF No. 407) ¶ 59; Singleton Dep. (ECF No. 260) at 41.)  When renting a car, Singleton was not permitted to discount rental rates by more than a few dollars without first receiving his branch manager's authorization.  (Singleton Dep. (ECF No. 260) at 15.)

The parties agree that when the branch manager was absent Singleton became "the highest ranking guy" at the branch.  (Singleton Dep. (ECF No. 260) at 40; Singleton JCS (ECF No. 407) ¶ 27.)  Specifically, Singleton testified that an assistant manager "can overrule" a management assistant.  (Singleton Dep. (ECF No. 260) at 27.)  The parties, however, dispute whether Singleton would run the Stony Island location when the branch manager was outside of the office.  (Singleton JCS (ECF No. 407) ¶ 29.)  Singleton testified that he did not "run the branch by himself," since he still needed to obtain the branch manager's approval to rent vehicles to customers who did not have the proper qualifications.  (Id.)  When the branch manager left the Matteson location in late 2006, Singleton managed the branch for a period of time no less than a few weeks while ERAC-Chicago searched for a new branch manager.  (Singleton Dep. (ECF No. 260) at 9.)  During this time, Singleton was responsible for daily operations of the branch, including opening and closing the branch, setting employee schedules, and managing the fleet.

6

(Id.)  Singleton would have also been responsible for reporting any disciplinary incidents that arose; however, Singleton testified that he never had to do so.  (Id.)  At times when the branch had a branch manager, Singleton did not set schedules, even on days when the branch manager was not present in the branch.  (Id. at 36.)  According to Singleton, his schedule "largely overlapped" with that of his branch manager, who was present the majority of time that Singleton was working.  (Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 12.)

As an assistant manager, Singleton had the authority to make notations in the "significant event" log, which recorded employees' "conduct, misconduct, [or] exceptional performance." (Singleton Dep. (ECF No. 260) at 37.)  Singleton, however, described his authority to discipline as only including the ability to report an observation to his supervisors. (Singleton Decl. (ECF No. 260) at 93 ¶ 6.)  The parties dispute whether Singleton ever disciplined management trainees.  (See Hollins Decl. (ECF No. 263) ¶¶ 21-22; Singleton JCS (ECF No. 407) ¶¶ 50-51.) Specifically, ERAC claims that Singleton twice verbally disciplined management trainees, and that he also made entries into the "significant event" log: once because of a management trainee's inappropriate attire and unkempt hair, and the other time because a management trainee failed to make a customer callback to determine the location of a rented vehicle. (Singleton JCS (ECF No. 407) ¶¶ 50-51; Hollins Decl. (ECF No. 263) ¶ 22.)  Singleton denies having had the authority to discipline employees, and averred that he only reported these two incidents of employee misconduct to the branch manager.  (Singleton JCS (ECF No. 407) ¶¶ 50-51.)

At times when the branch was fully staffed, Singleton did not set schedules, even on days when the branch manager was not present in the branch.  (Id. at 36.)  He testified that

> the Branch Manager set my schedule and the schedules of the other branch employees, told us when we could leave at the end of the day, and . . . [t]o the extent that I helped the Branch Manager

> enforce the schedules, this simply consisted of observing who was
> supposed to be in the office and reporting any issues to the Branch
> Manager.

(Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 3.)  He did testify that he believed he would

have been permitted to send an employee home without contacting his manager when "business

was slow," but he did not testify that he had ever actually done so.  (Singleton Dep. (ECF No.

260) at 36.)

Singleton's application with the Chicago Fire Department after he had left employment at

ERAC-Chicago indicates that he made all business decisions and was directly responsible for

increasing revenue as an assistant manager.  (Singleton Dep. (ECF No. 260) at 46.)  He testified

at his deposition that he meant that he shared those responsibilities with others, but that he

participated in making business decisions with the manager.  (Id.)  He testified that management

trainees, and other employees of the branches where he worked, also assisted the branch manager

in making business decisions.  (Id.)  While employed as an assistant manager, Singleton

performed several functions aimed at controlling and bolstering the branch's profits.  (Singleton

JCS (ECF No. 407) ¶¶ 16-9.)  He routinely increased sales by "[s]ell[ing] more coverage" to

customers and "sell[ing] up rentals," which he encouraged other employees to do as well to

increase branch profits.  (Singleton Dep. (ECF No. 260) at 15.)  He further controlled and

regulated expenses of the branch by inspecting records and vehicles to ensure that vehicle

damage was documented.  (Id.)  Singleton would also ensure his subordinates rented vehicles at

the published rates, which he agreed "meant more money in [his] pocket." (Id.)  Singleton also

served as "branch corporate accounts manager," where he helped to foster corporate account

growth within the branch, often traveling outside of the office to do so.  (Singleton Dep. (ECF

No. 260) at 40-1.)  Singleton, however, lacked authority to enter into arrangements with

corporate accounts without first speaking with the branch manager.  (<u>Id.</u> at 41.)

Singleton's duties in controlling the fleet of cars at the ERAC-Chicago branches where

he was assistant manager included ensuring proper utilization of the fleet, completing

preventative maintenance on the fleet on a timely basis, expediting out-of-service units and body

shop units, managing the correct mix of cars for the business of the branch, and ensuring that the

units were accounted for at the end of the day.  (Singleton JCS (ECF No. 407) ¶ 20.)  Fleet

management included determining which reservations needed to be filled and what cars were

available to fill those reservations.  (Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 5.)  While

employed as an assistant manager at the Stony Island location, Singleton sometimes

accompanied the area manager to repossess vehicles that had not been timely returned.

(Singleton JCS (ECF No. 407) ¶ 22.)  The parties dispute whether management trainees and

management assistants traveled outside of the office to participate in repossessions.  (<u>Id.</u>)

The parties also dispute whether Singleton, as an assistant manager, was responsible for

supervising other employees.  (<u>Id.</u> ¶ 30.)  Although Singleton admits that he did provide

management assistants and management trainees with guidance and advice, he testified that he

did not consider them to be his subordinates and that he was not responsible for training them.

