IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ENTERPRISE RENT-A-CAR | ) | MDL No. 2056 |
| WAGE & HOUR EMPLOYMENT | ) | |
| PRACTICES LITIGATION | ) | Misc. No. 09-210 |
| | ) | |
| | ) | Civil No. 07-1687 |
| NICKOLAS HICKTON, *et. al.*, | ) | Civil No. 09-0815 |
| | ) | Civil No. 09-0816 |
| Plaintiffs, | ) | Civil No. 09-0824 |
| | ) | Civil No. 09-0832 |
| v. | ) | Civil No. 09-0833 |
| | ) | Civil No. 09-1188 |
| ENTERPRISE RENT-A-CAR | ) | Civil No. 09-1321 |
| COMPANY, *et. al.*, | ) | Civil No. 10-1003 |
| | ) | Civil No. 10-1189 |
| Defendants. | ) | Civil No. 10-1456 |
| | ) | Civil No. 11-0071 |
| | ) | Civil No. 11-0333 |
| | ) | Civil No. 11-1024 |
| | ) | Civil No. 12-0659 |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| Bromfield v. Enterprise Rent-A-Car | ) | |
| Company, Civil No. 09-1188 | ) | |
| | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

*I. Introduction*

This opinion concerns sample plaintiff Joseph Biski ("Biski").  Pending before the court

are eight motions for summary judgment filed by the relevant operating subsidiaries (collectively

"defendants") of defendant Enterprise Rent-a-Car Company ("ERAC") against sample plaintiffs[1]

selected from the cases consolidated in this multidistrict litigation ("MDL").  The consolidated

---

[1] The following individuals were selected as sample plaintiffs: Robert Bajkowski; Joseph Biski ("Biski"); Wayman
F. Graham II; Kevin C. Hagler; Nils Hagstrom; Nickolas C. Hickton; Melinda McQuaig (formerly, Melinda Herrin);
and Brandon Singleton.

cases involve allegations that defendants violated the compensation requirements of the Fair

Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay

plaintiffs overtime compensation.   Plaintiffs are or were assistant managers employed by one of

the defendants.

This memorandum opinion addresses the motion for summary judgment filed by

defendant ELRAC, LLC ("ERAC-New York"), a subsidiary of ERAC, against Biski.  (ECF No.

243.)[2]  ERAC-New York argues that Biski qualified for the executive, administrative and

combination exemptions from the compensation requirements of the FLSA.  Biski responds that

summary judgment would be improper at this stage because there are genuine disputes of

material facts concerning whether the "narrowly construed" FLSA exemptions are applicable.

ERAC-New York argues that no dispute is genuine because plaintiffs submitted declarations that

violated the "sham affidavit" doctrine in an attempt to fabricate disputes of fact.  In response,

Biski argues that the sham affidavit doctrine is not applicable and that certain of the declarations

filed in support of the motion for summary judgment were submitted in violation of Federal Rule

of Civil Procedure 26.  Each of those arguments will be addressed.

After an extensive review of the parties' submissions, the hearing transcript of the oral

argument and the applicable legal principles, the court concludes that in light of the summary

judgment standard of review and the narrowness of the FLSA exemptions, ERAC-New York

failed to satisfy its burden of proving as a matter of law that Biski was properly classified as

exempt.  The motion for summary judgment filed by ERAC-New York against sample plaintiff

Biski will be DENIED.

---

[2] Unless otherwise indicated, all references in this opinion to CM/ECF electronic document filing numbers are made
with reference to the MDL master docket, filed under the miscellaneous case number 2:09-mc-210.

## *II. Factual Background*

Joseph Biski was hired by ERAC-New York's Schenectady branch as a management trainee on June 11, 2003.  (Biski Dep. (ECF No. 271-1) at 12.)  He was promoted to management assistant on August 2, 2004.  (Declaration of Patrick Bresonis ("Bresonis Decl.") (ECF No. 271-2) ¶ 5.)  On November 1, 2004, Biski was promoted to assistant manager at the Schenectady branch.  (Id.)  On May 30, 2005, Biski became the assistant manager of the Colonie branch and remained there until transferring to an Enterprise call center within Liberty Mutual on April 2, 2006.  (Id.)  Biski resigned from ERAC on November 22, 2006.  (Id.)   Biski's claims against ERAC-New York concern the one-and-one-half-year period during which Biski was employed as assistant manager of the Schenectady and Colonie branches.

ERAC-New York is also known as ERAC's "Group 24" and "stretches from northern New Jersey to Connecticut up into Vermont and part of New York."  (Biski Dep. (ECF No. 271-1) at 11.)  While Biski was an assistant manager at the Schenectady branch there were between two and six management trainees and management assistants, at any time, working at the branch; the branch did not employ car preps, drivers or interns.  (Id. at 33.)  The Colonie branch occasionally employed a car prep in addition to three to five management trainees and management assistants.  (Id.)  The Schenectady branch had a rental fleet of approximately 125 to 130 vehicles and the Colonie branch had approximately 100 vehicles.  (Id. at 85.)  Biski averred that the Schenectady branch was more sales– and retail-oriented than the Colonie branch, which received more dealership and body shop business.  (Id. at 55.)  Though there were different mixes of customers and business at the two branches, Biski testified that his role as assistant manager was the same at both branches, as were the tasks he performed.  (Id.)

3

Biski testified that assistant managers at ERAC-New York helped the branch manager oversee the operations of the branch and the employees, although they still performed the same functions of the nonexempt employees—picking up cars and washing and cleaning cars. (Biski Dep. (ECF No. 271-1) at 12.) In his declaration and throughout his deposition testimony, Biski stated that as assistant manager he spent the majority of his time performing the same rental processing tasks that he performed as a management assistant. (Id. at 6, 12; Declaration of Joseph Biski ("Biski Decl.") (ECF No. 337, Ex. C) ¶ 7.) Biski declared that "[a]s an Assistant Manager [his] primary job responsibility was renting cars to customers. To do this, [he] routinely cleaned and washed cars, picked up and dropped off customer's [sic] cars, and completed rental paperwork, which took most of [his] time each day." (Biski Decl. (ECF No. 337, Ex. C) ¶ 7.)

In addition to the rental processing tasks Biski performed, many of Biski's tasks as an assistant manager overlapped with the work of management trainees and management assistants, including performing call-backs, opening and closing the branch, maintain the branch safe and cash box, and "running the counter." Each of these tasks is discussed in order below.

Call-backs are telephone calls made to car renters to obtain information regarding the status of a given rental, to make sure a customer's information is up-to-date, or to find out if the customer needs to extend their rental. (Biski Dep. (ECF No. 271-1) at 19.) The branch manager assigned call-backs to every employee, including Biski. (Id.) Additionally, as an assistant manager, Biski testified he would follow up with branch employees on the status of their call-backs and remind them of assignments from the branch manager when necessary. (Id.)

Biski testified that the branch managers of both the Schenectady and Colonie branches closed and locked up their rental facilities on approximately eighty-five to ninety percent of days

the facilities were open; the remaining ten to fifteen percent of days were shared equally between Biski (with half of the remaining days) and the management trainees and management assistants (collectively, with half of the remaining days).  (Id. at 62.)  Biski stated that each employee knew the alarm codes and had the keys necessary to open and close the branch office.  (Id. at 61-62.)

Biski averred that each employee had access to the branch safe's combination code, which was stored in a Rolodex; and so, whoever was first to work in the morning would access the safe to retrieve car keys.  (Id. at 58-59.)  A branch's safe would contain the keys to the branch's cars, as well as a cash box.  (Id. at 58.)  According to Biski, every employee, from branch manager to management trainee, accessed the cash box within the safe, because each employee was given a section of the accounts receivable list and was responsible for money collections.  (Id. at 59-60.)  As assistant manager, Biski testified he would remind employees to complete their collections near the end of each month.  (Id. at 60.)