(<u>Id.</u>; Singleton Dep. (ECF No. 260) at 38-39.)  In his predeposition affidavit, Singleton averred:

> I recall that I did not directly manage the work of hourly
> employees. . . . Generally, hourly employees knew the tasks that
> they were required to perform and the process by which they were
> directed.  Enterprise provides hourly employees with a lot of
> training about policies and procedures regarding routine branch
> operations, selling techniques and customer satisfaction.  The
> primary goal of branch employees is to sell car rentals and related
> services and products and ensure customer satisfaction.  Therefore,
> in my position as Assistant Manager, the largest amount of my

time was spent completing such rentals and my time with hourly employees was often limited to reminding them of what Enterprise's policies and procedures were.

(Singleton Decl. (ECF No. 333, Ex. B) ¶ 8.)  Singleton believed that he gave guidance and advice by providing feedback to co-workers who had handled difficult situations, but that he did not train employees because he did not tell them to carry out their job in a specific way or according to his directions.  (Singleton Dep. (ECF No. 260) at 38-39.)  Singleton averred that his role as an assistant manager did not include "training and shaping [the] behaviors" of management trainees and management assistants regarding customer service issues.  (Id.) According to Singleton, these responsibilities belonged to the branch manager.  (Id.)

Defendant disputes Singleton's testimony that he was not responsible for training management assistants and management trainees.  According to Rhonda Hollins ("Hollins"), Singleton's branch manager at the Stony Island location, Singleton was involved in training employees in sales, marketing and company policies and procedures.  (Hollins Decl. (ECF No. 263) ¶¶ 18-19.)  Although he testified that he was not responsible for management assistants and management trainees, Singleton acknowledged that that he often delegated his work to management assistants and management trainees, including pursuing new business leads, maintaining the fleet, and making "callbacks," or courtesy calls to customers with outstanding rentals.  (Singleton Dep. (ECF No. 260) at 16.)  Hollins testified that Singleton also trained management assistants and management trainees on "how to sell insurance coverage to customers," "how to present the customers with the options available with their rental," and how to use "any new process or procedure implemented by the Group."  (Hollins Decl. (ECF No. 263) ¶ 19.) Singleton and Hollins attended training classes on how to use a new "2.0 services system" so that they could teach other employees how to use it.  (Id.)

Singleton participated in new hire interviews for management trainees and car preps, and he contributed to employee performance reviews, although he lacked the authority to hire any branch employees. (Singleton Dep. (ECF No. 260) at 27-28; Singleton JCS (ECF No. 407) ¶ 38.) The parties dispute the weight and deference Singleton's reviews were provided. (Singleton JCS (ECF No. 407) ¶ 39.) Singleton testified that he never evaluated any employees on his own and that he never went over a review with any individual employee, but he wrote comments on employee performance evaluation forms. (Id.; Singleton Dep. (ECF No. 260) at 27, 33-4.) At the Stony Island branch, Singleton met with car preps during interviews and he escorted management trainees around the branch during their branch visits. (Singleton JCS (ECF No. 407) ¶ 40.) Hollins, Singleton's branch manager at the Stony Island location, and George Whiting, who was a management trainee under Singleton, testified that Singleton conducted employee reviews and evaluations. (Hollins Decl. (ECF No. 263) ¶ 14; Singleton JCS (ECF No. 407) ¶ 39.) Hollins testified that Singleton would provide input to her about applicant interviews to aid her in making hiring decisions, stating that the "Assistant Branch Manager in general and Brandon [Singleton] in particular played an important role in the process . . . when deciding whether or not a candidate should be hired." (Hollins Decl. (ECF No. 263) ¶ 12.)

While working as a management trainee, and later as a management assistant, Singleton was paid an hourly wage. (Id. ¶ 5.) Singleton testified that he became an assistant manager to "make more money," believing that "the commission check was a way to get paid off the profit of the branch." (Singleton Dep. (ECF No. 260) at 14-5.) As an assistant manager, Singleton was paid a base salary plus a 2.10% commission on the profits earned at the branch where he was employed. (Singleton JCS) (ECF No. 407) ¶ 10.) Singleton's starting salary in 2006 (and through the beginning of 2007) was $27,900 per year. (Id. ¶ 11.) His salary increased to

$28,900 per year in April 2007, and to $30,399.98 in February 2008. (Id.) In 2006, Singleton earned approximately $3,158 in commissions. (Id.) He earned approximately $10,108 in commissions in 2007, and in 2008 he earned approximately $1,202 in commissions. (Id.) In 2007, the one full year that Singleton was an assistant manager, his total compensation was approximately $39,306. (Id.) During the twenty-two months that Singleton worked as an assistant manager, his average annual commission was $7,892. The average yearly value of his three salaries, plus his average annual compensation, amounts to $36,958.66.

As an assistant manager, Singleton worked a minimum of fifty hours, a maximum of sixty-five hours, and an average of sixty hours per week. (Singleton Dep. (ECF No. 260) at 7.) Singleton's de facto, average hourly wage –assuming he worked sixty hours per week and fifty weeks a year, and not accounting for overtime pay that he contests he was entitled to receive— was $12.32 for each hour he worked.

During the time that Singleton was employed as an assistant manager, management assistants were paid an annual base salary ranging from $23,277.54 (in 2006) to $25,438.40 (in 2008), and could earn up to $34,000 if they worked ten hours of overtime each week. (Singleton JCS (ECF No. 407) ¶ 12.) Assuming a fifty-work-week year, a management assistant who worked forty hours in a week earned up to $12.72 for each hour worked and a management assistant who worked fifty hours in a week earned up to $13.60 for each hour worked. During this same period, management trainees were paid an annual base salary ranging from $21,819.20 (in 2006) to $23,940.80 (in 2008), and could earn between $30,000 and $32,000 if they worked ten hours of overtime each week. (Id.) Assuming a fifty-work-week year, a management trainee who worked forty hours in a week earned between $10.95 and $11.97 per hour, and a

management assistant who worked fifty hours in a week earned between $12.00 and $12.80 for each hour worked.

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions***.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing Celotex Corp., 477 U.S. at 322-23; Anderson, 477 U.S. at 248)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). The court must rely on the substantive law to identify which facts are material. Abington Friends Sch., 480 F.3d at 256 (citing Anderson, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### *IV. Discussion*

The FLSA is a federal statute, originally enacted in 1938, and designed to combat substandard labor conditions relating to unfair wages, overlong working hours and a variety of other perceived evils.  At issue in this motion for summary judgment are some of the myriad exemptions to the FLSA's overtime requirements.  Specifically, ERAC-Chicago claims that Singleton was exempt from the FLSA's compensation requirements under either the executive exemption or the combination exemption.