According to Biski, the employee "running the counter," also known as "running the show," directs the flow of rental car traffic for the day.  Directing and delegating tasks relevant to rental processing—such as who will pick up a customer or drop a customer off at a specific time—directing employee lunch breaks, and overseeing rental upgrades and fleet management (a term which will be explained more fully below) are some of the activities involved in running the show.  (Id. at 20, 46, 53, 55, 62, 79.)  The employee running the counter was also referred to as the "quarterback" or "Q.B."  (Id. at 20, 62)  Biski testified that the branch manager ran the counter most frequently and that he was second, ahead of any management assistant.  (Id. at 66.)  He explained that the circumstances dictated who would be quarterback: for example, an assistant manager may start as quarterback and have to leave for a pick-up at which time the position would be assumed by another employee.  (Id.)  Biski stated that, as an assistant

5

manager, he was responsible for "running the show" twenty-five to thirty percent of the time. (Id. at 21, 66.)  He explained that the branch manager and management assistants would be responsible for "running the show" the remaining seventy to seventy-five percent of the time. (Id. at 21.)  When Biski was not "running the show" he was washing and vacuuming cars, picking up customers, writing rental tickets, and performing call backs.  (Id.)  With respect to washing and vacuuming cars, Biski testified that he would spend ten to fifteen minutes per car and would wash and vacuum ten to fifteen cars each day.  (Id.)

Biski testified that the quarterback was responsible for scheduling and directing employee lunch breaks.  (E.g., id. at 46.)  Biski testified that the quarterback "absolutely had the discretion to say 'yes or no to give [an] upgrade.'"  (Id. at 55.)  He explained that if a management trainee wanted to give a customer a rental upgrade, then he would "probably have to ask whoever was running the counter that day," whether it was a management assistant, the assistant manager, or the branch manager.  (Id. at 54-55.)

According to Biski, all employees participated in "fleet management," which encompassed all tasks relevant to managing (a) the flow of vehicles in and out of the branch, (b) the quantity and types of vehicles at the branch, and (c) rental vehicle maintenance and performance.  (Id. at 62-66.)  Biski noted that  he spent thirty-five percent of his time each week participating in fleet management in two performance evaluations he received in June 2006, and twenty percent of his time in a September 2006 review.  (Biski Review, June 23, 2006 (ECF No. 271-11) at 8; Biski Review, September 22, 2006 (ECF No. 271-12) at 8.)  Matthew Ramos ("Ramos"), Biski's area manager, declared, "Mr. Biski was responsible for managing the fleet at his branches.  This duty required him to plan ahead to anticipate what vehicles his branch would need and to coordinate with [his area manager] and other branches to obtain those vehicles."

6

(Declaration of Matthew Ramos ("Ramos Decl.") (ECF No. 271-3) ¶ 11.)  Biski admitted to a lesser degree of responsibility in fleet management; he testified that management trainees, management assistants, and the assistant manager "assist the branch manager" in managing the fleet through their roles as quarterback and LOFR captain (described below).  (Biski Dep. (ECF No. 270-1) 62-64. 66.)

Biski testified that the quarterback running the counter participates in fleet management by requesting cars from and sending cars to other ERAC branches.  (Id. at 62-63.)  He stated that the area manager and branch managers, however, controlled the mix of vehicles on the lot for each branch (e.g., ensuring the branch had the proper number of specialty vehicles).   (Id. at 65.)

With respect to requesting cars from another branch, Biski's role in fleet management as an assistant manager was substantially unchanged from when he was a management trainee. Biski testified that any employee had the authority to call another branch and request a car, permission did not have to be sought, and "[i]t was just understood, if you can find a car and you can get one, then great." (Id. at 28.)  Biski testified that he had the same authority as a management trainee or management assistant to request cars from outside their region or to request special orders such as luxury vehicles.  (Id. at 63.)

Biski testified that all employees took turns as "LOFR captain," the person responsible for lube, oil, filter and repair of the vehicles.  (Id.)  The branch manager assigned the role of LOFR captain to management trainees, management assistants, the assistant manager, and to himself or herself.  (Id.)  In his testimony, Biski explained that LOFR captains were responsible for "ensur[ing] completion of preventative maintenance," by delivering rental vehicles to the appropriate venues to address vehicle recalls, change the oil, have warning lights inspected or tires repaired or rotated.  (Id. at 63-64.)

7

The parties dispute the extent of Biski's participation in developing an employee schedule.  Biski testified that he assisted the branch manager in "coming up with  . . . a [scheduling] plan," especially with respect to who would work Saturdays, but the branch manager would generally plan employee vacation and assign employees duties for a given day. (Id. at 46.)  Chad Reisner ("Reisner"), a management trainee who worked concurrently with Biski, testified, however, that "employees would either ask [Biski] or the branch manager before leaving work early, scheduling lunch, or scheduling vacation.… [Biski] would arrange employee schedules to ensure that [they] got time off when [they] needed it.  This was especially true at the Colonie branch, where [the branch manager] generally deferred to [Biski] almost completely on scheduling."  (Declaration of Chad Reisner ("Reisner Decl.") (ECF No. 271-4) ¶¶ 16, 17.)

Biski's branch manager made the decisions regarding who did what in the branch and assigned the roles.  (Id. at 40.)  Biski admitted to delegating assignments such as cleaning cars, picking up customers or performing call backs and that he followed up with employees to make sure those tasks were completed.  (Id. at 40-41.)  He estimated that he delegated tasks on average once or twice per day.  (Id. at 34.)  With respect to directing work, Biski explained that he did not direct others "all that often," and that such direction was limited to reminding other employees of ERAC-New York policies and encompassed only five to ten percent of his time. (Id. at 33.)

With respect to marketing, Biski testified that the branch manager would assign marketing days to employees on the branch schedule.  (Id. at 34.)  Marketing meant "visit[ing] accounts, talk[ing] to body shops, dealerships, maybe some corporate accounts . . . generally just get[ting] a feel of how things are going, . . . [or] if we can get any more of their business."  (Id.)

8

Each employee participated in marketing, and the branch manager established an overall sales and marketing strategy for the branch; Biski could not articulate any way in which his participation in marketing was different than any of the nonexempt employees at the branches where he worked.  (Id. at 34, 47.)  Ramos, on the other hand, testified that Biski was "responsible for marketing and driving sales as an Assistant Manager," and that "Biski was not particularly strong in this area."  (Ramos Decl. (ECF No. 271-3) ¶ 16.)  According to Reisner, Biski "had discretion to invest the branch's money on marketing efforts without getting permission from anyone," whereas other employees "would not do so without first obtaining permission from Biski or a branch manager."  (Reisner Decl. (ECF No. 271-4) ¶¶ 34, 35.)  The examples provided by Reisner of Biski's authority to spend money on marketing were that Biski was permitted to bring pizza, donuts, or unspecified "marketing supplies" on a marketing run without obtaining prior approval.  (Id. ¶ 34.)

The parties dispute the extent of Biski's involvement in personnel matters, including training, hiring, firing, evaluating, and disciplining employees.

For instance, according to his own testimony, to the extent Biski "trained" other employees, those activities were limited to giving advice or tips and coaching, and Biski had done that since he was a management trainee.  (Id. at 38, 40, 48.)  Patrick Bresonis ("Bresonis"), Human Resources Generalist Supervisor, declared that Biski "played a significant role in training non-management employees," specifically noting that Biski helped two employees prepare for an internal exam, which determined whether employees were eligible or prepared for promotion. (Bresonis Decl. (ECF No. 271-2) ¶ 18.)  Reisner declared that Biski "trained [him] in a wide variety of skills related to rental operations, including customer service and callbacks… [and also] teamwork skills.  [Biski] led by example.  If he saw any [employee] struggling, [he] would

always help."  (Reisner Decl. (ECF No. 271-4) ¶¶ 10, 11.)  Biski testified that helping prepare

fellow employees for tests and interviews occupied five percent of his time as an assistant

manager.  (Biski Dep. (ECF No. 271-1) at 77.)

      With respect to important human resources decisions, Bresonis testified that "[t]he

Human Resources Department gives particular weight to the views of Assistant Managers in

making personnel decisions, including decisions regarding hiring, promotions, and

terminations."  (Bresonis Decl. (ECF No. 271-2) ¶ 14.)  Ramos averred that as area manager he

gave "particular weight to Mr. Biski's opinions and insights when [Ramos] made personnel

decisions."  (Ramos Decl. (ECF No. 271-3) ¶ 13.)  According to Biski's testimony, however, he

was not actively involved in the hiring or firing of employees or the performance appraisal

process.  (Biski Dep. (ECF No. 271-1) at 40.)  It was the branch manager's responsibility to

review employee performance and conduct "one-on-one" meetings with each employee on a

monthly basis.  (Id. at 41-42.)  Biski did not conduct any one-on-ones for any branch employee.