As a preliminary matter, before addressing the substantive arguments relating to FLSA exemptions, the court will address the two secondary arguments presented by the parties.  First, ERAC-Chicago argues that Singleton submitted a sham affidavit after his deposition, which this court should disregard in assessing the existence of genuinely disputed material facts.  Second, Singleton argues that ERAC-Chicago failed to disclose the identity of witnesses whose statements were attached to its motion for summary judgment, in violation of Rule 26 of the Federal Rules of Civil Procedure.

### A. Sham Affidavit Doctrine

ERAC-Chicago asserts that Singleton submitted a "sham affidavit." (ERAC-Chicago's Resp. to Singleton's Suppl. Mem. of Law Regarding the "Sham Affidavit" Issue ("ERAC-Chicago Resp.") (ECF No 189 at 2:09-cv-00816).)  Under the "sham affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'" Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 679 (3d Cir. 2006) (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see, e.g., Jiminez v. All Am.

Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007) (holding that to permit the plaintiffs to engineer factual disputes by means of self-serving affidavits "'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'" (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969))); Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231, 2008 U.S. Dist. LEXIS 70026, at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment based on employee's "performance evaluations . . . , her contemporaneous reporting of her job responsibilities, [her] resume, and her deposition testimony"), adopted by Memorandum Opinion, Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231 (W.D. Pa. Apr. 7, 2008).

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez, 503 F.3d at 253. Because the trial court is vested with the inherent power to grant summary judgment on disputed records, Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary weight to an affidavit that is clearly offered solely for the purpose of defeating summary judgment. Jiminez, 503 F.3d at 253. The practical underpinning of the sham affidavit doctrine "is that prior depositions are more reliable than affidavits." Id.

In Jiminez, the Court of Appeals for the Third Circuit recognized that other courts of appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent affidavit contradicts prior deposition testimony, it should be disregarded." Id. at 254. The Court of Appeals for the Third Circuit has "adopted a more flexible approach." Id. The court recognized in Jiminez that "not all contradictory affidavits are necessarily shams." Id. Notably, "'[w]hen there is independent evidence in the record to bolster

an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." Id. (quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004)). "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the affiant should have the opportunity to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit. Id.; see Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents. See Lytle v. Capital Area Intermediate Unit, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting Baer, 392 F.3d at 625)). To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ." Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)). When allegations in a subsequent affidavit could support statements made in prior deposition testimony, the dueling statements "are more appropriately dealt with on cross-examination than on summary judgment." Ragan v. Fuentes, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J. Sept. 28, 2007).

17

Singleton's original declaration is dated October 16, 2009. He was deposed on January 19, 2010, and submitted a supplemental declaration dated February 1, 2011.[8] (ECF No. 333.) Singleton argues the two declarations are consistent with each other and with his deposition testimony. ERAC-Chicago points to several alleged inconsistencies between the supplemental declaration and the deposition testimony.

First, ERAC-Chicago argues that paragraph 3 of Singleton's supplemental declaration is inconsistent with his prior deposition testimony. Paragraph 3 provides:

> While I was employed as an Assistant Manager at the Matteson branch, I did not have authority over the operation and management of the branch. This was the job of the Branch Manager. For example, the Branch Manager set my schedule and the schedules of the other branch employees, told us when we could leave at the end of the day, and instructed me when I was involved with a rental regarding the types of customer identification that he would approve prior to renting the vehicle (information which I communicated to other branch employees when they were involved with rentals). To the extent that I helped the Branch Manager enforce the schedules, this simply consisted of observing who was supposed to be in the office and reporting any issues to the Branch Manager.

(Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 3.) ERAC-Chicago argues that paragraph 3 contradicts several portions of Singleton's testimony: first, that he believed he would have been permitted to send an employee home without contacting his branch manager when "business was slow" (Singleton Dep. (ECF No. 260) at 36); second, that he set employee schedules during "a period of a couple weeks" after one branch manager had left and before his replacement arrived (Id. at 9); third, that he was responsible for enforcing the schedule when the branch manager was

_____

[8] It is unclear whether the delay of more than a year is the result of a typographical error. Many of the other supplemental declarations filed by plaintiffs in this MDL were filed in early February 2010. In any event, the discrepancy does not impact the court's sham affidavit analysis.

not present (Id. at 10).  (ERAC-Chicago Resp. (ECF No 189 at 2:09-cv-00816) at 2-3.)  None of the deposition testimony referred to by ERAC-Chicago is flatly contradicted by paragraph 3.

Singleton's testimony about sending an employee home when "business was slow" was hypothetical, and his testimony never indicates he actually exercised this authority. (See Singleton Dep. (ECF No. 260) at 36.)  His testimony regarding a two-week period while there was no branch manager could be seen as supplemental information to the testimony in paragraph 3, which is clearly dealing with periods of time where there was an acting branch manager. Finally, paragraph 3 clarifies Singleton's deposition testimony that he was responsible for enforcing the schedule when the branch manager was not present.  It does not contradict his earlier statement, but expounds upon it and explains what he meant.  There are no clear and extreme facts which Singleton has retracted in his supplemental statement, and to the extent the parties disagree about perceived inconsistencies in the characterization or meaning of particular words, that disagreement is best resolved by cross-examination and argument to the jury.

Second, ERAC-Chicago argues that paragraph 5 of his supplemental declaration is inconsistent.  Paragraph 5 provides:

> At the branches where I worked as Assistant Manager, all branch employees were responsible for fleet management.  Fleet management included determining which reservations needed to be filled and what cars were available to do so.  In addition, fleet management included figuring out who had to drive to pick up cars that were needed from other branches to fulfill orders.  The Branch Manager played a large role in this process and was the person primarily responsible for managing the fleet.

(Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 5.)  ERAC-Chicago argues that paragraph 5 contradicts Singleton's deposition testimony that he was not responsible for fleet management when he worked at the airport branch.  (Singleton Dep. (ECF No. 260) at 21-22; ERAC-Chicago

Resp. (ECF No 189 at 2:09-cv-00816) at 4.) Because Singleton was never an assistant manager at the airport branch, and because paragraph 5 explicitly applies only to branches where Singleton worked as an assistant manager, there is no contradiction between the deposition and the supplemental declaration. (Singleton Dep. (ECF No. 260) at 22.) ERAC-Chicago also argues that paragraph 5 contradicts Singleton's deposition testimony that it was "important" that an assistant manager or branch manager be present at the branch to make "decisions about how to manage the fleet for that day." (Id. at 36.) Again, the supplemental declaration does not flatly contradict Singleton's deposition testimony. The assistant manager or branch manager needed to be present for a variety of reasons, including making decisions about fleet management, but all branch employees may have shared that responsibility in a variety of ways—by participating in the decision-making process, or even by alerting decision makers when there were issues with fleet management.

Third, ERAC-Chicago argues that paragraph 11 of Singleton's supplemental declaration is inconsistent with his prior testimony that (1) he did not remember whether he conducted performance reviews for subordinates, (2) it was possible that he conducted such reviews, (3) it was possible that he conducted reviews or was present in the room during the performance reviews of a few specific employees. (ERAC-Chicago Resp. (ECF No 189 at 2:09-cv-00816) at 5-6.) Paragraph 11 provides:

> Any so-called "management" responsibilities I had were insignificant and secondary to my primary duty of renting cars. For example, as an Assistant Manager I was required to complete a small section of the performance evaluations of other branch employees. However, when I received the evaluation forms, the remainder had already been filled in by the Branch Manager. My understanding was that I was involved in the evaluation process for the limited purpose of documenting matters I had observed involving the employee being evaluated. I do not recall personally

> delivering any evaluations to branch employees or being in the
> room with the employees during the reviews.

(Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 11.)  Although Singleton's memory lapse in his

deposition testimony may provide a basis for impeachment on cross-examination, paragraph 11

is not a sham so long as it does not flatly contradict clear facts in the deposition testimony.  The

full factual extent of his allegedly contradicted deposition testimony is a lack of present memory.

Paragraph 11 does not refute, but instead reiterates, the lack of memory regarding those matters.

In any event, even if the testimony were contradictory (which it is not), there is independent

evidence in the record to bolster Singleton's assertion, as he estimated that he spent none of his

time on "human resources management" on the self-evaluation and performance review he

completed in 2007, and testified at his deposition that his estimate in that review was accurate.

(Singleton Dep. (ECF No. 260) at 43-44.)

Fourth, ERAC-Chicago argues that paragraph 13 of Singleton's supplemental declaration

is inconsistent with his prior testimony that (1) he was the branch corporate accounts manager

("BCAM"), (2) he delegated aspects of the BCAM role to other ERAC-Chicago employees, and

(3) the BCAM role included growing the accounts, the number of rentals, and their income.

(ERAC-Chicago Resp. (ECF No 189 at 2:09-cv-00816) at 6-7.)  Paragraph 13 provides:

> Although I was considered to be the Branch Corporate
> Accounts Manager (BCAM), I had no real "managerial" authority.
> I did not have the authority to enter into arrangements with
> corporate accounts to rent cars without first speaking with the
> Branch Manager and, at times, even the Regional Corporate
> Accounts Manager ("RCAM") would have to get involved.  As
> BCAM, I occasionally traveled outside of the office, but I could
> not close any deals without first speaking with a supervisor.  The
> most that I could do was to send a referral back to the office.

(Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 13.)  There is no factual contradiction between the deposition testimony and paragraph 13.  To the extent ERAC-Chicago argues that Singleton's delegation of BCAM responsibilities amounts to managerial authority, it is disputing Singleton's conclusion and not its factual underpinnings.  Because the declaration merely supplements incomplete testimony, it should not be considered a sham.  See Lytle, 2009 WL 82483, at *2.

Fifth, ERAC-Chicago argues that paragraph 15 of the supplemental declaration is sham testimony.  Paragraph 15 provides:

> While I was an Assistant Manager, I did not have the authority to discipline branch employees on my own.  Although I could make notations in the "significant event log," my role regarding employee misconduct was to simply record my observations.  On one occasion when I was working at the Stony Island branch, a Management Trainee arrived at work wearing inappropriate attire and unkepmt [sic] hair  .  I knew that the employee's appearance that day was inappropriate because Enterprise has a strict dress code for its branch employees.  As a result, I reported my observation to the Branch Manager, Rhonda Wells.

(Singleton Suppl. Decl. (ECF No. 333, Ex. C) ¶ 15.)  ERAC-Chicago argues that this testimony contradicts earlier deposition testimony that he was "responsible for reporting" and "taking down" misconduct in the significant event log.  There is no contradiction in facts between the two sources of testimony.  The supplemental declaration merely expounds upon an issue which was briefly discussed during the deposition, a permissible practice.

ERAC-Chicago provides several other arguments that the supplemental declaration is a sham affidavit.  For example, ERAC-Chicago argues that Singleton's supplemental declaration testimony that he had limited discretion and that the branch manager had authority over the branch contradicts his deposition testimony that he carried out a variety of functions which do

not demonstrate limited discretion or authority. Those arguments are best presented to a finder of fact, and do not establish flatly contradictory matters of fact. ERAC-Chicago argues that Singleton's supplemental testimony that he only directed the work of subordinates on "rare occasions" is contradicted by deposition testimony in which he provided several examples of the kind of assistance he gave to subordinates. Again, any perceived inconsistency in the testimony is nonfactual, but deals with the characterization given the facts by the witnesses and parties involved. Whether a task was "direction" of subordinates or merely "assistance" and the particular meaning of the word "rare" do not amount to "clear facts."

For the reasons set forth above, because the supplemental declaration is not flatly contradictory of prior deposition testimony, the court will not disregard Singleton's supplemental declaration as a sham. The court, however, notes that ERAC-Chicago could not meet its substantial burden of proof on summary judgment even if the supplemental declaration were disregarded. Notably, the vast majority of the factual information contained in the factual background section of this memorandum opinion is derived from sources other than the supplemental declaration. Even if the declaration were stricken from the record, there would still be sufficient genuinely disputed material facts to preclude the court from entering summary judgement in ERAC-Chicago's favor.