(Id. at 42.)  During an employee review, the branch manager would give him or her a written

evaluation.  (Id. at 44.)  The branch manager filled out the employee review, and Biski added

brief comments after the review was completed and was required to sign the evaluation form;

Biski testified his participation and input were very limited.[3]  (Id.)  With respect to promotions,

---

[3] With respect to employee performance evaluations, Biski testified:

        The review was filled out almost in whole by the branch manager except for that
        section where I could put my opinion and comments.  I didn't really have
        anything to do with the rest of the review.  I just looked it over to see that it was
        complete. . . . I didn't have anything to do with the actual review.  I signed off on
        it.

(Biski Dep. (ECF No. 271-1) at 44.)  For example, on one review, Biski wrote, "Overall, [this employee] does a
great job representing Enterprise with both our accounts and customers.  In the office she is very reliable and does
anything asked of her.  I look forward to your continued success at Enterprise."  (Management Trainee Review
(ECF No. 271-7) at 5.)

the area manager would consult with the branch manager to determine which employees were

eligible for promotion to assistant manager.  (Id. at 43-44.)  Generally, Biski was not asked for

input about promotion decisions; to the extent his opinion was solicited, it was limited to whether

he believed the candidate could pass the requisite advancement exam, and did not include his

opinions about whether the person was otherwise qualified or ready for the position.  (Id.)

Biski denied participating in making difficult or important decisions:

> I can't think of any examples off the top of my head as far as
> difficult decisions.  I don't know that I was ever faced with any
> amazingly tough decisions that I -- and if I was, for the most part,
> it would be discussed with the branch manager or an area manager
> because it was probably outside the realm and the scope of what
> I'm used to dealing with day in and day out.

(Id. at 55.)

According to Biski, he was present for only one interview of a management trainee

candidate, which was conducted by the area manager.  (Id. at 40.)  At the end of the interview,

the area manager stated he had decided not to hire the candidate, and Biski told him that he

agreed.  (Id.)  Reisner, on the other hand, testified that "[Biski] sat in on interviews with

candidates seeking jobs at our branches, and he provided input about those candidates to the

Branch Manager and Area Manager.  I saw [Biski] participate in several interviews."  (Reisner

Decl. (ECF No. 271-4) ¶ 27.)

Generally, it was not Biski's responsibility to investigate and resolve employee issues

and complaints.  (Biski Dep. (ECF No. 271-1) at 42.)  Biski recalled one instance where an

employee complained to him about another employee and Biski relayed the complaint to the

branch manager who resolved the complaint.  (Id. at 42-43.)  Biski's opinion regarding the

appropriate resolution of that complaint was not solicited.  (Id. at 43.)

Biski averred that disciplining employees was the branch manager's responsibility and he did not participate except in the few situations explained in this paragraph, at the direction of his superiors.  (Id. at 29, 43.)  For example, twice on the same day, Biski was directed by the area manager to complete an "employee warning notice."  (Id. at 30-31.)  In the branch manager's absence, the area manager and a human resources employee told him to complete the warning notice, and that it could not wait until the branch manager returned.  (Id.)  They instructed him about specific phrasing and words to place on the warning notice.  (Id. at 31.)  Biski completed an entry in the "significant event log" once when an employee rented a vehicle to a customer under the age of twenty-one.  (Id. at 32.)  Biski spoke with the area manager and branch manager about the incident before he completed the entry.  (Id.)  Biski explained that he would not recommend discipline because he did not know the company guidelines for discipline.  (Id. at 43.)  Any time he participated in discipline, such as when he gave the written warnings discussed above, he acted at the specific direction of one of his superiors at ERAC-New York.  (Id.)

Biski testified that fifty hours per week was generally the targeted maximum on-the-clock permitted for work by management trainees and management assistants when he was an assistant manager.  (Biski Dep. (ECF No. 271-1) at 47.)   He, on the other hand, routinely worked more than fifty hours per week.  (Biski Decl. (ECF No. 337, Ex. C) ¶ 3.)  Biski testified that when he applied to become a management trainee he was told to expect to work more than fifty hours every week, even as a nonexempt employee.  (Biski Dep. (ECF No. 271-1) at 6.)

Biski's base salary as an assistant manager was $27,400 per year.  (Bresonis Decl. (ECF No. 271-2) ¶ 10.)  Additionally, he received a commission, which was a percentage of the branch's annual profits.  (Id. ¶ 8.)  Management trainees and management assistants were paid base salaries of $20,200 and $22,000, respectively, and received overtime pay for working

12

beyond forty hours per week.  (Id. ¶ 11.)  In the twelve months prior to becoming an assistant

manager, Biski "earned total compensation of about $28,864.  In his first 12 months serving as

an Assistant Manager, he earned total compensation of about $33,222."  (Id. ¶¶ 5, 9.)  At fifty

hours per week and receiving time-and-a-half pay for overtime, a management assistant with a

base salary of $22,000 would receive $30,250 in annual compensation per year.  At fifty-five

hours per week, he or she would receive $34,375 in annual compensation.


### *III. Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions*.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing Celotex Corp., 477 U.S. at 322-23; Anderson, 477 U.S. at 248)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  The court must rely on the substantive law to identify which facts are material.  Abington Friends Sch., 480 F.3d at 256 (citing Anderson, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v.

14

Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility

determinations at the summary judgment stage.  Simpson v. Kay Jewelers, Div. of Sterling, Inc.,

142 F.3d 639, 643 n.3 (3d Cir. 1998).


## IV. Discussion

The FLSA is a federal statute, originally enacted in 1938, and designed to combat

substandard labor conditions relating to unfair wages, overlong working hours and a variety of

other perceived evils.  At issue in this motion for summary judgment are some of the myriad

exemptions to the FLSA's overtime requirements.  Specifically, ERAC-New York claims that

Biski was exempt from the FLSA's compensation requirements under one of the following

exemptions:  1) executive; 2) administrative; or 3) combination.

As a preliminary matter, before addressing the substantive arguments relating to FLSA

exemptions, the court will address the two secondary arguments presented by the parties.  First,

ERAC-New York argues that Biski submitted a sham affidavit after his deposition, which this

court should disregard in assessing the existence of genuinely disputed material facts.  Second,

Biski argues that ERAC-New York failed to disclose the identity of witnesses whose statements

were attached to its motion for summary judgment, in violation of Rule 26 of the Federal Rules

of Civil Procedure.


### A. Sham Affidavit Doctrine

ERAC-New York asserts that Biski submitted a "sham affidavit."  Under the "sham

affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in

opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior

deposition testimony.'" <u>Seitz v. Detweiler, Hershey and Assocs., P.C.</u> (<u>In re CitX Corp.</u>), 448

F.3d 672, 679 (3d Cir. 2006) (quoting <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004)); <u>see,</u>

<u>e.g.</u>, <u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d 247, 252 (3d Cir. 2007) (holding that to

permit the plaintiffs to engineer factual disputes by means of self-serving affidavits "'would

greatly diminish the utility of summary judgment as a procedure for screening out sham issues of

fact'" (quoting <u>Perma Research & Dev. Co. v. Singer Co.</u>, 410 F.2d 572, 577-78 (2d Cir.

1969))); <u>Zalewski v. PNC Fin. Servs. Group, Inc.</u>, No. 06-1231, 2008 U.S. Dist. LEXIS 70026,

at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment

based on employee's "performance evaluations . . . , her contemporaneous reporting of her job

responsibilities, [her] resume, and her deposition testimony"), <u>adopted by</u> Memorandum

Opinion, <u>Zalewski v. PNC Fin. Servs. Group, Inc.</u>, No. 06-1231 (W.D. Pa. Apr. 7, 2008).