### B. Rule 26 Disclosures

Plaintiffs assert that statements submitted by defendants in support of the various motions for summary judgment were made in violation of Federal Rule of Civil Procedure 26. Defendants argue that they satisfied their Rule 26 obligations because the identities of the declarants were disclosed in the course of depositions. Attached to ERAC-Chicago's motion for

summary judgment are the declarations of Abdul Levy, Hollins, Valerie Kobel and George Whiting (collectively, "declarants"), all of whom are or were employees of ERAC-Chicago. (ECF Nos. 259, 262-65.) ERAC-Chicago argues that the identity of declarants was disclosed to Singleton through the course of discovery.

A party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i). "A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E).

Under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

Rule 37(c) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified *or is harmless*." Fed. R. Civ. P. 37(c) (emphasis added); <u>see</u> <u>Sherrod v. Lingle</u>, 223

F.3d 605, 612 (7th Cir. 2000).

Because the court is denying this motion for summary judgment, it need not rule on the

propriety of the disclosures under Rule 26.   Instead, the discretionary application of Rule 37

sufficiently disposes of the issue, because, presuming defendants did violate Rule 26, the

presumed violations would have been harmless.  The imposition of Rule 37 sanctions is within

the discretion of this court.  <u>Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.</u>, 60 F.3d

153, 156 (3d Cir. 1995).  There are several factors which courts of appeals will consider in

evaluating how this court exercises its discretion regarding Rule 37 sanctions.  <u>In re TMI Litig.</u>,

193 F.3d 613, 721 (3d Cir. 1999).  This court will use those factors as a guide in applying its

discretion. The factors are:

> (1) the prejudice or surprise in fact of the party against whom the
>
> excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted
>
> witnesses would disrupt the orderly and efficient trial of the case or
>
> of other cases in the court, and
>
> (4) bad faith or willfulness in failing to comply with the district
>
> court's order.

<u>Id.</u> (citing <u>Meyers v. Pennypack Woods Home Ownership Ass'n</u>, 559 F.2d 894, 904-05 (3d Cir.

1977)).

Singleton was given the opportunity to pursue additional discovery of declarants before

the court ruled on the motion for summary judgment and chose not to do so.  (Tr. of Continued

Arg. (ECF No. 807) at 117, July 25, 2011.)  The only relief requested by plaintiffs in the briefing

on this issue is a "request that the Court disregard the declarations of Defendants' witnesses

provided after the close of the summary judgment discovery period."  (Pl.'s Resp. to Defs.'

Suppl. Br. on the Sufficiency of Disclosures (ECF No. 791) at 2.)  There is no pending motion

for sanctions.  As the court explains *infra* in Section IV.C, genuinely disputed material facts

compel a resolution of this motion in favor of Singleton.  Thus, to the extent the court relied on

the declarants' testimony, the reliance was harmless, as the only relief requested by Singleton

relates to the court's determination of this motion, on which Singleton ultimately prevailed.

Applying the TMI/Meyers factors, the court finds: first, there is no prejudice to Singleton,

as explained above; second, Singleton had the opportunity to conduct further discovery with

respect to declarants, but chose not to do so, and could have cured any perceived prejudice; third,

efficient administration of this multidistrict litigation compels the court to resolve this summary

judgment motion without further procedural delay or complicated wrangling of the record

without purpose; and fourth, the court finds no bad faith on the part of ERAC-Chicago.  For

these reasons, and all the reasons listed above, but primarily because the court is resolving the

summary judgment in favor of Singleton, there is no need to disregard the statements of the

declarants, as requested by Singleton.


### *C. The FLSA Exemptions*

#### *1.  General Framework*

The FLSA exempts from its overtime provisions "any 'employee in a bona fide

executive, administrative, or professional capacity.'"  Soehnle v. Hess Corp., 399 F. App'x 749,

750 n.1 (3d Cir. 2010) (quoting 29 U.S.C. § 213(a)(1)).  Additionally, the FLSA exempts from

its overtime provisions "[e]mployees who perform a combination of exempt duties." 29 C.F.R. § 541.708.

In light of the broad remedial purpose of the FLSA,[9] exemptions are narrowly construed against the employer. Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir. 2000). An FLSA exemption is properly characterized as an affirmative defense. Id. at 180-81, 183. Thus, "[t]he burden of proof to establish that its employees come within the scope of an overtime exemption is on the employer." Friedrich v. U.S. Computer Serv., 974 F.2d 409, 412 (3d Cir. 1992). "[I]f the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991).

ERAC-Chicago bears the burden of proving that Singleton was exempt from the overtime provisions of the FLSA. Id. In order for summary judgment to be granted, ERAC-Chicago must establish all the essential elements of an exemption to the extent required by the summary judgment standard discussed above. If a reasonable jury could find that ERAC-Chicago did not meet its burden with respect to just one element of the relevant exemptions, it would be compelled to return a verdict in favor of Singleton. As such, summary judgment is inappropriate here unless there are no genuine issues as to material facts with respect to *any* of the elements of the exemption. Each exemption, however, is independently sufficient to provide the basis for judgment in favor of ERAC-Chicago. See 29 U.S.C. § 213(a)(1) ( providing that "any employee employed in a bona fide executive, administrative, *or* professional capacity" is exempt (emphasis

---

[9] "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987); see De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 373 (3d Cir. 2007); Sperling v. Hoffman-La Roche Inc., 862 F.2d 439, 446-47 (3d Cir. 1988) (relying on the FLSA's "broad remedial purpose" as a basis for a liberal construction of the statute in favor of potential plaintiffs).

added)).  To prevail, ERAC-Chicago must establish a lack of genuinely disputed material facts with respect to *all* the elements of at least one of the asserted exemptions.[10]

The Secretary of Labor has statutory authority to publish FLSA regulations to aid courts in determining the scope of exemptions and has exercised that authority.  69 Fed. Reg. 22,121 (Apr. 23, 2004).  Section 13(a)(1)  of the FLSA provides that "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman *as such terms are defined and delimited from time to time by regulations of the Secretary*" is exempt.  29 U.S.C. § 213(a)(1) (emphasis added).  Unlike prior regulations, the currently applicable 2004 regulations were adopted after notice and comment and fall within the ambit of the Secretary's legislative rule-making authority.  69 Fed. Reg. 22,121, 22,124 (Apr. 23, 2004).  These regulations are, therefore, entitled to <u>Chevron</u> deference.  <u>See</u>  <u>Chevron USA v. Natural Res. Def. Council</u>, 467 U.S. 837 (1984); <u>Cash v. Cycle Craft Co., Inc.</u>, 508 F.3d 680, 683. (1st Cir. 2007).