      "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot

maintain a consistent story or is willing to offer a statement solely for the purpose of defeating

summary judgment." <u>Jiminez</u>, 503 F.3d at 253.  Because the trial court is vested with the

inherent power to grant summary judgment on disputed records, <u>Anderson v. Liberty Lobby</u>, 477

U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary

weight to an affidavit that is clearly offered solely for the purpose of defeating summary

judgment.  <u>Jiminez</u>, 503 F.3d at 253.  The practical underpinning of the sham affidavit doctrine

"is that prior depositions are more reliable than affidavits."  <u>Id.</u>

      In <u>Jiminez</u>, the Court of Appeals for the Third Circuit recognized that other courts of

appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that,

whenever a subsequent affidavit contradicts prior deposition testimony, it should be

disregarded." <u>Id.</u> at 254.  The Court of Appeals for the Third Circuit has "adopted a more flexible

approach." Id.  The court recognized in Jiminez that "not all contradictory affidavits are necessarily shams." Id.  Notably, "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." Id. (quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004)).  "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the affiant should have the opportunity to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit. Id.; see Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents. See Lytle v. Capital Area Intermediate Unit, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting Baer, 392 F.3d at 625)).  To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ." Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).  When allegations in a subsequent affidavit could support statements made in prior deposition testimony, the dueling statements "are more appropriately dealt with on cross-examination than

17

on summary judgment." <u>Ragan v. Fuentes</u>, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J. Sept. 28, 2007).

Biski's original declaration is dated October 20, 2009.  (Biski Decl. (ECF No. 337, Ex. C).)  He was deposed on December 8, 2009 (Biski Dep. (ECF No. 271-1) at 1), and submitted a supplemental declaration dated January 26, 2011 (Biski Suppl. Decl. (ECF No. 327, Ex. A)). Biski argues the two declarations are consistent with each other and his deposition testimony. ERAC-New York points to alleged inconsistencies between the declarations and the deposition testimony, which will be discussed below in order.  As an initial matter, however, the court notes that Biski's initial declaration was made prior to the deposition.  In such circumstances, the sham affidavit doctrine still applies because there is "no principle that cabins sham affidavits to a particular sequence." <u>In re CitX Corp.</u>, 448 F.3d at 679-80.  Nonetheless, "cross-examining the affiant in [the] later deposition seems the better way to find the flaws in a bogus affidavit."  <u>Id.</u>

First, ERAC-New York argues that portions of paragraph 4 of Biski's supplemental declaration are inconsistent with his prior deposition testimony.  In paragraph 4, Biski declared, among other things, that "at no time did [he] recommend or suggest to [his] supervisors that an employee be hired or fired, and [he] was not asked to give any input on these decisions by [his branch and area manager]."  (Biski Suppl. Decl. (ECF No. 337, Ex. A) ¶ 4.)  ERAC-New York argues that paragraph 4 contradicts Biski's deposition testimony that he sat in on an interview with an area manager once.  The court finds that the testimony is not flatly contradictory and is, therefore, not a sham.  During his deposition, Biski made clear that he played no actual role in the decision not to hire the candidate, but rather ratified the decision already made by his area manager.

18

Second, ERAC-New York takes issue with portions of paragraph 5 of Biski's supplemental declaration, in which he testified that he "rarely directed the work of other branch employees[, but that] [o]n those rare occasions when [he] did, however, it was in accordance with the explicit directives to him by the Branch Manager." (Id. ¶ 5.)  To the extent such testimony contradicts portions of Biski's testimony where he admitted to delegating tasks, once or twice a day, to subordinates without explicit directives from his superiors, the declaration testimony is flatly contradictory, and the court will disregard it to that extent for the purposes of this summary judgment opinion because no reasonable jury would consider it reliable, so it cannot be the source of a *genuine* dispute.  ERAC-New York also takes issue with the portion of paragraph 5 in which Biski declared: "The positions of Assistant Manager, Management Assistant and Management Trainee are largely interchangeable."  Such testimony is not flatly contradictory because it is supported by his consistent testimony during his deposition that many of the tasks carried out by those employees, as well as the responsibilities given them, are the same.  ERAC-New York's argument that the declaration testimony is contradictory because Biski admitted at his deposition that there were *some* specific differences between the positions is unavailing, because testifying that they are *largely* interchangeable is consistent with that theme.

Third, ERAC-New York argues that portions of paragraph 7 of Biski's supplemental declaration are inconsistent with his deposition testimony.  ERAC-New York takes issue with the legal conclusions contained in his declaration testimony that "[t]he limited discretion [he] was able to exercise as an Assistant Manager concerned routine matters unrelated to the management of the branch or its employees" and that "[m]anaging the branch was not [his] primary duty." (Id. ¶ 7.)  The perceived inconsistency in the testimony is nonfactual, but deals with the

contradictory characterization and legal import given the facts by the two parties to the case.

Biski testified consistently that he believed his most important and frequent tasks were sales-

related, and that important decisions were left for the area and branch manager.  For the purposes

of the sham affidavit doctrine, it is immaterial whether ERAC-New York disputes Biski's legal

opinions, and entirely expected that they would.  In any event, to the extent paragraph 7

expresses Biski's legal opinion—inadmissible opinion evidence—it would not be sufficient to

create a genuine dispute of material fact and preclude summary judgment.

Fourth, ERAC-New York argues that portions of paragraph 9 of Biski's supplemental

declaration constitute sham testimony.  ERAC-New York argues that his explanation that before

he became an assistant manager, he considered his assistant manager to be one of his supervisors

because the assistant manager was "above [him] in terms of the store hierarchy."  (Id. ¶ 9.)

ERAC-New York did not present any deposition testimony which was contradicted by this

portion of Biski's supplemental declaration, and the court is not aware of any.  ERAC-New York

may properly test and probe Biski's explanation on cross-examination, in the presence of a jury

who may make credibility determinations.  This testimony is not sham because it permissibly

explains and expands upon Biski's deposition testimony.

Fifth, ERAC-New York challenges Biski's testimony in paragraph 8 of his supplemental

declaration that he "did not directly manage the work of hourly employees."  (Id. ¶ 8.)  ERAC-

New York argues that this testimony is contradicted by his testimony that he occasionally

directed employees and delegated work.  ERAC-New York seems to argue that "managing" and

"directing" are synonymous.  The court finds that they are not the same in the context of the

FLSA.  Notably, a person may direct employees, but still not qualify as a "manager" for the

purposes of the executive exemption.  To the extent the parties dispute the consistency of

paragraph 8, that dispute goes to their differing *legal* interpretations of the facts, and is not appropriately raised as an attack on the genuineness of the declaration.  In paragraph 8, particularly the portions explicitly challenged by ERAC-New York, Biski restated his general theory of liability—that he was not a manager of the hourly employees at his branches, and should have, therefore, received overtime compensation.  There is nothing factually contradictory within the challenged portions of paragraph 8, and it is not a sham.  If the record did not support Biski's litigation position or legal understanding of this case, as he expressed it at his deposition, the court would not consider that information to be evidence sufficient to create a genuine dispute because it would amount to inadmissible legal opinion evidence.

Sixth, ERAC-New York argues that portions of paragraph 11 of the supplemental declaration constitute sham testimony.  The challenged portion of paragraph 11 provides that Biski "spent the majority of his time performing the work of Enterprise's non-exempt, hourly employees."  (Id. ¶ 11.)  That testimony is supported by Biski's deposition where he testified that he spent only thirty percent of his time, at the most, as the branch's quarterback, and that the rest of his time (*i.e.*, the majority of his time) was spent carrying out the same nonexempt labor-intensive or sales-related tasks performed by the nonexempt employees at the branches.  It is not, therefore, a sham.

Seventh, ERAC-New York argues that paragraph 5 of Biski's original declaration is inconsistent with his later deposition testimony.  Paragraph 5 provides:

> Although I had the title of Assistant Manager, my managerial responsibilities were very limited.   The Branch Manager and Area Manager had authority over all store operations, including operations and personnel that I helped to oversee.   For example, I did not have the authority to hire, fire, promote or demote employees working in the store.   These actions were always determined by the Branch or Area Manager and I had no

21

> authority regarding such matters.   Moreover, I did not make
> recommendations that were given any weight about whether any
> employee should be hired or fired.