Under the regulations, exempt work includes any work which is "directly and closely related to the performance of exempt work."  29 C.F.R. § 541.703.  The regulations provide the following guidance:

> The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, "directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. Work "directly and closely related" to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and

---

[10] Unlike some of the other motions for summary judgment pending in this MDL, the motion filed with respect to Singleton only claims the executive and combination exemptions.

28

> making decisions; and using a photocopier or fax machine. Work is not "directly and closely related" if the work is remotely related or completely unrelated to exempt duties.

Id.  In a similar vein, "[o]ccasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees" are exempt when they are done as a means of performing an exempt task.  29 C.F.R. § 541.707.  The court should consider the following factors in determining whether occasional tasks are exempt: (1) "[w]hether the same work is performed by any of the exempt employee's subordinates"; (2) the "practicability of delegating the work to a nonexempt employee"; (3) "whether the exempt employee performs the task frequently or occasionally"; and (4) "existence of an industry practice for the exempt employee to perform the task." Id.

The executive and combination exemptions will be addressed in order.


### 2. The Executive Exemption

An exempt "executive" is any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;[11]
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

_____

[11] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

29 C.F.R. § 541.100(a).

*(a) Management as Primary Duty*

The regulations provide a nonexhaustive list of "management" duties. 29 C.F.R. § 541.102.[12] An employee may concurrently perform nonexempt duties and still qualify for the executive exemption as long as the requirements of § 541.100 (including the primary duty requirement) are otherwise satisfied. Id. § 541.106.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a); see Reich v. Wyoming, 993 F.2d 739 742 (10th Cir. 1993) (providing that the employee's primary duty is that which is of principal importance to his or her employer); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982) (finding assistant manager's primary duty to be that which is most critical or important to success of the business). Thus, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's

---

[12] Section 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

job as a whole." 29 C.F.R. § 541.700(a). The regulations identify four nonexhaustive factors to

consider when determining an employee's primary duty, including:

> (1) "the relative importance of the exempt duties as compared with other types of duties;"
>
> (2) "the amount of time spent performing exempt work;"
>
> (3) "the employee's relative freedom from direct supervision; and"
>
> (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

Id. The amount of time spent in the performance of exempt work may be a useful guide in

determining whether exempt work is an employee's primary duty. Id. Employees who spend

more than half of their time on exempt work generally satisfy the primary duty requirement. Id.

The regulations caution, however, against blind adherence to a time-based analysis, as time spent

on exempt work is only one of the four nonexhaustive factors to consider. Id. [13]

Each of the four factors will be considered in order.

First, with regard to the relative importance of exempt duties, Singleton testified that after

being promoted, his job tasks were "roughly the same" as those of management trainees, and that

after being promoted to assistant manager, he "spent the majority of [his] time performing the

---

[13] The regulations provide the following example of the application of the primary duty analysis:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

same tasks that [he] did when [he] was a Management Assistant." (See Singleton's Statement of Facts ("Singleton SOF"), ¶¶ 8, 9; Singleton's Resp. at 11.)  He testified at his deposition that he spent "at least" fifty-five percent of his time directly involved in sales and customer service, involving one-on-one interaction with clients, in which he attempted to promote customer satisfaction, to increase the profitability of rental agreements by upselling the customers, and to cultivate new business.  (Singleton Dep. (ECF No. 260) at 43-44.)  In his initial, predeposition declaration he averred that he spent the largest amount of his time completing rentals, selling related services and ensuring customer satisfaction.  (Singleton Decl. (ECF No. 333, Ex. B) ¶ 8.) Viewing the facts in the light most favorable to Singleton, a jury could reasonably conclude that his most important duties were those in which he spent the largest amount of his time, and which were most closely tied to the profit of the branch.

ERAC-Chicago argues Singleton's performance-based compensation indicates that his most important function within ERAC-Chicago involved management.  (Def.'s Br. (ECF No. 258) at 12.)  There are simply too many disputed facts—particularly with regard to the extent to which Singleton actually oversaw operations in the branches where he worked when the branch manager was not present—for the court to conclude that no reasonable jury, accepting the facts in the light most favorable to Singleton, could find that his most important task to ERAC-Chicago was the nonexempt work, which he spent the majority of his time doing.  Of particular relevance is the disputed testimony regarding the extent to which Singleton trained employees versus giving guidance, the extent to which Singleton was permitted to deviate from pre-established schedules when the branch manager was not present in the branch without explicit authorization, and the extent to which Singleton's schedule actually overlapped with his branch manager's schedule.

Resolving disputes in favor of Singleton, (1) his primary time commitments while working as an assistant manager were in sales, (2) his branch manager was usually present when he was working, (3) he could not and did not tell co-workers how they were required to carry out their own jobs but merely offered advice, (4) when the branch manager was occasionally not present, the branch was run according to a predetermined schedule and employees carried on tasks for which they had been fully trained, (5) the full extent of Singleton's authority to manage and discipline his co-workers was observational, and (6) decisions of importance made in the branch manager's absence required prior approval by telephone by the branch manager. Thus, because the court must resolve all doubts in favor of Singleton at summary judgment, the court concludes that a reasonable jury could find that the first factor favors Singleton, and that his primary duties involved inside sales and marketing, which are not exempt managerial tasks. See 29 C.F.R. § 541.102.

Second, regarding the amount of time spent on exempt work, the largest amount of Singleton's time as an assistant manager (at least fifty-five percent) was spent on nonexempt inside sales and marketing tasks. Given the summary judgment standard, and accepting as true Singleton's testimony regarding his allocation of time between exempt and nonexempt work at ERAC-Chicago, the court concludes that a reasonable jury could find the second factor favors Singleton.