(Biski Decl. (ECF No. 337, Ex. C) ¶ 5.)  ERAC-New York argues that paragraph 7 contradicts

Biski's deposition testimony, arguing that it lacks foundation (*i.e.*, that he is incapable of

knowing whether any recommendation he gave was given weight) and contradicted by his

deposition testimony that he was present during one interview.  After that interview, his opinion

was solicited from his area manager about the candidate, but only after the area manager had

already announced that he decided not to hire her.  The testimony is not contradictory or

foundationless.  Biski was capable of observing that his supervisor had already made a decision

before requesting an opinion from Biski.  Because the testimony is not contradictory, it is not a

sham, and the court will not disregard it.

For the reasons set forth above, and with the exceptions noted, the court finds the

challenged declaration testimony not flatly contradictory of Biski's deposition testimony.  The

declarations are, therefore, not shams.  The court notes that ERAC-New York could not meet its

substantial burden of proof on summary judgment even if the declarations were disregarded.

Notably, most of the factual information contained in the first section of this memorandum

opinion is derived from sources other than the challenged portions of the declarations.  Even if

the declarations were stricken from the record, there would still be sufficient genuine disputes of

material fact to preclude the court from entering summary judgment in ERAC-New York's

favor.

### B. Rule 26 Disclosures

Plaintiffs assert that statements submitted by defendants in support of the various motions for summary judgment were made in violation of Federal Rule of Civil Procedure 26. Defendants argue that they satisfied their Rule 26 obligations because the identities of the ERAC-New York employees who made declarations ("declarants") were disclosed in the course of depositions.

A party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i).  "A party must make its initial disclosures based on the information then reasonably available to it.  A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E).

Under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

23

Rule 37(c) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless*." FED. R. CIV. P. 37(c) (emphasis added); see Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000).

Because the court is denying this motion for summary judgment, it need not rule on the propriety of the disclosures under Rule 26.   Instead, the discretionary application of Rule 37 sufficiently disposes of the issue, because, presuming defendants did violate Rule 26, the presumed violations would have been harmless.   The imposition of Rule 37 sanctions is within the discretion of this court.  Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir. 1995).   There are several factors which courts of appeals will consider in evaluating how this court exercises its discretion regarding Rule 37 sanctions.  In re TMI Litig., 193 F.3d 613, 721 (3d Cir. 1999).   This court will use those factors as a guide in applying its discretion. The factors are:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and
>
> (4) bad faith or willfulness in failing to comply with the district court's order.

24

Id. (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)).

Biski was given the opportunity to pursue additional discovery of declarants before the court ruled on the motion for summary judgment and chose not to do so.  (Tr. of Continued Arg. (ECF No. 807) at 117, July 25, 2011.)  The only relief requested by plaintiffs in the briefing on this issue is a "request that the Court disregard the declarations of Defendants' witnesses provided after the close of the summary judgment discovery period."  (Pl.'s Resp. to Defs.' Suppl. Br. on the Sufficiency of Disclosures (ECF No. 791) at 2.)  There is no pending motion for sanctions.  As the court explains infra in Section IV.C, genuinely disputed material facts compel a resolution of this motion in favor of Biski.  Thus, to the extent the court relied on declarants' testimony, the reliance was harmless, as the only relief requested by Biski relates to the court's determination of this motion, on which Biski ultimately prevailed.

Applying the TMI/Meyers factors, the court finds: first, there is no prejudice to Biski, as explained above; second, Biski had the opportunity to conduct further discovery with respect to declarants, but chose not to do so, and could have cured any perceived prejudice; third, efficient administration of this multidistrict litigation compels the court to resolve this summary judgment motion without further procedural delay or complicated wrangling of the record without purpose; and fourth, the court finds no bad faith on the part of ERAC-New York.  For these reasons, and all the reasons listed above, but primarily because the court is resolving the summary judgment in favor of Biski, there is no need to disregard the statements of the declarants, as requested by Biski.

25

*C. The FLSA Exemptions*

*1. General Framework*

The FLSA exempts from its overtime provisions "any 'employee in a bona fide

executive, administrative, or professional capacity.'"  Soehnle v. Hess Corp., 399 F. App'x 749,

750 n.1 (3d Cir. 2010) (quoting 29 U.S.C. § 213(a)(1)).  Additionally, the FLSA exempts from

its overtime provisions "[e]mployees who perform a combination of exempt duties."  29 C.F.R. §

541.708.

In light of the broad remedial purpose of the FLSA,[4] exemptions are narrowly construed

against the employer.  Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir.

2000).  An FLSA exemption is properly characterized as an affirmative defense.  Id. at 180-81,

183.  Thus, "[t]he burden of proof to establish that its employees come within the scope of an

overtime exemption is on the employer."  Friedrich v. U.S. Computer Serv., 974 F.2d 409, 412

(3d Cir. 1992).  "[I]f the record is unclear as to some exemption requirement, the employer will

be held not to have satisfied its burden."  Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900

(3d Cir. 1991).

ERAC-New York bears the burden of proving that Biski was exempt from the overtime

provisions of the FLSA.  Id.  In order for summary judgment to be granted, ERAC-New York

must establish all the essential elements of the exemption to the extent required by the summary

judgment standard discussed above.  If a reasonable jury could find that ERAC-New York did

not meet its burden with respect to just one element of the exemptions, it would be compelled to

---

[4] "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during
the Great Depression, and has been liberally interpreted."  Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987);
see De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 373 (3d Cir. 2007); Sperling v. Hoffman-La Roche Inc., 862
F.2d 439, 446-47 (3d Cir. 1988) (relying on the FLSA's "broad remedial purpose" as a basis for a liberal
construction of the statute in favor of potential plaintiffs).

return a verdict in favor of Biski.  As such, summary judgment is inappropriate here unless there

are no genuine issues as to material facts with respect to *any* of the elements of the exemption.

Each exemption, however, is independently sufficient to provide the basis for judgment in favor

of ERAC-New York.  See 29 U.S.C. § 213(a)(1) ( providing that "any employee employed in a

bona fide executive, administrative, *or* professional capacity" is exempt (emphasis added)).  To

prevail, ERAC-New York must establish a lack of genuinely disputed material facts with respect

to *all* the elements of at least one of the asserted exemptions.

The Secretary of Labor has statutory authority to publish FLSA regulations to aid courts

in determining the scope of exemptions and has exercised that authority.  69 Fed. Reg. 22,121

(Apr. 23, 2004).  Section 13(a)(1) of the FLSA provides that "any employee employed in a bona

fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman

*as such terms are defined and delimited from time to time by regulations of the Secretary*" is

exempt.  29 U.S.C. § 213(a)(1) (emphasis added).  Unlike prior regulations, the currently

applicable 2004 regulations were adopted after notice and comment and fall within the ambit of

the Secretary's legislative rule-making authority.  69 Fed. Reg. 22,121, 22,124 (Apr. 23, 2004).

These regulations are, therefore, entitled to Chevron deference.  See  Chevron USA v. Natural

Res. Def. Council, 467 U.S. 837 (1984); Cash v. Cycle Craft Co., Inc., 508 F.3d 680, 683. (1st

Cir. 2007).

Under the regulations, exempt work includes any work which is "directly and closely

related to the performance of exempt work."  29 C.F.R. § 541.703.  The regulations provide the

following guidance:

> The phrase "directly and closely related" means tasks that are
> related to exempt duties and that contribute to or facilitate
> performance of exempt work. Thus, "directly and closely related"

27

work may include physical tasks and menial tasks that arise out of
exempt duties, and the routine work without which the exempt
employee's exempt work cannot be performed properly. Work
"directly and closely related" to the performance of exempt duties
may also include recordkeeping; monitoring and adjusting
machinery; taking notes; using the computer to create documents
or presentations; opening the mail for the purpose of reading it and
making decisions; and using a photocopier or fax machine. Work
is not "directly and closely related" if the work is remotely related
or completely unrelated to exempt duties.