Third, according to Singleton's testimony, he was only free from supervision in a few situations. Specifically, the branch manager was responsible for scheduling, training, hiring and firing, discipline and performance evaluations. Singleton stated that his schedule largely overlapped with the branch manager and that his branch manager was present the majority of the time he was scheduled to work. Singleton was generally required to obtain prior approval when

deviating from pre-established rental rates by more than a few dollars.  Even when the branch

manager was not present, Singleton was required to call for approval before he could rent

vehicles to customers who did not have proper qualifications.  He was permitted only to report

and not to act on disciplinary matters.  He had little independent authority over scheduling

employees.  Even in his role as BCAM, his authority was limited to exploring possibilities and

was required to refer potential new corporate accounts to his branch manager.  Resolving factual

disputes in Singleton's favor, a reasonable jury could conclude that the third factor favors

Singleton, because he was, according to his own testimony, under almost constant supervision by

his branch manager and had very limited discretion to act without consulting his branch

manager.

Fourth, the court must consider Singleton's wage in relation to nonexempt employees.

Singleton earned approximately $12.32 for each hour he worked as an assistant manager at

ERAC-Chicago, and he averaged sixty hours of work per week. [14]   During the time that

---

[14] A few courts have discouraged the use of mathematics to compare wages with salaries, as this court has done. See, e.g., Taylor v. Autozone Inc., No. CV 10–08125–PCT–FJM, 2012 WL 254238, at *11 (D. Ariz. Jan. 27, 2012); Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (holding that the court should not perform "mathematical gymnastics," such as dividing an employee's weekly salary by the number of hours he worked to determine his hourly wage, but should instead "simply compare[] the manager's weekly salary with the highest possible non-exempt weekly wage" (assuming forty hours of work)).  To compare a weekly salary with an hourly wage is to compare apples with oranges.  Ultimately, in order to make a comparison, the court must engage in some amount of mathematical extrapolation.  For example, in Moore, although the court dismissed the use of mathematics, in order to make a meaningful comparison, the court was required to assume forty hours worked by nonexempt employees to determine a "weekly wage."  352 F. Supp. 2d at 1279.  The court finds the approach utilized in this opinion to be the most useful and appropriate way to provide a meaningful comparison.  Instead of making unsupported assumptions about the number of hours worked, the court is resolving factual disputes in light of the summary judgment standard.  Support for this court's approach is found in a decision of the Court of Appeals for the Third Circuit:

> [T]he regulation requires an analysis of the relationship between the foremen's salary and the wages paid to the crew members.  The foremen's salary here breaks down to $129 per nine-hour day.  The crew members receive $106.50 per eight-hour day.  If the crew members worked nine hours, their daily wage would come to $126.47 (with overtime).  There are, however, some benefits that the

Singleton was employed as an assistant manager, a management assistant who worked forty hours in a week earned up to $12.72 for each hour worked, a management assistant who worked fifty hours in a week earned up to $13.60 for each hour worked, a management trainee who worked forty hours in a week earned between $10.95 and $11.97 per hour, and a management trainee who worked fifty hours in a week earned between $12.00 and $12.80 for each hour worked.

In other words, Singleton, although he worked more hours than nonexempt co-workers with similar duties, was paid an hourly rate equivalent to or less than most of those nonexempt co-workers. A reasonable jury could conclude that this factor favors Singleton. There is evidence that his primary duties were similar to the primary duties of his nonexempt co-workers.

Because the court concludes that, when viewing the facts in the light most favorable to Singleton, the four primary duty factors collectively could be found in Singleton's favor, it is for a jury to determine whether his primary duty was management. A reasonable jury could conclude that Singleton's nonexempt tasks in sales were his duties of principal importance to ERAC-Chicago, see Reich v. Wyoming 993 F.2d 739, 742 (10th Cir. 1993), and were most critical or important to the success of ERAC-Chicago, see Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982). A jury could reasonably conclude that his most critical or important purpose to ERAC-Chicago was to perform the necessary sales functions remaining after the nonexempt management assistants and trainees had used their forty hours (without incurring any overtime expenses to ERAC-Chicago).

---

foremen receive that the hourly workers do not. . . . In sum, this evidence, while inclined in favor of exempt status, is not compelling.

Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1146 (3d Cir. 1983).

Although the court's determination that ERAC-Chicago has not met its substantial burden of proof on the primary duty element is independently sufficient to dispose of this motion with regard to the executive exemption, the court will consider the other elements of the exemption in order.

### (b) Customarily and Regularly Directs Work of Two or More Employees

To qualify under the executive exemption, an employee must customarily and regularly direct the work of two or more other employees. 29 C.F.R. § 541.100(a)(3). According to the regulations:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement." Id. § 541.104(c).

ERAC-Chicago did not meet its burden to demonstrate that, as a matter of law, Singleton customarily and regularly directed the work of two or more full time employees. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement." Id. Accepting Singleton's deposition testimony, the branch manager was responsible for training, directing and supervising employees, setting the work schedule, making disciplinary decisions, and even exercised that authority when he or she was absent from the branch. ERAC-Chicago argues that Singleton admitted to customarily and regularly directing work of two or more full-time

36

employees.  Specifically, it points to Singleton's testimony that he delegated his work to management assistants and management trainees, including pursuing new business leads, maintaining the fleet, and making "callbacks," or courtesy calls to customers with outstanding rentals.  Genuine factual disputes remain, however, regarding the extent to which Singleton shared in supervision of branch employees with the branch manager.  Accepting the facts in the light most favorable to Singleton, the branch manager was scheduled to work with Singleton the majority of the time, and exercised relatively strict control over the branch even when not present.   ERAC-Chicago failed to meet its burden on this element because a reasonable jury could conclude that (1) Singleton did not supervise two or more full-time employees on a customary and regular basis,[15] and (2) Singleton "merely assist[ed] the manager … and supervise[d] only in the actual manager's absence."  29 C.F.R. § 541.104(c).