Id.  In a similar vein, "[o]ccasional, infrequently recurring tasks that cannot practicably be

performed by nonexempt employees" are exempt when they are done as a means of performing

an exempt task. 29 C.F.R. § 541.707.  The court should consider the following factors in

determining whether occasional tasks are exempt: (1) "[w]hether the same work is performed by

any of the exempt employee's subordinates"; (2) the "practicability of delegating the work to a

nonexempt employee"; (3) "whether the exempt employee performs the task frequently or

occasionally"; and (4) "existence of an industry practice for the exempt employee to perform the

task." Id.

The executive, administrative and combination exemptions will be addressed in order.


### 2. The Executive Exemption

An exempt "executive" is any employee:

(1) Compensated on a salary basis at a rate of not less than $455
per week . . . ;[5]

(2) Whose primary duty is management of the enterprise in which
the employee is employed or of a customarily recognized
department or subdivision thereof;

---

[5] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative
exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).


### (a)  Management as Primary Duty

The regulations provide a nonexhaustive list of "management" duties.  29 C.F.R. § 541.102.[6]  An employee may concurrently perform nonexempt duties and still qualify for the executive exemption as long as the requirements of § 541.100 (including the primary duty requirement) are otherwise satisfied.  Id. § 541.106.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a); see Reich v. Wyoming, 993 F.2d 739 742 (10th Cir. 1993) (providing that the employee's primary duty is that which is of principal importance to his or her employer); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir.

---

[6] Section 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

1982) (finding assistant manager's primary duty to be that which is most critical or important to success of the business).   Thus, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  The regulations identify four nonexhaustive factors to consider when determining an employee's primary duty, including:

> (1) "the relative importance of the exempt duties as compared with other types of duties;"
>
> (2) "the amount of time spent performing exempt work;"
>
> (3) "the employee's relative freedom from direct supervision; and"
>
> (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

Id.  The amount of time spent in the performance of exempt work may be a useful guide in determining whether exempt work is an employee's primary duty.  Id.  Employees who spend more than half of their time on exempt work generally satisfy the primary duty requirement.  Id. The regulations caution, however, against blind adherence to a time-based analysis, as time spent on exempt work is only one of the four nonexhaustive factors to consider.  Id. [7]

Each of the four factors will be considered in order.

_____

[7] The regulations provide the following example of the application of the primary duty analysis:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

First, with respect to the relative importance of exempt duties, a jury could reasonably determine that Biski's limited exempt duties were much less important than his nonexempt duties.  Among Biski's exempt executive duties were his limited role training employees, and any time he spent directing and delegating other employees in their work, including the time he spent "running the show."  A jury could reasonably conclude, based upon Biski's testimony, that these obligations were not nearly as important to ERAC-New York as Biski's responsibilities in performing labor-intensive or sales-related functions at the branch.  Those labor-intensive or inside-sales tasks (which are nonexempt) were vital to the success of his branch.  It is reasonable to conclude that Biski's most important purpose was to complete the menial and sales tasks necessary to rent cars to customers, without incurring overtime expenses to the branch.  This conclusion is bolstered by the substantial evidence in the record that Biski's managerial roles were very limited, and involved mostly unimportant decisions, such as when an employee could take a lunch break, or which employee would pick up a customer.  The first factor weighs against Biski's primary duty being management.

Second, regarding the amount of time spent on exempt work, Biski testified that he spent the seventy to seventy-five percent of the time he was not "running the show" on nonexempt tasks such as washing and vacuuming cars, picking up customers, writing rental tickets and performing call backs.   The second factor weighs against Biski's primary duty being management.

Third, with respect to freedom from supervision, Biski's testimony indicated that he relied on supervisors whenever an important issue arose, and that, even when his branch manager was absent, he had access to human resources personnel or his area manager.  He testified that the branch manager usually ran the counter at the branch, and that the person running the

31

counter, even if it was a nonexempt employee, oversaw mundane decisions such as whether to grant an upgrade.  He testified that he always referred difficult or important decisions to his supervisors.  Freedom from supervision includes the concept of independent discretion.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1270 n.57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision. . . . Thus, the . . . regulations . . . are consistent with[] our consideration of the frequency with  which an employee exercises discretionary powers in our primary duty analysis.").  There is little, if any, evidence in the record showing that Biski exercised discretion in matters beyond temporarily reassigning employees within the branch, or delegating minor tasks.  The third factor weighs against Biski's primary duty being management.

Fourth, the court must consider Biski's wage in relation to nonexempt employees.  Because the court was not presented with any evidence about the "wages paid to *other* employees" during the time period when Biski was an assistant manager, the court will consider this factor neutral.  To the extent the court has limited information about the wages of nonexempt employees based upon Biski's wage before his promotion, or based on reasonable inferences from the record, the factor would still be neutral.  At fifty-five hours per week, a management assistant could earn greater annual compensation than Biski, but at fifty hours per week, he or she would earn slightly less on an annual basis.[8]  In light of the lack of record evidence about

---

[8] A few courts have discouraged the use of mathematics to compare wages with salaries, as this court has done.  See, e.g., Taylor v. Autozone Inc., No. CV 10–08125–PCT–FJM, 2012 WL 254238, at *11 (D. Ariz. Jan. 27, 2012); Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (holding that the court should not perform "mathematical gymnastics," such as dividing an employee's weekly salary by the number of hours he worked to determine his hourly wage, but should instead "simply compare[] the manager's weekly salary with the highest possible non-exempt weekly wage" (assuming forty hours of work)).  To compare a weekly salary with an hourly wage is to compare apples with oranges.  Ultimately, in order to make a comparison, the court must engage in some amount of mathematical extrapolation.  For example, in Moore, although the court dismissed the use of mathematics, in order to make a meaningful comparison, the court was required to assume forty hours worked by nonexempt employees to determine a "weekly wage."  352 F. Supp. 2d at 1279.  The court finds the approach

how much management trainees and management assistants who worked concurrently with Biski *actually* earned (as opposed to what they're base salary was), and because the limited evidence available leads to no meaningful comparison, the court cannot discern that this factor would weigh either for or against management being Biski's primary duty.  The court will, therefore, consider it a neutral factor.

Because the court concludes that, when viewing the facts in the light most favorable to Biski, three of the four primary duty factors collectively could be found in Biski's favor and the other factor is neutral, it is for a jury to determine whether his primary duty was management. A reasonable jury could conclude that Biski's nonexempt tasks—like writing sales tickets, cleaning cars, and picking up customers—were his duties of principal importance to ERAC-New York, see Reich v. Wyoming 993 F.2d 739, 742 (10th Cir. 1993), and were most critical or important to the success of ERAC-New York, see Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982).   A jury could reasonably conclude that his most critical or important purpose to ERAC-New York was to perform the necessary menial functions remaining after the nonexempt management assistant and (to the extent car preps were hired) car preps had gone home for the day.  This conclusion is supported by Biski's testimony that his job functions were essentially

---

utilized in this opinion to be the most useful and appropriate way to provide a meaningful comparison.  Instead of making unsupported assumptions about the number of hours worked, the court is resolving factual disputes in light of the summary judgment standard.  Support for this court's approach is found in a decision of the Court of Appeals for the Third Circuit:

> [T]he regulation requires an analysis of the relationship between the foremen's salary and the wages paid to the crew members.  The foremen's salary here breaks down to $129 per nine-hour day.  The crew members receive $106.50 per eight-hour day.  If the crew members worked nine hours, their daily wage would come to $126.47 (with overtime).  There are, however, some benefits that the foremen receive that the hourly workers do not. . . . In sum, this evidence, while inclined in favor of exempt status, is not compelling.

Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1146 (3d Cir. 1983).

unchanged by his promotion to assistant manager and the court's conclusion that those

managerial tasks he *did* perform were largely unimportant, noncritical functions, which were

shared with nonexempt employees.

### (b) Customarily and Regularly Directs Work of Two or More Employees

To qualify under the executive exemption, an employee must customarily and regularly

direct the work of two or more other employees, or their equivalent.  29 C.F.R. §§ 541.100(a)(3),

541.104(a).  According to the regulations:

> The phrase "customarily and regularly" means a frequency that
> must be greater than occasional but which, of course, may be less
> than constant. Tasks or work performed "customarily and
> regularly" includes work normally and recurrently performed
> every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701.   "An employee who merely assists the manager of a particular department

and supervises two or more employees only in the actual manager's absence, does not meet this

requirement."  Id. § 541.104(c).