*(c)  Authority to Hire, Fire, or Effect Some "Other Change of Status"*

In order to qualify as an exempt executive, an employee must have authority to hire or fire other employees, or have particular weight given to his or her suggestions and recommendations regarding hiring, firing, promotion, advancement or other changes of status.  29 C.F.R. § 541.100(a)(4).  "[O]ther change of status" means any "tangible employment action" as that term is commonly used under Title VII, such as "reassignment with significantly different responsibilities."  69 Fed. Reg. 22,122, 22,131 (Apr. 23, 2004).   In the Title VII context, the

---

[15] ERAC-Chicago failed to provide any evidence that Singleton worked with more than two full-time hourly employees or an equivalent mixture of full-time and part-time employees during his tenure at ERAC-Chicago. ERAC-Chicago points to deposition testimony by Singleton in which he mentions that he had two part-time employees and one management assistant "at that time."  ERAC-Chicago did not meet its burden of proof on the affirmative defense of the executive exemption because it failed to show that Singleton *regularly* supervised the requisite number of employees; rather it pointed to evidence of the required amount at one discrete moment in time.

Supreme Court has defined "tangible employment action [to] constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Pa. State Police v. Suders, 542 U.S. 129, 144 (2004). "A tangible employment action in most cases inflicts direct economic harm." Burlington Indus., 524 U.S. at 762.

To determine whether an employee's suggestions and recommendations are given "particular weight," it is not required that the employee have final authority regarding any of the above-listed changes of employment status. 29 C.F.R. § 541.105. Instead, courts should consider whether making suggestions is part of the employee's job description or duties, whether suggestions are made or requested frequently, and whether they are frequently relied upon. Id.; see Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (finding crew leaders of chicken catchers to be nonexempt when they could not hire or fire employees, but had limited authority to borrow workers from other crews, and made referrals to their employer regarding prospective employees).

Singleton was not responsible for the hiring, firing, advancement, promotion or other changes of the status of branch employees. According to his testimony, he was not even permitted to verbally reprimand subordinate employees and it was questionable whether he could send them home on slow business days without consulting first with his branch manager.

ERAC-Chicago does not argue that Singleton had authority to make hiring, firing and similar decisions, but argues instead that his recommendations were given "particular weight." There are materially disputed facts with respect to whether Singleton's recommendations were given particular weight. Under those circumstances, ERAC-Chicago did not meet the burden of

proof on this element.  Although Hollins testified that Singleton played an "important role" and provided "invaluable feedback" in the hiring process of management trainee candidates, Singleton testified that branch and area managers always made hiring decisions, and that his involvement was limited to conducting tours.  A jury could credit Singleton's testimony and conclude that his recommendations with respect to hiring were not given substantial weight. Singleton's minimal involvement in the disciplinary process provides circumstantial evidence that he was not intimately involved in tangible employment action decisions, as does his calculation that he spent zero percent of his time on "human resources management" on his contemporaneous employee self-evaluation.

ERAC-Chicago points to testimony that Singleton independently conducted performance reviews.  Singleton, however, testified that he has no recollection of personally delivering employee evaluations or even being present in the room for an evaluation.  Similarly, the parties dispute whether Singleton's participation in filling out the performance reviews established that his recommendations were given particular weight.  With respect to the performance evaluations, Singleton testified that he simply filled in a perfunctory comments section after the branch manager had completed the form.  A jury must determine whether his comments were trifling or substantial, whether he occasionally filled out other portions of the review, and whether he in fact conducted reviews by himself in order to determine whether his involvement in the performance review and evaluation process was substantial enough to reach the level required to establish this element of the executive exemption.

With respect to particular weight, the court must consider whether suggesting employment actions is part of the employee's job description or duties, whether suggestions are frequently made or requested, and whether they are frequently relied upon.  29 C.F.R. § 541.105;

Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006). There are genuine disputes with respect to this component as well. Resolving doubts in favor of Singleton, the court finds that Singleton minimally participated in job interviews, reported the bad behavior of co-workers on at least two occasions, and did not believe he was permitted to discipline or otherwise affect the advancement and promotion of his co-workers beyond encouraging them and reporting them when disciplinary matters arose (which implies that he was not encouraged to make recommendations regarding other employees and tangible employment actions). Because there are material facts in dispute, a jury should be permitted to determine whether Singleton's suggestions were given "particular weight."

Because there are material facts in dispute with respect to three of the four elements of the executive exemption, ERAC-Chicago failed to meet its burden and summary judgment cannot be granted on the basis of the executive exemption.

### 3. The Combination Exemption

Under the FLSA regulations, an employee who performs a combination of exempt duties—but who does not satisfy the primary duty requirement under any of the stand-alone exemptions—may nonetheless qualify for exempt status. 29 C.F.R. § 541.708. "[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption" so long as the other requirements, such as the salary basis test, are met. Id.; accord IntraComm, Inc. v. Baja, 492 F.3d 285, 292-95 (4th Cir. 2007) (deferring to the Secretary of Labor's interpretation that "the combination exemption provides a mechanism for cobbling together different exempt duties for the purposes of meeting the primary-duty test" but "does not . . . relieve employers of their burden to independently establish the other

requirements of each exemption whose duties are combined"). The primary thrust of the combination exemption, therefore, is merely that the performance of exempt executive work cannot be the basis for preventing an otherwise exempt administrative employee from being exempted because his primary duty is blended between executive and administrative work and vice versa. Id.

Because the court concluded that ERAC-Chicago did not meet its burden with respect to other necessary elements of the executive exemption—beyond merely failing to establish the primary duty element—the combination exemption is inapplicable to Singleton. See IntraComm, 492 F.3d at 292-95. The combination exemption will only overcome deficiencies in the primary duty element, and cannot be used as an end-around to circumvent the other requirements of the exemptions. Id. Thus, the court cannot grant ERAC-Chicago's motion for summary judgment on the basis of the combination exemption.

### V. Conclusion

For the reasons set forth in this memorandum opinion, because ERAC-Chicago did not as a matter of law prove *all* the elements of at least one of the exemptions, and in consideration of the relevant summary judgment standard and the narrowly construed FLSA exemptions, ERAC-Chicago's motion for summary judgment against sample plaintiff Brandon Singleton (ECF No. 241) will be denied. Summary judgment is precluded by the abundance of disputed material facts regarding Singleton's job responsibilities, on which the court must defer to future resolution by a jury. An order will follow.

By the court,


 /s/ Joy Flowers Conti
Hon. Joy Flowers Conti
United States District Judge


Date:  July 20, 2012