ERAC-New York did not meet its burden to demonstrate that, as a matter of law, Biski

customarily and regularly directed the work of two or more full time employees.  "An employee

who merely assists the manager of a particular department and supervises two or more

employees only in the actual manager's absence, does not meet this requirement."  Id.  Accepting

as true Biski's deposition testimony, Biski's branch manager was responsible for directing and

supervising the ERAC-New York employees, managing them, and setting the work schedule.   In

determining this element, although supervisory responsibility may be distributed among multiple

executives, hours worked by a subordinate employee cannot be credited to more than one

executive.  29 C.F.R. § 541.104(d) ("Hours worked by an employee cannot be credited more

than once for different executives.  Thus, a shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement.").  The record indicates there were times during which there were only two nonexempt employees working at the Schenectady branch.  There is insufficient evidence in the record to conclude that there were sufficient collective hours worked by the three subordinate employees at the Schenectady branch (including Biski) during those periods to satisfy this element of the executive exemption with respect to a branch manager *and* to Biski.

A reasonable jury could also conclude that Biski only supervised other employees in the branch when the manager was not present, based on the testimony that the person running the counter, who was usually the branch manager, oversaw mundane decisions, and that he referred to his superiors with respect to important decisions, when the branch manager was not present.

The court concludes that ERAC-New York failed to meet its burden to satisfy this factor of the executive exemption because a reasonable jury could conclude that (1) Biski did not, at times, supervise two or more full-time employees on a customary and regular basis, and (2) Biski "merely assist[ed] the manager … and supervise[d] . . . only in the actual manager's absence" even when there were sufficient employees working at ERAC-New York.  29 C.F.R. § 541.104(c).

### (c)  Authority to Hire, Fire, or Effect Some "Other Change of Status"

In order to qualify as an exempt executive, an employee must have authority to hire or fire other employees, or have particular weight given to his or her suggestions and recommendations regarding hiring, firing, promotion, advancement or other changes of status. 29 C.F.R. § 541.100(a)(4).  "[O]ther change of status" means any "tangible employment action"

as that term is commonly used under Title VII, such as "reassignment with significantly different responsibilities." 69 Fed. Reg. 22,122, 22,131 (Apr. 23, 2004). In the Title VII context, the Supreme Court has defined "tangible employment action [to] constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Pa. State Police v. Suders, 542 U.S. 129, 144 (2004). "A tangible employment action in most cases inflicts direct economic harm." Burlington Indus., 524 U.S. at 762.

To determine whether an employee's suggestions and recommendations are given "particular weight," it is not required that the employee have final authority regarding any of the above-listed changes of employment status. 29 C.F.R. § 541.105. Instead, courts should consider whether making suggestions is part of the employee's job description or duties, whether suggestions are made or requested frequently, and whether they are frequently relied upon. Id.; see Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (finding crew leaders of chicken catchers to be nonexempt when they could not hire or fire employees, but had limited authority to borrow workers from other crews, and made referrals to their employer regarding prospective employees).

There are genuine issues of fact with respect to this element of ERAC-New York's affirmative defense which preclude summary judgment. Biski testified he was not responsible for the hiring, firing, advancement, promotion or other changes of the status of branch employees. The record shows that Biski neither meaningfully participated in nor made material suggestions with respect to hiring, firing, advancement, promotion or other material changes of status. He testified he did not discipline employees, except in a few situations where he merely

36

documented what happened or carried out the explicit directions of his supervisors, because he did not know ERAC-New York's disciplinary policies.

With respect to particular weight, the court must consider whether suggesting employment actions is part of the employee's job description or duties, whether suggestions are frequently made or requested, and whether they are frequently relied upon.  29 C.F.R. § 541.105; Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006).  There are genuine disputes with respect to this component.  Although testimony of ERAC-New York employees indicates that Biski was expected to participate and did participate in these types of decisions, his own testimony indicates that he did not have sufficient involvement.  In resolving the dispute, the court must credit the testimony of Biski.  Because, as was explained above, his recommendation about a hiring decision was made only once, and only after the decision had already been made, a reasonable jury could conclude that his suggestion did not receive particular weight.

ERAC-New York's attempt to argue that Biski's reporting or making a record of disciplinary situations is sufficient to meet this element is unavailing.  The record makes clear that he did little more in those situations than write down what had happened, at the direction of a superior.  All employees have some degree of responsibility to report disciplinary or troubling information to their employer about co-workers.  Creating a record or reporting an issue does not reach the level necessary to meet the requirements of this element of the executive exemption.

Because there are material facts in dispute with respect to three of the four elements of the executive exemption, ERAC-New York failed to meet its burden and summary judgment cannot be granted on the basis of the executive exemption.

### *3.  The Administrative Exemption*

An exempt "administrative" employee is any employee:

> (1) Compensated on a salary or fee basis at a rate not less than $455 per week[9] . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

### *(a)  Primary Duty of Management or Business Related Office Work*

Under the administrative exemption, an employee's "primary duty"[10] must consist of performing office or nonmanual work directly related to the management and general business operations of the employer.  29 C.F.R. § 541.200(a)(2).  Section 541.201(b) provides examples of "[w]ork directly related to management or general business operations":

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b).

---

[9] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.
[10] See supra, Section IV.C.2.a, for a discussion of the term "primary duty."

In order for work to be "directly related to the management or general business operations," it must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. § 541.201(a).  The concept of a "production worker" is not limited to individuals involved in the manufacture of tangibles.  Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-04 (3d Cir. 1991).  For example, in Martin v. Cooper, the Court of Appeals for the Third Circuit held inside[11] salespersons of electrical products to be production, rather than administrative, employees.  Id. at 903.

The administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they contribute to the running of the business itself.  Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1127 (9th Cir. 2002).  Thus, context matters: an underwriter at a department store who decides whether to issue credit to consumers "performs a support function auxiliary to the department store's primary function of selling clothes"; whereas, an underwriter for a large bank "is directly engaged in creating the 'goods'—loans and other financial services—produced and sold by [the bank]."  Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009).  Courts distinguish exempt administrative employees from nonexempt production employees who perform administrative tasks by determining whether the employees are engaged in the "running of the business and not merely . . . the day-to-day carrying out of its affairs."  Bratt v. Cnty. of Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990).

---

[11] An "inside" salesperson is an employee who makes sales inside his or her place of business, which contrasts with the outside salesperson, exempt under the FLSA, who must be "customarily and regularly engaged away from the employer's place of business."  29 C.F.R. § 541.500.

ERAC-New York argues that Biski was involved in many of the activities expressly identified in § 541.201(b), including marketing, accounting, safety and health, personnel management and human resources.  (Mem. Supp. Def. ELRAC's Mot. Summ. J. as to Pl. Joseph Biski ("ERAC-New York Br.") (ECF No. 244) at 20-23.)  ERAC-New York also argues that his fleet management responsibilities were administrative without specifically identifying which of the § 541.201(b) categories that work would fall under.  (Id.)  Biski argues that his office responsibilities were not sufficiently important to ERAC-New York and were merely the carrying on of its daily affairs.

To the extent ERAC-New York points to specific administrative job duties performed by Biski, many such duties were nonexempt.  For example, ERAC-New York argues that Biski's marketing and sales calls to customers and prospective customers were administrative tasks relating to marketing.  For a variety of reasons, the court is not persuaded that such actions, even if they were Biski's primary duty, would qualify as administrative under the regulations.  First, making sales calls is not an office task, and driving a vehicle to a prospective customer is more akin to manual work, such as operating machinery.  Second, making sales calls and salesmanship (which are distinct from marketing) are not listed as examples of exempt areas of work in § 541.201(b).  Third, the regulations provide a separate exemption for outside sales employees, which ERAC-New York did not raise as a distinct defense in this motion for summary judgment (but only as a component of the combination exemption).

With respect to ERAC-New York's argument that Biski's responsibilities in fleet management constituted administrative work, such work is not administrative because it does not amount to the running of the business; it is merely the carrying out of its day-to-day affairs. Biski's fleet management responsibilities amounted to participation in the production of ERAC-

40

New York's marketplace offering—rental cars—as opposed to performance of an auxiliary task directly related to the management of the business.  See 29 C.F.R. § 541.201(a); Davis, 587 F.3d at 535; Bothell, 299 F.3d at 1127; Bratt, 912 F.2d at 1070.

With respect to other tasks which ERAC-New York argues were administrative, there are genuine disputes about whether Biski performed those duties, the frequency of performance, and what the performance actually entailed.  These disputes include Biski's responsibilities in human resources and personnel management.  As discussed above with respect to the executive exemption, the court must accept Biski's testimony that his role in those tasks was incredibly limited, and that he generally did not participate in a meaningful way in running the ERAC-New York branches with respect to those aspects of the business.

More importantly, there is insufficient evidence to determine as a matter of law that the arguably administrative tasks performed by Biski constituted his "primary duty."  It is not the province of this court on a motion for summary judgment to determine which witness's testimony to credit and which to discredit, and the court cannot disregard the testimony of Biski that his primary responsibility in terms of time spent and importance to ERAC-New York was sales-related or involved physical labor.  Inside sales tasks and physical tasks are not within the ambit of the administrative exemption. Martin v. Cooper, 940 F.2d at 903-06.  Inside salespeople may be production employees.  Id.  ERAC-New York did not meet its burden of proving that Biski's primary duty was management– or business-related office or nonmanual work.

41

*(b)  Discretion and Independent Judgment and Matters of Significance*

To fall within the administrative exemption, an employee must "exercise . . . discretion and independent judgment with respect to matters of significance" as part of his or her primary duty.  29 C.F.R. § 541.200(a)(3).  The regulations consider the exercise of discretion and independent judgment to involve evaluation of options and subsequent decisionmaking.  Id. § 541.202(a).  Courts should determine whether an employee exercises discretion and independent judgment "in . . . light of all the facts involved in the particular employment situation in which the question arises."  Id. § 541.202(b).  When determining whether an employee exercises discretion and independent judgment with respect to matters of significance, courts should consider the following nonexhaustive list of factors:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id.

The FLSA "discretion and independent judgment" requirement can be satisfied even if the employee's decisions are reviewed or changed by a superior.  "[T]he term 'discretion and

independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review," but the employee's decisions "may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c).   For that reason, "[t]he fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." Id.   Employees can exercise discretion and independent judgment even when their recommendations are subject to review. Id.; accord Paul v. UPMC Health Sys., No. 09-1565, 2009 WL 699943, at *12 (W.D. Pa. Mar. 10, 2009).   Carrying out clerical duties, on the other hand, is not sufficient for administrative exemption, even if the duties involve a small amount of discretion.  See Goldstein v. Dabanian, 291 F.2d 208, 210-11 (3d Cir. 1961) (holding that employees, whose duties included cashing checks, accepting payments and issuing money orders, were not within the administrative exemption).

Here, ERAC-New York did not specifically address the factors enumerated in 29 C.F.R. § 541.202(b).   ERAC-New York instead argued generally that when Biski gave upgrades and discounts to unsatisfied customers, participated in employee evaluations, and determined which customers could rent cars, he was required to exercise independent judgment and discretion. (ERAC-New York Br. (ECF No. 246) at 26-28.)   None of these tasks reach the level of importance or consequence contemplated by the regulations as necessary to qualify an employee for the management exemption.  Section 541.202(b) gives examples of the types of a question a court should consider in this analysis, and suggests that the term "matters of significance" is a context-specific determination which "must be applied in the light of all the facts involved in the particular employment situation." 29 C.F.R. § 541.202(b).  It refers to "major assignments,"

"matters that have significant financial impact," and establishing policies and objectives for the company.  Id.  For the most part, Biski was bound by company policy, and did not deviate from it.  He was usually subject to the oversight of the person running the show or the branch manager.  The record reflects that Biski deferred to superiors when his branch manager was absent and he was presented with a difficult situation.  To the extent that he made discretionary decisions while he was running the show, those decisions were not significant enough, in the context of a car rental business, to meet the requirements of the regulations.  Minor deviations in rates for specific types of cars, and decisions about which cars to keep on which lots—the full extent of his independent discretion—are among the most mundane, least significant types of decisions made by employees at a car rental company.  Merely because he could damage the business if he made a mistake or acted recklessly in his duties does not establish that he has the requisite discretion to meet the administrative exemption.  29 C.F.R. § 541.202(f) ("An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.").

Resolving factual disputes in favor of Biski's testimony, the court finds that a reasonable jury could conclude that none of the enumerated factors listed in 29 C.F.R. § 541.200(a)(3) were proven. There are material facts in genuine dispute regarding both Biski's independence and his discretion.

For the reasons stated above, the court finds that there are genuine disputes with respect to material facts in two of the three § 541.200(a) elements of the administrative exemption. Because ERAC-New York has the burden of proving each element of the exemption, these genuine disputes preclude summary judgment on the basis of the administrative exemption.

### *4.  The Combination Exemption*

Under the FLSA regulations, an employee who performs a combination of exempt duties—but who does not satisfy the primary duty requirement under any of the stand-alone exemptions—may nonetheless qualify for exempt status.  29 C.F.R. § 541.708.   "[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption" so long as the other requirements, such as the salary basis test, are met.  Id.; accord IntraComm, Inc. v. Baja, 492 F.3d 285, 292-95 (4th Cir. 2007) (deferring to the Secretary of Labor's interpretation that "the combination exemption provides a mechanism for cobbling together different exempt duties for the purposes of meeting the primary-duty test" but "does not . . . relieve employers of their burden to independently establish the other requirements of each exemption whose duties are combined").  The primary thrust of the combination exemption, therefore, is merely that the performance of exempt executive work cannot be the basis for preventing an otherwise exempt administrative employee from being exempted because his primary duty is blended between executive and administrative work and vice versa.  Id.

Biski's testimony that he spent the majority of his time on nonexempt tasks, and the court's conclusion that a reasonable jury could conclude such nonexempt tasks constituted his primary duty preclude summary judgment on the basis of the combination exemption.

Conclusively, because ERAC-New York did not meet its burden with respect to other necessary elements of both the administrative and the executive exemptions—beyond merely failing to establish the primary duty element—the combination exemption is inapplicable to Biski.  See IntraComm, Inc. 492 F.3d at 292-95.   Thus, the court cannot grant ERAC-New

York's motion for summary judgment on the basis of the combination exemption, even if his

primary duty were found to be some combination of exempt administrative and executive tasks.[12]

### VI. Conclusion

For the reasons set forth in this memorandum opinion, because ERAC-New York did not

prove as a matter of law *all* the elements of at least one of the exemptions, and in consideration

of the relevant summary judgment standard and the narrowly construed FLSA exemptions,

ERAC-New York's motion for summary judgment against sample plaintiff Joseph Biski (ECF

No. 243) will be denied. Summary judgment is precluded by the abundance of disputed material

facts regarding Biski's job responsibilities, on which the court must defer to future resolution by

a jury.[13] An order will follow.

---

[12] ERAC-New York argues that the court should consider the time Biski spent marketing outside the branch as part of the combination exemption analysis, under the theory that it should be classified as exempt under the outside sales exemption, which was not raised as an independent defense. Because, as explained above, ERAC-New York failed to meet its burden with respect to necessary elements of both exemptions it did raise as independent defenses, the court need not consider the impact of the time spent on outside sales calls. Even if Biski's primary duty was a combination of executive, administrative and outside sales tasks, ERAC-New York needed to prove all other necessary elements of those exemptions—which it failed to do—in order to meet the requirements of the combination exemption.

[13] ERAC-New York also raised analogous exemption defenses to Biski's state law overtime claims in its motion, but did not independently address the state law issue. Instead, ERAC-New York noted in a footnote that the state exemptions are the same as the federal exemptions. (ERAC-New York Br. (ECF No. 244) at 25 n.4.) Based on that concession, the court will deny the motion for summary judgment with respect to ERAC-New York's state law defenses, in addition to the FLSA defenses, for the same reasons it denied the motion with respect to the FLSA defenses, which are set forth in this memorandum opinion.

By the court,


  /s/ Joy Flowers Conti
Hon. Joy Flowers Conti
United States District Judge


Date:  August 22, 2012